**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Email: tschneider@schneiderwallace.com
Email: jkim@schneiderwallace.com
Email: mweiler@schneiderwallace.com

**ROCHE FREEDMAN LLP**
Kyle W. Roche (*pro hac vice*)
Richard Cipolla (*pro hac vice*)
Jolie Huang (*pro hac vice*)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 970-7509
Email: kyle@rcfllp.com
Email: rcipolla@rcfllp.com
Email: jhuang@rcfllp.com

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
Bahar Sodaify (SBN 289730)
Yana Hart (SBN 306499)
Christina N. Mirzaie (SBN 333274)
9255 Sunset Blvd., Suite 804
Los Angeles, CA 90069
Telephone: (213) 788-4050
Email: rclarkson@clarksonlawfirm.com
Email: bsodaify@clarksonlawfirm.com
Email: yhart@clarksonlawfirm.com
Email: cmirzaie@clarksonlawfirm.com

**ROCHE FREEDMAN LLP**
Velvel Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 971-5943
Email: vel@rcfllp.com
Email: ceconomides@rcfllp.com

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAEEM SEIRAFI, EDWARD BATON, ANTHONY COMILLA, BRETT DEENEY, and ABRAHAM VILINGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEDGER SAS, SHOPIFY (USA) INC., and SHOPIFY INC.,<br><br>Defendants. | No. 21-cv-02470-EMC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1. NEGLIGENCE;<br>2. NEGLIGENCE PER SE;<br>3. DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF;<br>4. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq*.;<br>5. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CIVIL CODE SECTION 1750, *et sea.;* |

6. DECEIT BY CONCEALMENT,
   CALIFORNIA CIVIL CODE SECTIONS
   1709, 1710;
7. GEORGIA UNIFORM DECEPTIVE
   TRADE PRACTICES ACT, O.C.G.A.
   10-1-370 *et seq*;
8. GEORGIA FAIR BUSINESS
   PRACTICES ACT, O.C.G.A. 10-1-393 *et
   seq*;
9. NEW YORK DECEPTIVE TRADE
   PRACTICES ACT, N.Y. GEN. BUS.
   LAW SECTION 340, *et seq.*

Individually and on behalf of all others similarly situated, Plaintiffs Naeem Seirafi ("Seirafi"), Edward Baton ("Baton"), Anthony Comilla ("Comilla"), Brett Deeney ("Deeney"), and Abraham Vilinger ("Vilinger"), (collectively, "Plaintiffs"), bring this Action against Defendant Ledger SAS ("Ledger") and Defendants Shopify Inc., and Shopify (USA) Inc. ("collectively, "Shopify"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

I. **INTRODUCTION**

*"We know security means never standing still."*

-Ledger.

1. Plaintiffs seek redress for the substantial, Class-wide damages that Ledger's and Shopify's misconduct caused in connection with a massive 2020 data breach that those companies negligently allowed, recklessly ignored, and then intentionally sought to cover up. The breach has publicly leaked approximately 272,000 pieces of detailed personally identifiable information ("PII), including consumers' full names, email addresses, postal addresses, and telephone numbers.

2. With Shopify assisting as its e-commerce vendor, Ledger purports to provide "the highest level of security for crypto assets." Its primary products are hardware wallets ("Ledger wallets") that store the "private keys" of an individual's crypto-assets. These private keys are akin

to a bank-account password in that access to the private keys allows an individual to transfer one's crypto-assets. But unlike a bank-account transaction, crypto-asset transactions are non-reversible: whoever gains access to the private keys associated with a crypto-asset can then transfer or spend that asset with impunity. Ledger purports to provide owners of crypto-assets with the best security to protect private keys from hackers and other bad actors.

3.      Ledger's sale platform is built on security and trust. As Ledger describes, "we are a unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software." [1]

4.      Ledger thus knows that anonymity is necessary to protect against hacking attempts. Crypto-asset transactions are publicly visible on the underlying blockchain, but using solely public information, nefarious actors cannot identify the owner of particular crypto-assets. Without personally identifying information, hackers face an immense obstacle to targeting an individual's crypto-assets. Conversely, when a hacker knows the identity of a crypto-asset owner, the hacker can construct a workable attack catered to a target.

5.      Consequently, to the world of hackers, Ledger's customer list is gold. It is a list of people who have converted substantial wealth into anonymized crypto-assets that are transferrable without a trace. Using that list, hackers can manipulate or compel those owners to make untraceable and irreversible transfers of the crypto-assets into the hackers' accounts. The stakes of security for crypto-assets are thus enormous. With anonymity, owning a Ledger wallet is a cutting-edge method of securing crypto-assets. But without anonymity, owning a Ledger device simply creates a target for attackers.

6.      Ledger understands these realities and purports to account for them. As Ledger claims in its advertising: "If you don't want to get hacked, get a Ledger wallet." [2] Ledger advertises that it has the "highest security standards," that it "continuously look[s] for vulnerabilities on Ledger

---

[1] *See* Ledger. "We Are Ledger: A Brand Vision". November 22, 2019. https://www.ledger.com/we-are-ledger

[2] *See* Ledger, "Enjoy Security, Ownership and Ease of Use for Your Crypto with Ledger." https://www.ledger.com/ (accessed on June 3, 2021).

products as well as our providers' products in an effort to analyze and improve the security," and that its products provide "the highest level of security for crypto assets." Ledger has built a reputation of the highest possible trust, protection, and security for consumers. Based on Ledger's advertising claims, consumers expect that their personal data, along with their cryptocurrency assets, will remain anonymous, secure, and private. With that expectation, consumers specifically seek out the products and services provided by Ledger. True and correct screenshots of Ledger's advertising claims on its website are depicted below:



# The highest security standards

### The first & only certified hardware wallet on the market

Ledger is the first and only certified hardware wallet on the market, certified for its security by ANSSI, the French cyber security agency.

### Integrates a Secure Element (SE), the most secured chip

Ledger hardware wallets integrate a certified chip, designed to withstand sophisticated attacks, and capable of securely hosting cryptographic data such as private keys.

### The only device with a custom Operating System for more protection

Ledger wallets are the only hardware wallet to have their own custom OS (BOLOS) to protect the device against malicious attacks and isolate applications from each other.

### Genuine check to assure your device integrity at all time

The genuine check developed by Ledger is an authentication ensuring that your Ledger device has not been tampered with or compromised by a third party.

### Key takeaways

– Ledger hardware wallet, combined with the Ledger Live application, is the best solution to secure and control your crypto assets
– Ledger hardware wallets are designed with the highest security standard to keep your crypto secure at all time
– Ledger Live app is the one-stop-shop for your crypto: buy, sell, exchange, stake and lend your assets with our partners, easily & securely
– With Ledger you can secure and manage a wide range of crypto assets – 1500+ crypto assets supported
– The most popular hardware wallets: more than 2 millions units sold all over the world

≡ Ledger   Products ⌄   Downloads   Learn ⌄   Crypto Assets   For Busine

People have always protected what they hold precious. When things were tangible, trust was visible.

But that world has changed.

Today, we're at the confluence of two global trends: a global trust crisis and global dataisation. In 15 years, there will be a trillion devices connected online. As more and more of our lives become digital, the threats we face won't be stopped by walls or physical armies.

Critical digital assets are the new oil and securing them is the most important challenge for the coming years.

**That's where we come in. We are Ledger.**

We are a unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software. And in today's world, we know that trust deserves proof. This is why we provide transparency in how our technology works.

We relentlessly stress-test our own technology solutions. Our Ledger Donjon team is made up of world-class experts with extensive backgrounds in the security and smartcard industries. They continuously look for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security. We know security means never standing still.

What first started as an idea of building a secure element chip to safeguard digital assets for crypto enthusiasts has quickly evolved into the creation of a cutting edge security technology company serving individuals, institutional investors and enterprises. This goes beyond just crypto and bitcoin. From connected pacemakers to water supply systems to electric grids, there will be countless critical digital assets in the future that need security. If they're not safe, they can be stolen or compromised, eventually hurting your wallet or even your life.

And through resilience, we give our clients and customers the ability to recover from setbacks, quickly adapt to change and keep going in the face of adversity. Resilience empowers our clients to explore and embrace pioneering opportunities like never before.

Ledger enables resilience through verifiable trust. Knowing trust is the greatest way to make our world truly move forward and progress.

**We are Ledger. Resilience by design.**



‹ › | ⊡ |   🅰️⊞ ☷ ⌖ ⬭ ⌂ shop.ledger.com ↻   ⊕ ⬆ ⊡ +

Warning: Due to Brexit, shipments to UK take longer than usual.

≡ Ledger   Products ⌄   Downloads   Crypto assets   Get started ⌄   For Business ⌄   Support   🛒

**How do we secure personal data?**

In order to ensure the integrity and confidentiality of your personal data, we implement appropriate physical, electronic and organizational procedures to safeguard and secure personal data throughout our Services.

In particular, Ledger implements necessary technical and organizational measures, in order to ensure the security and confidentiality of your personal data collected and processed, and particularly, to prevent your personal data from being distorted, damaged or communicated to unauthorized third parties, by ensuring an appropriate level of security with regards to the risks associated with the processing and the nature of the personal data to be protected.

We notably implement the following security measures, among others:

- Payment Data security: If you provide us with credit card information, such information is encrypted using a secure Internet Trade Protocol (TLS) and sent directly to our Payment Service Provider (PSP). This information is never stored on our server.
- Awareness program and employee trainings
- Data encryption in transit and at rest
- Data centers routinely audited
- Data redundancy for resilience in case of disasters
- Role-based authentication
- Two-factor authentication of our authorized employees
- Continuous system monitoring
- Industry-standard security evaluations
- Independent third-party security reviews and penetration tests

While we endeavor to provide best-in-class protection for your personal data when you use our Services, please keep in mind that the transmission of information on the Internet is not fully secure.

FIRST AMENDED CLASS ACTION COMPLAINT

7.      Despite its repeated promises and world-wide advertising campaign touting state of the art security for its customers, Ledger repeatedly and profoundly failed to protect its customers' identities, causing targeted attacks on thousands of its customers' crypto-assets and causing Class members to receive far less security than they thought they purchased with a Ledger wallet.

8.      In mid-2020, between April and June, hackers found and exploited a database vulnerability at Ledger and its e-commerce vendor, Shopify, to obtain a list of Ledger's customers, as well as email addresses and other contact information. By June 2020, Ledger's customer list had made its way onto the internet's black market, making Ledger wallet owners vulnerable.

9.      The circumstances grew much worse over the next six months. From June 2020 through December 2020, at least one of the hackers who had acquired the data published it online, providing over 270,000 names, physical addresses, phone numbers, and order information to every hacker in the world. As a direct result, the attacks on Ledger's customers grew exponentially, with customers losing money, facing threats of physical violence, and even feeling vulnerable in their own homes. Indeed, using the customer shipping addresses that Ledger and Shopify had failed to protect, hackers threatened to enter the homes of and attack Ledger customers unless those customers made untraceable ransom payments with the crypto-assets Ledger was supposed to secure.

10.     In the face of these obviously emergent circumstances, rather than acting to protect its customers, Ledger stood still. It did not even inform its customers of the breach. Instead, it initially denied that any breach had occurred and continued to claim its products provided the best possible protection for crypto-assets. As the customer list began to spread on the dark web, Ledger admitted the existence of the breach but nevertheless disputed its publicly-reported scope.

11.     By December 21, 2020, however, Ledger could no longer cover up the data breach that it had known about for at least 6 months. On that day, the hacked customer list was posted publicly and became widely available. In a message posted on its website from its CEO, Ledger finally admitted to the scope of the attack, stating that the company "very deeply regret[s] this situation." Ledger's CEO further acknowledged that, as a result of the hack, "many [Ledger

customers] have been targeted by e-mail and SMS phishing campaigns and that it's clearly a nuisance."

12.     Ledger's and Shopify's misconduct, failure to prevent the data breach, and failure to take action for six months (if not longer), has made targets of Ledger customers, with their identities known or available to every hacker in the world. Ledger's persistently deficient response compounded the harm. In failing to individually notify every affected customer or admit to the full scope of the breach, Ledger left customers unaware of the data breaches and concomitant hacking risks. The natural and foreseeable result was that many customers fell victim to hackers' phishing emails disguised as emails from Ledger.

13.     Ledger's deficient response to the data breach included a failure to provide any support for customers who had been targeted by the breach or who feared they would be targeted in the future. Users are informed that "Ledger does not provide phone support." Instead, customers are directed to contact Ledger by submitting a written complaint in an online form or by email, to which Ledger would respond after weeks (if it responded at all). Following the December breach, customers reported emailing Ledger dozens of times with no response. Users reported through Twitter that they submitted customer service requests that went unanswered for several weeks, several months, and hundreds of days. Ledger acknowledged its deficient response times, claiming after the breach "[w]e are facing an increase in requests which may result in a longer reply time from Ledger Support. We apologize for the delay while we work to provide you the best service."

14.     But Ledger never provided "the best service." It did not even provide a minimum level of service. Instead, Ledger had become the primary source of vulnerability to owners of crypto-assets and then left those customers without the help they needed. For those seeking to secure crypto-assets, it had become safer to have never purchased a product or service from Ledger. And all the while, Ledger stood still. Thus, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and complete lack of timely customer support, Ledger customers would not have purchased Ledger wallets or would not have paid as much as they did for Ledger wallets.

15.     On behalf of the Class and several Subclasses of Ledger customers affected by the data breach described herein, Plaintiffs seek, under state common law and consumer-protection statutes, to redress Defendants' misconduct occurring from April 1, 2020, to the present (the "Class Period").

**II.     PARTIES**

**Plaintiffs**

16.     **Plaintiff Seirafi** is an individual residing in Los Angeles, California. Seirafi purchased the Ledger Nano X for use as a digital wallet to control his cryptocurrency assets. On or around March 2019, Seirafi saw advertisements online for Ledger's services and hardware. Relying on Ledger's representations, Seirafi purchased the Ledger Nano X hardware wallet from Ledger's official website for approximately $120. In doing so, Seirafi was required to provide Ledger with his first and last name, email address, telephone number, and postal address. In making his purchase decision, Seirafi reasonably relied upon the data security services advertised by Ledger, believing Ledger's corresponding services to be safer, better protected, and more secure as a result. Seirafi would not have purchased the Ledger Nano X if he knew that the sensitive information collected by Ledger would be at risk. Seirafi has suffered damages and remains at a significant risk now that his PII has been leaked online.

17.     **Plaintiff Baton** is a resident of Georgia. In July 2017, he purchased a Ledger Nano S from the Ledger online store for use as a digital wallet to control his cryptocurrency assets. He subsequently purchased a second Ledger Nano S from the Ledger online store. In making those purchases, he reasonably relied on Ledger's misrepresentations about the security of its products. He would not have purchased the products if he had known that his sensitive information collected by Ledger would be at risk or that his purchase would become public knowledge. On December 21, 2020, Ledger informed him that his data had been part of a breach. Baton has suffered damages from the breach as set forth below.

18.     **Plaintiff Comilla** is a resident of Albany, New York. Comilla purchased the Ledger Nano X from the Ledger online store for use as a digital wallet to control his cryptocurrency assets on or about June 2, 2020. In doing so, Comilla was required to provide Ledger with his first and last

name, phone number, postal address, and email address. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products, believing that that Ledger Nano X was his safest and best option for storing his cryptocurrency. Comilla would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Comilla has suffered damages from the breach as set forth below.

19.     **Plaintiff Deeney** is a resident of London in the United Kingdom. Deeney purchased a Ledger "Back-Up Pack," consisting of a Ledger Nano X and a Ledger Nano S, on or about February 21, 2020 through Ledger's official website for € 114.16 (excluding tax) for use as a digital wallet to control his cryptocurrency assets. In doing so, Deeney was required to provide Ledger with his first and last name, the email address he used exclusively for crypto-asset transactions, his telephone number, and his postal address including unit number. In making his purchase, he reasonably relying on Ledger's misrepresentations about the security of its products. Deeney would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Deeney has suffered damages from the breach as set forth below.

20.     **Plaintiff Vilinger** is a resident of Tel Aviv, Israel. Vilinger purchased the Ledger Nano S from the Ledger online store for use as a digital wallet to control his cryptocurrency assets on or about January 15, 2018. In doing so, Vilinger was required to provide Ledger with his first and last name, phone number, postal address, and email address. In making his purchase, he reasonably relying on Ledger's misrepresentations about the security of its products, believing their ads and website that indicated the Ledger Nano S was a "cold" offline, secure, and not hackable wallet. Vilinger would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Vilinger has suffered damages from the breach as set forth below.

## **Defendants**

21.     Defendant Ledger SAS is a French simplified joint-stock company headquartered in Paris, France. Ledger SAS maintains its principal place of business at 1 Rue du Mail, 75002 Paris, France. It also has offices located at 121 2nd St., #4, San Francisco, CA 94105.  Defendant Ledger SAS offers the hardware wallet Products to secure and control cryptocurrency assets on an online

international marketplace, including the State of California. Ledger SAS directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Ledger SAS is the owner and distributor of the products at issue, was entrusted with the PII of Plaintiff and the Class, and is the company that created and/or authorized the false, misleading, and deceptive advertisements and promises (jointly and severally with Ledger Technologies, Inc.).

22.     Third party Ledger Technologies Inc. is a wholly-owned subsidiary and agent of Ledger SAS. It is incorporated in Delaware, is registered to do business in California, and, at the time of the breach, was headquartered in San Francisco, California and has a principal place of business located at 121 2nd St #4, San Francisco, California 94105.

23.     Defendant Shopify Inc. is a Canadian Corporation with offices at 151 O'Connor Street, Ground floor, Ottawa, Ontario, K2P 2L8.

24.     Defendant Shopify (USA) Inc. is a Delaware corporation and registered to do business in California. Up until a week before it announced the data breach, its principal place of business was in San Francisco, California. It now lists Ottawa, Canada as its principal place of business. It is a wholly-owned subsidiary of Shopify Inc. The Shopify entities had access to Ledger's customer's private information and failed to secure the received PII or implement any security measures or even screening measures to ensure that its agents, support representatives, and other individuals to whom Shopify entrusted the private PII data would ensure secure handling of the data.

## III.     JURISDICTION AND VENUE

25.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, there are more than 100 class members, and the matter is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

26.     This Court has personal jurisdiction over all parties because all Defendants conduct business in the State of California, and the substantial events leading up to the breach at issue have occurred in California.

27.     Shopify (USA) Inc. is registered to do business in California, and for the vast-majority of the relevant time period, listed a California address as its principal place of business.

28.     Similarly, Ledger SAS's agent, Ledger Technologies, is registered to do business in California has a substantial office at 121 2nd St #4, San Francisco, California 94105.

29.     Ledger SAS dominates and controls Ledger Technologies' internal affairs and daily operations. Not only is Ledger Technologies a wholly-owned subsidiary of Ledger SAS, but there is substantial overlap among their executives. For example, the Chief Executive Officer ("CEO") of Ledger Technologies is Pascal Gauthier, who is also the Chairman and CEO of Ledger SAS. Ledger Technologies' secretary is listed as Antione Thibault, who is the general counsel of Ledger SAS. Ledger Technologies' Chief Financial Officer ("CFO") is the CFO of Ledger SAS. Though Ledger SAS is not registered to do business in California, it boasts that it has employees in "Paris, Vierzon, and San Francisco" without differentiating between the two entities.

30.     Shopify Inc. dominates and controls Shopify (USA) Inc.'s internal affairs and daily operations. Not only is Shopify (USA) a wholly-owned subsidiary of Shopify, but as in Ledger's case, there is a substantial overlap among its executives. Shopify (USA)'s CEO and CFO is Amy Shapero—the CFO of Shopify. The Secretary of Shopify (USA) is Shopify's Chief Legal Officer. In addition, Shopify's job listings notes that it will "hire you [ ] anywhere" as long as it has "an entity where you are." That is, Shopify does not differentiate between its entities for any job responsibilities and thus does substantial business through the American employees it hires through its subsidiary formerly located in California.

31.     This Court also has personal jurisdiction over Shopify and Shopify (USA) because they solicit customers and transact business in California, including with Ledger and those who purchased products or services from Ledger.

32.     This Court also has personal jurisdiction over Ledger SAS because it solicits customers, including Plaintiffs and Class members, in the United States and California. In fact, 33% of the compromised two hundred and seventy-three thousand accounts with address information belonged to Class members with U.S. addresses. This Court also has personal jurisdiction over Ledger SAS because Shopify (USA) acted as that entity's agent for the conduct giving rise to

FIRST AMENDED CLASS ACTION COMPLAINT

12

1   Plaintiffs' claims. With respect to the breached data of Ledger SAS's customers, the responses to

2   the breaches, and the conduct giving rise to Plaintiffs' causes of action, Ledger SAS had the right

3   to control the conduct of Shopify, which acted as Ledger's agent and was authorized to act on Ledger

4   SAS's behalf with respect to Ledger's customers.

5   **IV.   FACTUAL ALLEGATIONS**

6     **A. Bitcoin and Crypto-Assets**

7      33. A crypto-asset is a digital asset designed to work as a medium of exchange or a store

8   of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions,

9   control the creation of additional units, and verify the transfer of the underlying digital assets.

10      34. Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most

11   popular crypto-asset, with a market capitalization of approximately $1.08 billion. Bitcoin spawned

12   a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of

13   approximately $1.94 trillion. (The term "bitcoin" can refer to both a computer protocol and a unit

14   of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol and software, and

15   the term "bitcoin" to label the units of exchange.)

16      35. At its core, Bitcoin is a ledger of addresses and transfer amounts that tracks the

17   ownership and transfer of every bitcoin in existence. This ledger is called the blockchain. The

18   blockchain is completely public.

19      36. Blockchains act as the central technical commonality across most crypto-assets.

20   While each blockchain may be subject to different technical rules and permissions based on the

21   preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

22      37. In April 2013, there were only seven crypto-assets listed on coinmarketcap.com, a

23   popular website that tracks the crypto-asset markets. As of this filing, the site monitors more than

24   9,112 crypto-assets.

25       i. Transacting with Bitcoin and Blockchain Addresses

26      38. Because all blockchain addresses and transfers are public, the way to verify

27    ownership of an address is through the use of public and private keys.

28

39.     Each address has one public key and one private key associated with it. With the private key, one can control the address and can move bitcoin in or out of the account. The public key is more like a digital signature that is used to verify ownership and transfers of funds. The blockchain address, public key, and private key are often mathematically related to one another.

40.     The private key is, however, the only mechanism that allows for the transfer of crypto-asset. With the private key—and nothing more—a person can implement an untraceable transfer of the crypto-asset from one digital address to another. Without the private key, the crypto-asset can never be transferred. In other words, anyone with the private key has total control over the funds. Thus, to safeguard crypto-assets, one must keep the private key private.

ii.     Security and Crypto-Assets

41.      It is the cryptographic principals behind the use of public and private keys that give crypto-assets their name. Cryptography is at the heart of blockchain transactions, and security is one of the chief advantages and selling points of the technology.

42.     Nonetheless, since the inception of crypto-assets, there have been high-profile hacks to steal them. One of the first large Bitcoin exchanges (handling over 70% of all Bitcoin transactions at the time) lost a staggering 850,000 bitcoins to theft, with a value exceeding $49 billion USD today.

43.     It has been estimated that over $4 billion crypto-assets were lost to theft and related crimes in 2019.[3] That risk of theft continues today.

44.     Because it is nearly impossible to guess a user's private key, hackers employ various methods to gain access to private keys. Once a hacker obtains the private key for an address, the hacker controls its funds. Unlike traditional accounts housed at banks, there are no approvals or fraud monitoring warnings for moving crypto-assets out of an account. Moreover, any transfer is effectively untraceable and irreversible, leaving the recipient immune from identification or claw-back.

---

[3] Jeb Su, *Hackers Stole Over $4 Billion From Crypto Crimes In 2019 So Far, Up From $1.7 Billion In All Of 2018*, FORBES (Aug. 15, 2019, 01:49 PM EDT), https://www.forbes.com/sites/jeanbaptiste/2019/08/15/hackers-stole-over-4-billion-from-crypto-crimes-in-2019-so-far-up-from-1-7-billion-in-all-of-2018/?sh=42ef46855f58.

45.     Given this constant threat of theft, security over an individual's private keys is paramount.

**B.  Ledger and Hardware Wallets**

46.     Ledger is a $300-million[4] corporation that is used world-wide for its unique hardware cryptocurrency wallets that allow consumers to secure and manage their cryptocurrency assets. Ledger's line of hardware security devices quickly gained in popularity and positioned Ledger as a global leader in the market with 1,000,000 units sold in more than 165 countries. Ledger designs and sells the Ledger Nano X and the Ledger Nano S, both hardware wallets, along with a corresponding application and other services for consumers to control and track their assets. Ledger advertises that its technologies constitute a "unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software."

47.     As set forth above, Ledger offers solutions to consumers to keep their crypto-assets safe. Ledger's main product offerings are "hardware wallets." These are physical consumer items that appear similar to a USB storage device. This is an example of a Ledger hardware wallet:



48.     Despite being named a "wallet," such wallets do not "hold" cryptocurrency in the way a traditional wallet stores cash. Rather, consumers store their private keys on these physical devices, which are never connected to the internet (at least in the case of Ledger's products).

---

[4] *See* Business & Finance. "Bitcoin wallet maker Ledger raises $75M investment." January 2019. https://businessandfinance.com/news/bitcoin-wallet-maker-ledger-75-million-dollars-investment/

49.     The wallet itself can be accessed only by entering a PIN. Simply misplacing the wallet thus poses no risk of theft.

50.     Ledger also produces "Ledger Live," a software product designed to interact with devices. This screenshot shows its core functionality, in that a user can use the software to buy, sell, send, and receive various crypto-assets:



51.     Ledger has been highly successful selling these devices and services. Having raised $88 million in funding, it is one of the market leaders for crypto-asset security.

52.     Ledger collects and processes the personal data of all consumers who purchase Ledger products, including, but not limited to, first and last names, e-mail addresses, post addresses, and telephone numbers.

53.     This PII was collected by Ledger when Plaintiff and the Class purchased the Products. Ledger's privacy policy, which was updated on July 28, 2020, outlines the security

measures used to protect consumer's PII and what this information is used for. [5] Under the privacy policy, Ledger claims to implement:

> "[N]ecessary technical and organizational measures, in order to ensure the security and confidentiality of your personal data collected and processed, and particularly, to prevent your personal data from being distorted, damaged or communicated to unauthorized third parties, by ensuring an appropriate level of security with regards to the risks associated with the processing and the nature of the personal data to be protected."

### i. Hacking Hardware Wallets

54.     Users of hardware wallets generally face discrete risks of theft by hacking because private keys exist only where the owners store them. If an owner stores the private keys only on a hardware wallet with no internet connectivity—and not on a personal computer—then traditional hacking cannot reveal those private keys. Instead, the main sources of risk are: (1) "phishing" attacks to trick a user into revealing the private PIN to their hardware wallet; or (2) physical intimidation that forces users into paying money or revealing that information to a hacker.

55.     Phishing is the practice of purporting to be a legitimate institution and contacting targets with the goal of soliciting passwords, banking information, or other sensitive information. Common examples of this practice include mass spam emails sent to mimic the look and feel of a banking website. The email recipient receives the email, believes she needs to link to the account to update information, clicks a link in the email that goes to a sham website made to look like the real bank website, and enters real login information into the sham website. The owners of the sham website then possess that victim's real banking login and password.

56.     Internet users are becoming more and more savvy to phishing, however, requiring hackers to craft attacks that are increasingly realistic and personalized and less reliant on large-scale mass efforts.

---

[5] See Ledger. "Privacy Policy". Last Updated July 28, 2020.
https://shop.ledger.com/pages/privacy-policy

FIRST AMENDED CLASS ACTION COMPLAINT

17

57.     Phishing attacks are also generally harder to accomplish against Ledger users, who are typically more skeptical and security conscious and, in turn, savvier to phishing practices. For example, Ledger users will commonly create special email addresses used just for interacting with accounts that manage their crypto assets. And Ledger users will often have a separate dedicated phone number to use for dual-factor authentication when interacting with their crypto assets. [6] These dedicated email addresses and phone numbers add another layer of protection to avoid phishing attacks. Users know that crypto-asset-related emails, texts, or calls to any "main" email address or phone number are illegitimate.

58.     Similarly, using a separate phone number can protect users from other attacks, such as SIM swap attacks. [7] A SIM swap attack occurs when an attacker gains control of an individual's phone number by convincing the individual's mobile carrier to switch it to a new SIM card—one that the attacker possesses. Once attackers gain control of that phone number, they can then bypass dual-factor authentication requirements.

59.     Plaintiff Baton—who has a professional background, including in technology—was as savvy as anyone buying crypto assets and hardware wallets as far back as 2017. Accordingly, in addition to buying multiple Ledger products for storing his crypto assets, Plaintiff Baton took other precautions. For example, he acquired a separate mobile phone and always interacted with crypto assets using a virtual private network to encrypt communications and shield his IP address.

60.     Similarly, Plaintiff Deeney is an experienced, sophisticated, and security-savvy crypto asset investor. He used a dedicated email address for his crypto asset transactions.

61.     As to physical intimidation, even the savviest internet user cannot insulate himself from such threats. A hacker can contact an owner of crypto-assets and threaten the owner with physical violence unless an effective ransom is paid (usually in the form of an untraceable transfer

[6] Dual authentication is a method in which a user is granted access to some system or device only after successfully presenting two or more pieces of evidence of rightful access, such as unique knowledge (*e.g.*, a password) or unique possession (*e.g.*, a key).

[7] SIM stands for "subscriber identification module," and a SIM card is a physical circuit that is used to securely store the unique identifier of any user on a cellular network.

of crypto-assets transfer to the hacker). These threats are rare. Without knowing an owner's home address, physical location, or even phone number, a hacker would have difficulty making a credible threat prompting payment from the victim. And hackers cannot identify viable targets by simply looking up publicly listed names, phone numbers, and addresses. Crypto-assets have not yet been widely adopted; therefore, attackers have no way of knowing whether would-be targets own crypto-assets or hardware wallets. In addition, for owners of crypto-assets, there is no analog for the physical bank ATM—where would-be attackers could potentially wait, identify victims with funds, and intimidate those victims.

62.     For these reasons, the single greatest point of vulnerability for owners of Ledger wallets is public disclosure of the information that a particular person owns the wallet. If hackers know the names and/or email addresses of people who own Ledger wallets, then hackers can target those people with sophisticated phishing schemes and tailored threats.

63.     Accordingly, by operating in the crypto-asset security space, Ledger places itself between user's funds and would-be hackers. The anonymity of its customer list is a key and obvious element of the security that Ledger offers. By analogy, a manufacturer of state-of-the-art lock safes would not publish its customer list, which is valuable to would-be thieves seeking to identify targets possessing high-value items. Similarly, public disclosure of Ledger's customers puts those individuals in the crosshairs of the very hackers the company seeks to impede.

64.     Furthermore, personally identifiable information, such as names and email addresses, may be combined with other sources of information to de-anonymize Ledger account holders. Not only may this information be used, as it was here, to create sophisticated "phishing" attacks, but it may also be used to de-anonymize user wallets and (through analysis of blockchain data) individual transactions.

65.     A great deal of information about Plaintiffs and Class Members is already available on the dark web. The availability of Plaintiffs' and Class Members' content and information on the dark web imposes further uncompensated costs on those individuals. The dark web permits criminals further access to users' content and information that make the thefts that occurred here more easily accomplished.

66.     As reported by CBS News, "The little drips of personal data leaked from every major data breach—your name, email, phone number, Social Security number, and mailing address—pool in a murky corner of the internet known as the dark web. Some of these leaks might seem relatively insignificant, but criminals exploit your personal data for profit and to help other criminal operations prosper. The dark web is where these transactions happen."

67.     The content and information exposed in the Ledger data breach certainly amplified the value of information already available on the dark web. On the dark web, "personal information was mixed in with wholesale data dumps of information about thousands of people," allowing the information be aggregated into "packages" that have street value.

> ii.    Ledger Advertises State-of-the-Art Security for Crypto-Assets

68.     Ledger's consistent message to consumers is that Ledger wallets offer the best possible protection for crypto-assets. Their tagline embodies this value proposition: "If you don't want to get hacked, get a Ledger wallet." Ledger represented to consumers, prior to the data breach at issue, the following:

> Critical digital assets are the new oil and securing them is the most important challenge for the coming years.
>
> That's where we come in. We are Ledger.
>
> We are a unique digital security ecosystem that provides protection and is *built on verifiable trust across our people, hardware and software.* And in today's world, we know that trust deserves proof. This is why we provide transparency into how our technology works.
>
> *We relentlessly stress-test our own technology solutions.* Our Ledger Donjon team is made up of world-class experts with extensive backgrounds in the security and smartcard industries. *They continuously look for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security. We know security means never standing still.*

(emphasis added).

69.     Ledger further and publicly asserted, prior to the data breach at issue:

- "At Ledger we are developing hardware wallet technology that provides the highest level of security for crypto assets;"

- "Ledger hardware wallet, combined with the Ledger Live application, is the best solution to secure and control your crypto assets;"

FIRST AMENDED CLASS ACTION COMPLAINT
20

- "Ledger hardware wallets are designed with the highest security standard to keep your crypto secure at all time;"

- "Ledger enables resilience through verifiable trust. Knowing trust is the greatest way to make our world truly move forward and progress."

70.    Ledger also republished, prior to the data breach at issue, acknowledgments from reputable third-party commentators:

- "French Crypto Wallet Ledger Is Solving Bitcoin's Biggest Flaw" (as featured in Forbes);

- "Ledger makes sure private keys never become accessible to thieves, online or anywhere else" (as featured in Bloomberg);

- "Ledger removes the risk of being hacked" (as featured on CNBC).

71.    Through those statements, Ledger conveyed to consumers that Ledger wallets, coupled with Ledger's services, provide the highest standard of security for owners of crypto-assets. Ledger further conveyed that it was tirelessly assessing its wallets and supporting services for vulnerabilities, while adapting to protect against those threats. By buying a Ledger wallet, consumers purportedly were buying into a comprehensive security support system that maximized protections against threats to crypto-assets.

72.    Making the forgoing, unequivocal representations, Ledger sold Class members the Ledger Nano X wallet for $119 and the Ledger Nano S wallet for $59. Class members would not have purchased these products at all, or would have paid significantly less for them, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and failure to provide timely customer support.

iii.    Ledger Uses Shopify as an E-commerce Vendor

73.    Ledger sells its Nano products through a number of distributors, including retailers like Amazon and Walmart. It also sells directly to consumers through https://shop.ledger.com/ (the "Shopping Website").

74.     Shopify powers Ledger's Shopping Website. Shopify is an e-commerce giant. Over one million businesses use its platform, and over $61 billion of sales occurred on its platform through these businesses in 2019. It is the largest publicly-traded company in Canada.

75.      Shopify's success is based on providing services to allow companies to easily operate online stores. Shopify provides e-commerce solutions for businesses to allow them to easily create digital storefronts. For example, Shopify allows you to create a well-designed web layout, provides a payment provider to accept credit card payments, and makes various profit and inventory applications available. These solutions are essentially a software product that companies subscribe to in order to host digital stores.

76.     When users purchase directly from Ledger on its Shopping Website, they must provide certain personal information before placing an order, such as their physical address, phone number, and email address. Because Ledger uses Shopify's services, Shopify acts as an intermediary between Ledger and purchasers of Ledger's products. Therefore, Shopify also has access to the personal information that purchasers provide.

77.     Shopify's terms of service obligate it to "take all reasonable steps" to protect the disclosure of confidential information, including "names, addresses and other information regarding customers and prospective customers."

**C.   The Ledger Data Breach**

78.     In mid-2020, between April and June, certain Shopify employees took advantage of Shopify's access to the personal information of Ledger's customers and acquired and exported Ledger's customer transactional records (the "Data Breach"). The Shopify employees also obtained data relating to other merchants.

79.     On September 22, 2020, Shopify announced that: (1) "two rogue members of our support team were engaged in a scheme to obtain customer transactional records of certain merchants;" (2) the "incident involv[ed] the data of less than 200 merchants;" and (3) "Our teams have been in close communication with affected merchants to help them navigate this issue and address any of their concerns." This announcement made it clear that Shopify was aware of the data breach before the day of the announcement and even had time to "conduct an investigation" and

notify affected merchants. On information and belief, Shopify knew of the data breach more than one week before.

80.      On information and belief, those rogue employees were located in America, as immediately after noting that the employees' access was terminated, Shopify's statement highlighted its compliance with *American* (rather than Canadian) legal authorities in stating that it was "currently working with the FBI and other international agencies." To the extent these employees were American, they were most probably employed by its California office.

81.      On February 19, 2021, moreover, a federal grand jury indicted a California man for wire fraud for his role in causing the data beach. The indictment alleges that starting in May 2019, he paid an employee of a Shopify vendor to provide him with Shopify's merchant data. The unnamed vendor acted as Shopify's agent, providing customer support services to Shopify customers on its behalf.

82.      The Data Breach in fact involved the data of approximately 272,000 people,[8] approximately a third of whom live in the United States.[9] Hackers copied information such as names, order details, email addresses, physical addresses, and phone numbers.[10] And for many more users, hackers obtained the email address users used when buying their Ledger.[11]

83.      By the time it publicly announced the breach, Shopify notified every affected merchant that rogue employees had stolen their data, but neither Shopify nor Ledger warned the hundreds of thousands of vulnerable Ledger customers harmed by the Data Breach. Instead, as the timeline below explains, Ledger attempted to cover up and downplay the scale of the Data Breach, while Shopify did nothing to protect the owners of the data Shopify had failed to secure.

---

[8] *E-commerce and Marketing data breach – FAQ*, LEDGER, https://support.ledger.com/hc/en-us/articles/360015559320-E-commerce-and-Marketing-data-breach-FAQ (last visited Apr. 5, 2021).

[9] Larry Cermak, *A detailed look at the Ledger data leak and other recent incidents*, THE BLOCK (Dec. 21, 2020, 9:49 AM EST), https://www.theblockcrypto.com/genesis/88706/a-detailed-look-at-the-ledger-data-leak-and-other-recent-incidents.

[10] *Id.*

[11] *Id.*

i.   April – June 2020: Ledger Initially Denies the Data Breach

84.   In May 2020, public rumors arose concerning the Data Breach. The rumors were that Ledger's consumer information from Shopify had been hacked.[12]

85.   This publicly-stated concern was an opportunity for Ledger to get ahead of the problem. Ledger should have, at a minimum: (1) disclosed the breach; (2) notified all impacted and potentially impacted users; (3) offered services to help impacted users transition to new accounts; (4) monitored for suspicious transactions; (5) hired third-party auditors to conduct security testing; (6) trained employees to identify and contain similar breaches; and (7) trained and educated their users about the threats they faced.

86.   Instead, Ledger's immediate reaction was to deny that there was a breach impacting Ledger's customers. Ledger falsely stated that "**Rumors pretend** our Shopify database has been hacked through a Shopify exploit. Our e-commerce team is currently checking these allegations by analyzing the **so-called** hacked [database], and so far **it doesn't match** our real [database]. We continue investigations and are taking the matter seriously."[13] During this time, the risks and damages to Ledger's customers were only increasing; a prompt and proper response from Ledger, including full disclosure to all customers, would have mitigated those risks and damages.

ii.   July 2020: Ledger Admits the Data Breach Occurred, but Downplays Its Scale

87.   On July 29, 2020, Ledger made partial admissions that exacerbated, rather than mitigated, the harm caused by the Data Breach.

---

[12] Jamie Redman, *Hacker Attempts to Sell Data Allegedly Tied to Ledger, Trezor, Bnktothefuture Customers*, BITCOIN (May 24, 2020), https://news.bitcoin.com/hacker-attempts-to-sell-data-allegedly-tied-to-ledger-trezor-bnktothefuture-customers/.

@UnderTheBreach, TWITTER (May 24, 2020, 03:39 AM) https://twitter.com/underthebreach/status/1264460979322138628?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1264460979322138628%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fnews.bitcoin.com%2Fhacker-attempts-to-sell-data-allegedly-tied-to-ledger-trezor-bnktothefuture-customers%2F.

[13] @Ledger, TWITTER (May 24, 2020 06:39 AM), https://twitter.com/Ledger/status/1264506360735174657.

88.     After researchers informed Ledger of a potential data breach on its website, Ledger announced that its marketing and e-commerce database had been exposed in June 2020:

> **What happened**
> On the 14th of July 2020, a researcher participating in our bounty program made us aware of a potential data breach on the Ledger website. We immediately fixed this breach after receiving the researcher's report and underwent an internal investigation. A week after patching the breach, we discovered it had been further exploited on the 25th of June 2020, by an unauthorized third party who accessed our e-commerce and marketing database – used to send order confirmations and promotional emails – consisting mostly of email addresses, but with a subset including also contact and order details such as first and last name, postal address, email address and phone number. **Your payment information and crypto funds are safe.**
>
> To be as transparent as possible, we want to explain what happened. An unauthorized third party had access to a portion of our e-commerce and marketing database through an API Key. The API key has been deactivated and is no longer accessible.
>
> **What personal information was involved?**
> Contact and order details were involved. This is mostly the email address of our customers, approximately 1M addresses. Further to investigating the situation we have also been able to establish that, for a subset of 9500 customers were also exposed, such as first and last name, postal address, phone number or ordered products. Due to the scope of this breach and our commitment to our customers, we have decided to inform all of our customers about this situation.
>
> Those 9500 customers whose detailed personal information are exposed will receive a dedicated email today to share more details.
>
> **Regarding your ecommerce data, no payment information, no credentials (passwords), were concerned by this data breach. It solely affected our customers' contact details**.
>
> **This data breach has no link and no impact whatsoever with our hardware wallets nor Ledger Live security and your crypto assets, which are safe and have never been in peril. You are the only one in control and able to access this information**.

(emphasis in original).

89.     Ledger's disclosure and responsive measures were flawed and misleading.

90.     *First*, as Ledger admitted, it failed to immediately warn its customers and instead waited on the results of its "internal investigation with third party experts before warning [its] community."[14] This delay in issuing even a warning was reckless, or at least negligent.

91.     *Second*, Ledger did not disclose that this breach had anything to do with the Shopify breaches, which involved insiders stealing information for personal profit. Ledger never even mentioned Shopify. This incomplete disclosure was reckless, or at least negligent.

92.     *Third*, Ledger was not clear as to the status and dissemination of the stolen data. Ledger explained that "[w]e are actively monitoring for evidence of the database being sold on the internet, and have found none thus far." Ledger also explained that they "immediately fixed this breach" and were undertaking an "internal investigation," choosing to eschew third party auditors. Ledger also took pains to repeatedly reiterate to consumers that the breach had "no impact whatsoever with our hardware wallets nor Ledger Live security and your crypto assets." In other words, Ledger's message was that, after an exhaustive internal investigation, they had identified a limited hack and had rectified the situation. This patently inaccurate disclosure was reckless, or at least negligent.

93.     *Fourth*, Ledger sent follow-up notifications only to the 9,500 customers who they determined had additional personal information exposed. In doing so, Ledger failed to notify its one million other customers whose email information had been exposed. This patently incomplete follow-up was reckless, or at least negligent.

   iii.   <u>August – December 2020: Hacking Attacks Increase on Ledger Users</u>

94.     By the fall of 2020, Ledger and Shopify were still failing to respond appropriately to the severe threats that customers faced or to the damages they had incurred. Ledger still had not disclosed that its customers had any connection to the Shopify breaches. It had not contacted every customer whose email address had been exposed to hackers. It had not provided sufficient disclosures or resources to assist customers in protecting against rising phishing schemes.

---

[14] *Addressing the July 2020 e-commerce and marketing data breach — A Message From Ledger's Leadership*, LEDGER (July 29, 2020), https://www.ledger.com/addressing-the-july-2020-e-commerce-and-marketing-data-breach.

Meanwhile, Shopify sat back and did nothing to protect the owners of the data it had lost. Meanwhile, several media reports signaled that Ledger's customers were under attack as a result of the Data Breach.

iv.   Ledger Users are Bombarded with Digital Phishing Scams

95.    Phishing scammers use emails and text messages to trick people into disclosing personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $57 million to such scams in 2019 alone. [15]

96.    Plaintiffs and other Ledger consumers began receiving a high-volume of phishing scams/emails that were designed to look like emails sent from Ledger. Such emails are intended to trick consumers into giving account information, passwords, and other valuable personal information to scammers. This activity significantly increases the risk of further substantial damages to Plaintiffs and the putative class, including both monetary and identity theft.

97.    In October 2020, for example, a Ledger user reported a phishing attempt by hackers posing as Ledger Support team members and asking Ledger customers to download fake versions of the Ledger Live software. The fake email looked very convincing:

---

[15] *See* Federal Trade Commission. Consumer Information. "How to Recognize and Avoid Phishing Scams". May 2019. https://www.consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams. *See also* Federal Bureau of Investigation. "2019 Internet Crime Report Released". February 11, 2020. https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120



98.     Other Ledger users responded to the report by confirming that they had received and been tricked by the fake email. One user reported: "Wow this looked really legit, so much so I used Contact Us form to ask Ledger if it was real. I am normally pretty good at sniffing things like this out – this was by far the most convincing attempt I have ever seen."[16]

99.     Plaintiff Seirafi also received similar phishing emails, which appeared to be from Ledger:

_____

[16] Benjamin Powers, *'Convincing' Phishing Attack Targets Ledger Hardware Wallet Users*, COINDESK (Oct. 27, 2020, 04:13 PM EDT, updated Nov. 2, 2020, 02:56 PM EST), https://www.coindesk.com/phishing-attack-ledger-cryptocurrency-wallet.



100.   More phishing emails to Plaintiff Seirafi followed:



FIRST AMENDED CLASS ACTION COMPLAINT
29

101.    The hackers behind this fake email were of course armed with Ledger's customer lists and email addresses and, therefore, knew they were targeting Ledger owners. Accordingly, the hackers invested the time and resources to create convincing—and, unfortunately, successful—fakes. Worse yet, because of Ledger's false and misleading statements and omissions regarding the Data Breach, Ledger's customers did not know that their email addresses had been compromised. Ledger thus deprived them of the opportunity to increase their wariness and/or take other precautions to avoid such hacking.

102.    The phishing attempts were not limited to emails. Ledger users began to report the receipt of SMS/text phishing messages, again claiming to be from Ledger, such as the below:



103.    Other hackers used a different phishing attempt, attempting to pose not as Ledger, but as other entities such as the Stellar Development Foundation ("Stellar"), an entity affiliated with the creator of the Stellar Lumen token purchased by Plaintiff Baton. Under this scheme, hackers sent an extremely sophisticated email posing as Stellar and soliciting users such as Baton to "stake" Stellar Lumen tokens—a well-known form of deposit that pays interest.

104.    These emails and websites were effective in part because they looked like Stellar's actual website, using real assets, articles, features, and other content from Stellar's email and website. In order to stake Lumens, a user would have to transfer the Lumens to a staking address. But the staking "address" provided to deposit the funds was not actually associated with Stellar, and once the funds were transferred, the hackers absconded with it. Critically, this phishing strategy did not require the disclosure of any private keys and increased a victim's trust in the malicious site.

105.    Creating such convincing versions of Stellar's website and emails required a significant amount of effort, which paid off because the hackers knew they could target the emails of likely cryptocurrency holders such as Plaintiff Baton.

v.    Sim-Swap Attacks on Ledger Users

106.    The data leak can also lead to SIM-swap attacks against the Class. [17]  A SIM-swap attack occurs when the scammer tricks a telephone carrier to porting the victim's phone number to the scammer's SIM card. By doing so, the attacker is able to bypass two-factor authentication accounts, as are used to access cryptocurrency wallets and other important accounts. The type of personal information that has been leaked poses a profound tangible risk of SIM-swap attacks for the Class.

107.    But for Defendants' unlawful conduct, scammers would not have accessed Plaintiffs' and the putative class members' contact information. Defendants' unlawful conduct—including active attempts to conceal the breach and minimize the extent of the breach or damages—has directly and proximately resulted in widespread digital attacks against Plaintiffs and the putative class.

108.    In response to these reports, Ledger should have devoted substantial resources and taken responsibility for being the source of the leak that allowed this precision targeting from hackers. Instead, Ledger continued to tout its security credentials and prevaricated about whether the increased phishing and hacking attempts arose from a data breach.

---

[17] See Yahoo Finance. "From SIM-Swaps to Home-Invasion Threats, Ledger Leak Has Cascading Consequences". December 23, 2020. https://finance.yahoo.com/news/sim-swaps-home-invasion-threats-213016265.html

109.    On November 2, 2020, Ledger refused to acknowledge the Data Breach was the source of the rising attacks on its customers:

> As soon as we discovered the data breach on Ledger's website in July 2020, we immediately patched it. Since then, we led two penetration tests with a third-party consultancy to verify and improve the security of our clients' data. For two weeks, some of Ledger's customers have been experiencing continuous phishing scams through various channels, including email and SMS. We've issued several scam alerts through our Twitter, email, and other channels to notify our users during the past two weeks.
>
> The internal task force is investigating these attacks, and as of now, **we can't state that scammers are using Ledger's marketing database**, and therefore, these attacks resulted from July's data breach. [18]

110.    Ledger's efforts to cover up and downplay the actual and potential scale of the Data Breach in the months leading up to its widespread public disclosure caused disastrous harm to its customers. During that time, many crypto-asset investors lost massive sums of money. Had Ledger acted responsibly during this period, much of that loss could have been avoided.

> vi.    <u>Ledger Users received Ransom threats demanding money or risk physical attack</u>

111.    Plaintiff Seirafi and members of the Class have also received ransom demands for monetary payment to prevent physical attacks in their homes. [19] A true and correct representation of a threat Plaintiff Seirafi received by text message is set forth below:

---

[18] Benjamin Powers, *'Convincing' Phishing Attack Targets Ledger Hardware Wallet Users,* COINDESK (Oct. 27, 2020, 04:13 PM EDT, updated Nov. 2, 2020, 02:56 PM EST), https://www.coindesk.com/phishing-attack-ledger-cryptocurrency-wallet.

[19] *See* Coin Telegraph. "Ledger data leak: A 'simple mistake' exposed 270K crypto wallet buyers". December 24, 2020. https://cointelegraph.com/news/ledger-data-leak-a-simple-mistake-exposed-270k-crypto-wallet-buyers; *see also,* Somag News. "The threat of 'raid home' to a Ledger user." December 22, 2020. https://www.somagnews.com/the-threat-of-raid-home-to-a-ledger-user/

112.    In fact, in a Twitter statement, Ledger corroborated ransom threats like the above, stating that "there has been a new wave of phishing attacks taking place since yesterday, threatening our users physically." [20]

113.    On platforms such as Reddit.com, some class members have also reported emailed threats of home invasion if the class member fails to provide a monetary payment. [21] True and

---

[20] *See* Twitter. https://twitter.com/Ledger/status/1341303521371680769?s=20

[21]    *See*    Reddit.com.    https://www.reddit.com/r/ledgerwallet/comments/kh8q82/fantastic/; https://www.reddit.com/r/ledgerwallet/comments/kipk68/i_received_a_home_invasion_threat_em ail/ (visited on March 22, 2021).

1  correct representations of some Reddit users' posts regarding ransom threats they have received

2  are set forth below:





114.     Plaintiffs and many Class members' home addresses are now public online. The Class is a group of people that are especially ripe for ransom demands because the attackers are aware that every member has cryptocurrency assets. This dire situation is analogous to a safe company posting online the name, phone number, email address, and physical address of its customers with safes most likely to contain cash, jewels, and gold bullion. With crypto-assets, the customer is even more vulnerable, because the attackers can force immediate untraceable payments of those assets.

115.     But for Defendants' unlawful conduct, such criminals would not have access to the home or other postal addresses of Plaintiffs and the Class. This access has resulted in, at minimum, an invasion of Plaintiffs' and the Class' privacy and can lead to even greater damages, including theft or violent physical attacks.

vii.   Raid of Plaintiff Seirafi's Home as Confirmed by Local Law Enforcement

116.   In addition to the threat of home invasion sent by e-mail to Plaintiff Seirafi and other Class members, on February 13, 2021, the Glendale Police Department received a 911 call by an unknown male stating he had shot his friend. Police were dispatched to Plaintiff's home, setting up a containment zone around the area Plaintiff Seirafi's house is located. While the police determined the call to be a false alarm, Plaintiff Seirafi and Plaintiff Seirafi's parents were frightened by this occurrence. One of the officers to whom Plaintiff Seirafi's counsel spoke confirmed that the caller had a European accent and that the address was traced to a European IP address. Attached as **Exhibit 1** is a true and correct copy of the Glendale Police Department report, No. 21-2025.

117.   Similarly, other Ledger consumers have expressed physical safety concerns. For instance, the founder of DeFi, a company located in London, reportedly moved homes after receiving physical threats, stating that "Ledger's customer base is all over the world. In certain countries the likelihood of an armed robbery could be higher. Ledger does not have the expertise to tell people they are safe." [22]

viii.   Severe Emotional Distress and Fear experienced by Ledger Users

118.   The damages described herein have resulted in severe emotional distress for Plaintiffs and the Class. Plaintiffs and the Class have lost all security and privacy now that their personal information, including the fact that they own crypto-assets, is available online for any attacker to access. Plaintiffs fear digital attacks, as well as the possibility of physical attacks at their homes.

119.   Plaintiff Seirafi's fear, unfortunately, came to fruition with the raid to his home that took place after his PII information was leaked during the breach.

120.   Plaintiff Deeney and his girlfriend were forced to move in or about January 2021 because of their fear of a home invasion targeting access to Deeney's crypto assets. Prior to the

---

[22] City A.M., "Ledger customers exposed as personal data is leaked."
https://www.cityam.com/ledger-customers-exposed-as-personal-data-is-leaked/ (last visited on March 26, 2021).

move, it was apparent that individuals were routinely intercepting mail sent to his home to mine further private information about him.

121.    Plaintiffs and the Class remain on edge and alert as they are bombarded with phishing emails and other scams. Plaintiffs are suffering from the mental and emotional distress associated with such insecurity and uncertainty caused by the data breach. After news of the data breach had been widely publicized, Ledger informed Plaintiff Comilla that he was one of the subset of users who had had "all" of their personal information disclosed. Comilla has been in a state of depression since the breach and theft happened, and his personal and professional relationships have suffered. Beyond the huge financial loss and mental anguish caused to Plaintiff Vilinger, the disclosure of his personal information and subsequent theft has caused him to suffer from stress, anxiety, depression and financial problems as a result.Their emotional suffering is all to common among the Class.

122.    For instance, another Reddit user posted that they are worried about their home address being leaked and their family being harmed. A true and correct representation of this user's post is set forth below:



123.    Another Reddit user posted a text message threat they received about getting "killed" if they do not pay in cryptocurrency. A true and correct representation of this post is set forth below:



124.    Another Reddit user shared his experience of receiving threats, fearing for his life for the first time if he did not transfer money. This user also stated that after going to the police in his local precinct, he learned that he was a second person who came in that day. A true and correct representation of this post is set forth below:



125.    So long as Plaintiffs and the Class members' PII is accessible on the internet, Plaintiffs and the Class will remain at substantial risk. Ledger has not offered any solutions to remedy the damages to Plaintiffs and the Class. Plaintiffs and the Class members will remain at permanent risk unless they take on the significant time and expense to change all of their personal information that was exposed.

126.    Because of Defendants' unlawful conduct, Plaintiffs and the Class are in constant fear and anxiety resulting from the leak of their PII and consistent barrage of scams and threats.

ix.    <u>December 2020: In the Face of Widespread Public Disclosure, Ledger Admits to the Scale of the Data Breach</u>

127.    By early December 2020, reports continued to escalate about phishing attempts on Ledger's users. By that time, Ledger's inaction had provided an opportunity for the hackers to increase the sophistication and effectiveness of phishing attempts. For example, some of the phishing attempts referenced breaches and then instructed users, as a security measure, to install fake versions of Ledger Live that asked for their private key information:

:::: Ledger

**December 4th — Important Security Update**

Dear client,

We regret to inform you that we have been alerted of a data breach affecting confidential data belonging to approximately 115,000 of our customers, which includes personal information, PIN-encrypted private and public keys, as well as the amount of each cryptocurrency stored inside the wallet.

You're receiving this message because the e-mail address (-) associated with your wallet has been found to be within the affected compromised data.

**What happened?**

On Wednesday, December 9th 2020, our security researchers detected an unauthorized third party gaining access to one of the Ledger Live's internal servers. We immediately fixed the breach and undertook an internal and external investigation of the situation.

**What we know**

As of today, it's not technically possible to conclusively assess the scope of the security breach. While there was no clear evidence of user wallets being affected, due to the nature of the breach, **we have to assume that your cryptocurrency assets could be compromised.**

**What you should do**

If you're receiving this email, you're affected by the breach. We have no evidence of user wallets being affected, but it's smart to place security over convenience. In order to make sure your assets are safe, install the latest version of Ledger Live and follow the instructions to secure your wallet with a new PIN.

Yours sincerely,
Pascal Gauthier, Ledger CEO

Download latest version

128.     Users reported losing significant sums of crypto-assets as a result of such phishing. Plaintiff Baton lost about 150,000 Stellar Lumens, worth approximately $72,000 at today's market prices. Plaintiff Comilla lost all his crypto assets due to a successful phishing attack, 2.6 bitcoin and 8 ether, worth about $115,000 at today's market prices. Plaintiff Vilinger also lost all his crypto

assets after the breach, 6.4 bitcoin worth about $225,000 at today's market prices, even though he only connected this Ledger product to the Internet every few months. On information and belief, he was the victim of de-anonymization of his Ledger wallet as set forth above. Plaintiff Deeney lost $145,000 when account manipulation caused by the data breach caused one of his trading accounts to be temporarily frozen, preventing him from closing out a short position on XRP.

129.    The phishing attempts were sufficiently successful—and notorious—so that, through December 20, 2020, the going rate among hackers for the compromised list of Ledger customer data was approximately $100,000. [23]

130.    On December 20, 2020, a hacker published the Ledger customer data online. This publication included the personal information of more than 270,000 Ledger customers. In fact, the contents of the Ledger database were distributed on Raidforums. Raidforums is a database sharing and marketing forum that distributes leaked information online. This leak of 272,000 pieces of detailed PII of consumers is significantly greater than he amount of data estimated by Ledger – of 9,500, an estimate reported by Ledger in July 2020.

131.    Consumers and reporters justly criticized Ledger, stating that the company, in its prior statements, had "vastly underestimated" the Data Breach. [24]

132.    With the data made publicly available for free, many Ledger customers started receiving frightening threats. Ledger customers immediately started receiving spam phone calls, emails, and even death threats. Many of these customers shared their experiences online:

---

[23] @UnderTheBreach, TWITTER (Dec. 20, 2020, 01:38 PM), https://twitter.com/UnderTheBreach/status/1340735356375851009.

[24] Vishal Chawla, Liam Kelly, *Ledger Breach Vastly Underestimated, 270,000 Clients Data Leaked*, CRYPTO BRIEFING (Dec. 21, 2020), https://cryptobriefing.com/ledger-breach-clients-data-leaked/.

133.    Plaintiffs Seirafi, Batton, Comilla, Deeney, and Vilinger like many members of the Class, also received spam emails, phone calls, and texts which, *inter alia,* attempted to phish for additional personal information and sell prurient content. Plaintiffs' PII is now available for other parties to sell and trade, and they continue to risk receiving more harm for the indefinite future. In fact, the U.S. Government Accountability Office found that, "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years." [25]

134.    The breach has also exposed the location of the purchased Products, by allowing access to Plaintiff and the Class' home addresses, which inherently impacts the security of the Products and, in turn, creates actual harm and a threat of future harm.

135.    Ledger's CEO, Pascal Gauthier, has refused to provide compensation to users whose PII information was leaked in the breach arguing that "It's just an online scam to scare you with these tactics." [26]

---

[25] *See* United States Government Accountability Office. Report to Congressional Requesters. June 2007. https://www.gao.gov/new.items/d07737.pdf

[26] *See,* Decrypt.co. "Ledger Won't Reimburse Users After Major Data Hack" December 21, 2020. https://decrypt.co/52215/ledger-wont-reimburse-users-after-major-data-hack

136.     Ledger knew of and advertised the importance of protecting its customers' personal information, but before and after the Data Breach, it failed to take reasonable steps to protect its customers. Before the breach, Ledger should have regularly deleted or archived customer data or should have otherwise protected that information from online accessibility. After the breach, for over *five* months, Ledger repeatedly failed to provide critical information to its customers, compounding the harm to Plaintiffs and the Class.

137.     Shopify similarly failed to protect Ledger's customer data. Shopify employees, rogue or not, had no need for direct access to Ledger customer data. Shopify should have: (1) limited employee access to customers' data in a way that prevented the rogue employees' access; (2) monitored employees' suspicious copying of customer data; (3) assisted Ledger with its investigation to determine the scope of the Data Breach; and (4) notified Ledgers' users of the Data Breach.

**D.  Plaintiffs Suffered Damages**

138.     Plaintiffs Seirafi, Baton, Comilla, Deeney, and Vilinger have suffered damages from the Data Breach as set forth above.

139.     If Ledger had timely disclosed the extent of the Data Breach, some Plaintiffs— sophisticated users with technology backgrounds and wary of scams—would have been on heightened alert and not fallen prey to these scams. Furthermore, others who may have been not as sophisticated in technology could also take steps to protect their privacy rights.

140.     As to other forms of damages, Plaintiffs emails and personal information have been compromised. Plaintiff Seirafi has received several spam messages since his email was leaked and his home was raided. Plaintiff Vilinger has received a huge amount of phishing and other scam emails, and his home was targeted in an attempted break-in. Plaintiff Baton had his email, physical address, and phone number compromised. He received regular spam calls, still receives spam emails, and had to change his phone number and where he receives packages—all as a result of this breach. The other Plaintiff suffered similar experiences.

141.   This breach has also exposed the location of the purchased Ledger products, by allowing access to Plaintiffs' and consumers' home addresses, which inherently impacts the security of the products themselves and creates actual harm and a threat of future harm.

142.   Some Plaintiffs remain fearful of intruders due to their physical address being publicly leaked.

143.   These leaks of personal information, in conjunction with the information that they were Ledger customers, have exposed Plaintiffs to additional risks of theft and threat.

144.   In addition, Plaintiffs would not have purchased Ledger's products at all, or would have paid significantly less for them, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and failure to provide timely customer service. Furthermore, had Plaintiffs known of Ledger's lax security practices, unhelpful customer service, and failure to report of the extent of the breach and other issues, Plaintiffs would not have provided any valuable PII to Ledger or stored any bitcoins or other forms of digital currency in Ledger wallets.

## V.   CLASS ALLEGATIONS

145.   Plaintiffs bring this Action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following Class and Subclasses:

> Nationwide, UK, and Israel  Class: All persons residing in the United States, the UK, or Israel who provided Ledger or Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

> Nationwide, UK, and Israel Phishing Subclass: All persons in the Nationwide, U.K. and Israel Class who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal information disclosed as a result of a data breach between April 1, 2020, and the present.

> Nationwide, UK, and Israel Consumer Class: All persons residing in the United States, UK, or Israel who purchased a Ledger Nano X wallet or a Ledger Nano S wallet from Ledger or an authorized reseller within the limitations period, as may be extended or tolled by any applicable rule of law or equitable doctrine.

> California Subclass: All persons residing in California who provided Ledger or Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

California Phishing Subclass: All persons in the California Subclass who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal information disclosed as a result of a data breach between April 1, 2020, and the present.

California Consumer Subclass: All persons residing in California who purchased a Ledger Nano X wallet or a Ledger Nano S wallet from Ledger or an authorized reseller within the limitations period, as may be extended or tolled by any applicable rule of law or equitable doctrine.

Georgia Subclass: All persons residing in Georgia who provided Ledger or Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

Georgia Phishing Subclass: All persons in the Georgia Subclass who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal information disclosed as a result of a data breach between April 1, 2020, and the present.

Georgia Consumer Subclass: All persons residing in Georgia who purchased a Ledger Nano X wallet or a Ledger Nano S wallet from Ledger or an authorized reseller within the limitations period, as may be extended or tolled by any applicable rule of law or equitable doctrine.

New York Subclass: All persons residing in New York who provided Ledger or Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

New York Phishing Subclass: All persons in the New York Subclass who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal information disclosed as a result of a data breach between April 1, 2020, and the present.

New York Consumer Subclass: All persons residing in New York who purchased a Ledger Nano X wallet or a Ledger Nano S wallet from Ledger or an authorized reseller within the limitations period, as may be extended or tolled by any applicable rule of law or equitable doctrine.

Accordingly, the Class Period is April 1, 2020, through the present except as to the Consumer Classes.

146.   Excluded from the Class and Subclasses are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

FIRST AMENDED CLASS ACTION COMPLAINT
45

147.     Plaintiffs reserve the right to amend the Class and/or Subclass definitions if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

148.     **Numerosity.** The Class and Subclass members are so numerous that joinder of all members is impracticable.  The precise number of Class and Sublcass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

149.     **Ascertainability.** The Class and Subclass members are readily ascertainable and identifiable. They may be identified through contact information that was breached. They may be notified of the pendency of this Action by electronic mail using a form of notice customarily used in class actions.

150.     **Typicality.** Plaintiffs' claims are typical of the claims of the Class and Subclass members, who are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the Class members.

151.     **Commonality.** Plaintiffs and the Class and Subclass members sustained damages and/or are entitled to restitution from data exposure caused by Defendants' unlawful conduct and/or for the diminution in value of the products they purchased revealed by Defendants' uniform and unlawful conduct. Common questions of law and fact include the following:

- Whether Defendants' conduct is an unlawful business act or practices within the meaning of Business and Professions Code section 17200, *et seq.*;

- Whether Defendants' conduct is an unfair business act or practice within the meaning of Business and Professions Code section 17200, *et seq.;*

- Whether Defendants' advertising is untrue or misleading within the meaning of Business and Professions Code section 17500, *et seq.;*

- Whether Defendants' represented to Plaintiffs and the Class that they would protect Plaintiffs and the Class members' PII;

- Whether Defendants' owed a duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

- Whether Defendants' breached a duty to Plaintiffs and the Class to exercise

FIRST AMENDED CLASS ACTION COMPLAINT

46

due care in collecting, storing, and safeguarding their PII;

- Whether Class members' PII was accessed, compromised, or stolen in the breach;

- Whether Defendants' conduct caused or resulted in damages to Plaintiffs and the Class;

- Whether Defendants failed to notify the public of the breach in a timely and adequate manner;

- Whether Defendants knew or should have known that its systems were vulnerable to a data breach;

- Whether Defendants adequately addressed the vulnerabilities that allowed for the data breach;

- Whether the precautions that Defendants took and failed to take with respect to the protection of the Class members' data;

- Whether the steps Defendants took and failed to take after learning of the Data Breach and the reasonableness (or rather unreasonableness) of those steps;

- The economic value of Ledger's wallets and services as advertised;

- The actual economic value of Ledger's wallets and services where, contrary to its advertising, Ledger failed to protect customers' personal information from nefarious actors;

- The quantification of the harm to Class members resulting from the exposure of their data to prospective hacking; and

- The restitution and/or damages to which Class members are entitled as result of the fact that the actual value of the Ledger wallets was far less than the value of the wallets as advertised.

152.    **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for Class and Subclass members to individually redress the wrongs done to them. Furthermore, litigating tens of thousands of individual cases will inevitably lead to inconsistent rulings and results, burden the

FIRST AMENDED CLASS ACTION COMPLAINT

47

judicial and legal system, and magnify the delay and expense to all the parties and the court system because of multiple trials on the same factual and legal issues.

153.     There will be no difficulty in the management of this Action as a class action.

154.     Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Classes and Subclasses and, as such, final injunctive relief, or restitutionary relief with regard to the class members as a whole is appropriate pursuant to Fed. R. Civ. Proc. Rule 23(b)(2).

## VI.     CLAIMS FOR RELIEF

## CALIFORNIA LAW SHALL APPLY TO CLAIMS FROM WORLD-WIDE PLAINTIFFS

155.     This action involves a unique set of events, where the actual data breach, and the conduct alleged herein causing injuries to not only California and Nationwide consumers but also to foreign consumers world-wide, occurred in California. *See e.g. Nortwest Mortg., Inc. v. Superior Court,* 72 Cal. App. 4th 214, 223-25, 85 Cal. Rptr. 2d 18 (1999) (holding that to assert a California state-law cause of action, an out-of state party must suffer injury from wrongful conduct that occurs in California.).

156.     Ledger and Shopify are global entities, that conduct business nationwide and globally, servicing consumers in the United States and in many foreign countries. They also provide services in virtually every state and advertise their platforms and products online targeting word-wide consumers.

157.     To enhance their brands and increase sales, Ledger and Shopify engage in high impact digital advertising wordwide, targeting consumers globally.

158.     Regardless of where a person resides, that person saw Ledger's similarly stated promises regarding Ledger's robust security and the "root of trust" using the most secure mechanisms and measures to protect consumers' cryptocurrency as well as personal data.

159.     Plaintiffs and the Class(es) while purchasing the Ledger's products from cloud-based software and relying on the uniform representations made by Ledger, were injured as a result of actions stemming from San Francisco, California, and thus, they suffered an injury from wrongful conduct that occurred in California.

160.     Specifically, Shopify and Ledger caused and then covered up a massive 2020 data breach that led to substantial damages for consumers. Shopify, previously headquatered in San Francisco, was one of the main actors/facilitators of the data breach. The data leak occurred through the use of Shopify's merchants and platforms.

161.     Shopify's rogue members of their support team obtained customer transactional records, including Ledger's customers. Shopify's agents then illegally exported customer transactional records in April and June 2020. Nevertheless, neither Shopify nor Ledger acknowledged the massive data breach, and they continued to cover up the rumors and incidents for the ensuing months.

162.     The breach had occurred and stemmed from the actions taking place in San Francisco – where Shopify originally maintained a principal place of business. Furthermore, while one of the Ledger entities (named Defendant Ledger herein) is based in France, its subsidiary/agent is headquatered in San Francisco, California, where the majority of events leading to the breach had occurred.

163.     The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of California residents and out of state residents against a company conducting business and wrongdoings stemming from California. California has a greater interest than any other state in the nationwide claims and is most intimately concerned with the claims and outcomes of this litigation. The conspiracy to implement the data breach led to a federal indictment in California alleging conduct occurring in California. *See United States v. Heinrich*, 8:21-cr-000222-JLS (C.D. Cal. 2021). Importantly, separating this litigation into a myriad of lawsuits through the entire U.S. while the conduct leading to the breach that occurred here stemps from California will involve not only duplicative actions, duplicative discovery, traveling of individuals/witnesses from San Francisco (who have intimate knowledge of what happened), and ultimately lead to inconsistent rulings, and burden of the judicial system and the parties.

164.    Defendants' center of business activities – their essential operations that allowed them to conduct business in the states are in California (San Francisco). Ledger's and Shopify's breach of their duties to Plaintiffs and the Class(es) emanated from California.

165.    Application of California laws to the Class with respect to Plaintiffs' and the Class' claims is neither arbitrary nor fundamentally unfair, because California has significant contacts and significant aggregation of contacts in this state and the injury to the Class and Plaintiffs happened in San Francisco, California.

166.    Under California's choice of law principles, the common law of California applies to the Class claims. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California Unfair Competition Law and Consumer Legal Remedies Act may be applied to non-resident plaintiffs.

167.    Furthermore, Plaintiffs seek recovery on behalf of the Class in the form of restitution, as well as punitive/exemplary damages, injunctive relief, and attorneys' fees and costs (pursuant to Cal. Code Civ. P. § 1021.5, FRCP 23). Ledger's and Shopify's misconduct, deceit, and concealment of material facts regarding the data breach at issue deprived Plaintiffs and the Class of legal rights, causing injury. In addition, Ledger's and Shopify's misconduct constitutes malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) because their actions depict a despicable conduct carried out with a willful and conscious disregard of the rights or safety of Plaintiffs and Class members and subjected Plaintiffs and Class Members to hardship. As a result, Plaintiffs and Class members are also entitled to punitive damages against Ledger and Shopify under Cal. Civ. Code § 3294(a).

### FIRST CAUSE OF ACTION

### NEGLIGENCE
**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, and the Nationwide, UK, and Israel Phishing Subclass and, Alternatively, on Behalf of the Remaining Non-Consumer Subclasses)**

168.    Plaintiffs incorporate the preceding paragraphs.

169.    Ledger and Shopify owed a duty to the Class members, including Plaintiffs, to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting

their personal information in their possession from being compromised, lost, or stolen, and from being accessed, and misused by unauthorized persons.

170.    This duty included: (a) designing, maintaining, and testing Ledger's and Shopify's security systems to ensure that the Class members' personal information was adequately secured and protected; (b) implementing processes that would timely detect a breach of their security systems; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; (d) maintaining data-security measures consistent with industry standards; and (e) timely and comprehensively notifying Class members of any potential or actual unauthorized access of their personal information.

171.    Ledger's and Shopify's duties to use reasonable care arose from several sources, including those described below. Ledger and Shopify had a common law duty to prevent foreseeable harm to others, including Class members, who were the foreseeable and probable victims of any inadequate security practices. Ledger and Shopify in fact knew that their failure to protect Class members' personal information would likely harm Class members, because they knew that hackers routinely attempt to steal such information and use it for nefarious purposes.

172.    Ledger's and Shopify's duties also arose under Section 5 of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to use reasonable measures to protect personal information by companies such as Ledger. Various FTC publications and data security breach orders further form the basis of Ledger's and Shopify's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

173.    Ledger's and Shopify's duties also arose from Ledger's unique position in the burgeoning crypto-asset market. Ledger strove to create "the highest level of security for crypto assets," and Ledger was in a unique and superior position to protect against the harm to the Class members as a result of data breaches. As Ledger's e-commerce vendor entrusted with Ledger's data, Shopify was in the same unique and superior position to protect against this harm.

174.    Ledger and Shopify also had duties to safeguard the personal information of the Class members and to promptly notify them of a breach because of state laws and statutes that require

Ledger to reasonably safeguard sensitive personal information. Timely notification was necessary to permit Class members to take appropriate measures to protect their identities as owners of crypto-assets, safeguard against threats to those crypto-assets, safeguard against personal threats, and take other steps to mitigate or ameliorate the damages caused by Ledger's and Shopify's misconduct.

175.    Ledger and Shopify breached their duties to the Class members and thus were negligent. Ledger and Shopify breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the personal information of the Class members; (b) detect the breaches while they were ongoing; (c) maintain security systems consistent with industry standards; and (d) disclose that the Class members' personal information in Ledger's and/or Shopify's possession had been or was reasonably believed to have been stolen or compromised.

176.    Ledger's and Shopify's negligence was, at least, a substantial factor in causing the Class members' personal information to be improperly accessed, disclosed, and otherwise compromised, and in causing the Class members' other injuries as a result of the data breaches.

177.    As a direct and proximate result of Ledger's and Shopify's negligence, the Class members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial, for injuries that include at least the following:

    a.  the theft of their personal information;

    b.  the diminished value and loss of the benefits of purchased Ledger devices, which now pose a security risk to the Class members;

    c.  the costs associated with the detection and prevention of phishing scams aimed at depriving the Class members of assets and funds;

    d.  the costs associated with purchasing new hardware and software to protect crypto assets and/or other assets and/or funds;

    e.  the costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breaches;

    f.  the imminent and impending injury flowing from potential fraud and theft posed by

their personal information being placed in the hands of criminals;

g.  the mental anguish from the stress and fear of receiving threats and other messages from internet users who have physical address information;

h.  the damages to and diminution in value of their personal information entrusted, directly or indirectly, to Ledger with the mutual understanding that Ledger would safeguard the Class members' data against theft and not allow access and misuse of their data by others; and

i.  the continued risk of exposure to hackers and thieves of their personal information, which remains in Ledger's possession and is subject to further breaches so long as Ledger fails to undertake appropriate and adequate measures to protect the Class members.

## SECOND CAUSE OF ACTION

### NEGLIGENCE PER SE
**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, and the Nationwide, UK, and Israel Phishing Subclass and, Alternatively, on Behalf of the Remaining Non-Consumer Subclasses)**

178.  Plaintiffs incorporate the preceding paragraphs.

179.  Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Ledger of failing to use reasonable measures to protect personal information. Various FTC publications and orders also form the basis of Ledger's and Shopify's duties.

180.  Ledger and Shopify violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect personal information and not complying with industry standards. Ledger's and Shopify's conduct was particularly unreasonable given the nature and amount of personal information they obtained and stored and the foreseeable consequences of a data breach that disclosed customers' personal information, including the fact that those customers owned crypto-assets, to hackers and other third parties.

181.  Ledger's and Shopify's violations of Section 5 of the FTC Act (and similar state statutes) constitute negligence per se. This negligence was, at least, a substantial factor in causing

the Class members' personal information to be improperly accessed, disclosed, and otherwise compromised, and in causing the Class members' other injuries as a result of the data breaches.

182.    The Class members, including Plaintiffs, are within the class of persons that Section 5 of the FTC Act (and similar state statutes) was intended to protect. In addition, the harm that the Class members have suffered is the type of harm that the FTC Act (and similar state statutes) were intended to prevent. Indeed, the FTC has pursued over fifty enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same or similar harm suffered by the Class members.

183.    As a direct and proximate result of Ledger's and Shopify's negligence, the Class members have been injured as described herein and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, and the Nationwide, UK, and Israel Phishing Subclass and, Alternatively, on Behalf of the Remaining Non-Consumer Subclasses)**

184.    Plaintiffs incorporate the preceding paragraphs.

185.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court also has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

186.    An actual controversy has arisen in the wake of the Data Breach regarding Ledger's and Shopify's present and prospective duties to reasonably safeguard customers' and consumers' personal information and whether Ledger and Shopify are maintaining data-security measures adequate to protect the Class members, including Plaintiffs, from further data breaches that compromise their personal information.

187.    Plaintiffs allege that Ledger's and Shopify's data-security measures remain inadequate. Ledger and Shopify deny these allegations. In addition, Plaintiffs continue to suffer

injury as a result of the compromise of their personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

188.    Pursuant to its authority under the Declaratory Judgment Act, Plaintiffs ask the Court to enter a judgment declaring, among other things, the following:

      i.    Ledger and Shopify owe a duty to secure consumers' personal information and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

      ii.    Ledger and Shopify are in breach of these legal duties by failing to employ reasonable measures to secure consumers' personal information.

189.    Plaintiffs further ask the Court to issue corresponding prospective injunctive relief requiring Ledger and Shopify to employ adequate security protocols consistent with law and industry standards to protect consumers' personal information.

190.    If an injunction is not issued, the Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Ledger and/or Shopify. The risk of another such breach is real, immediate, and substantial. If another breach at Ledger and/or Shopify occurs, the Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

191.    The hardship to the Class members if an injunction does not issue exceeds the hardship to Ledger and Shopify if an injunction is issued. Among other things, if another massive data breach occurs at Ledger and/or Shopify, the Class members will likely be subjected to substantial hacking attempts, physical threats, and other damage. On the other hand, the cost to Ledger and Shopify of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Ledger and Shopify have pre-existing legal obligations to employ such measures.

192.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing additional data breaches at Ledger and/or Shopify, thus eliminating the additional injuries that would result to the Class

1    members and the millions of consumers whose personal and confidential information would be

2    further compromised.

3                          **FOURTH CAUSE OF ACTION**

4    **CALIFORNIA UNFAIR COMPETITION LAW**
     **Cal. Bus. & Prof. Code § 17200, *et seq.***
5    **(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, the Nationwide, UK,
     and Israel Phishing Subclass, and the Nationwide, UK, and Israel Consumer Class,**
6    **and Alternatively, on Behalf of the California Subclass, California Phishing Subclass**
     **and California Consumer Subclass)**
7    **(Against Ledger Only)**

8        193.    Plaintiffs incorporate the preceding paragraphs.

9        194.    The Ledger is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

10       195.    California's Unfair Competition Law (the "UCL") prohibits "unfair competition,"

11   which Ledger violated by engaging in unlawful, unfair, and deceptive business acts and practices.

12                              **a.    "Unfair" Prong**

13       196.    Under California's False Advertising Law, Cal. Bus. & Prof. Code Section 17200, *et*

14   *seq*., a challenged activity is "unfair" when "any injury it causes outweighs any benefits provide to

15   consumers and the injury is one that the consumers themselves could not reasonably avoid."

16   *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

17       197.    Ledger's conduct as alleged herein does not confer any benefit to consumers.

18       198.    Ledger's conduct as alleged herein causes injuries to consumers, who do not receive

19   a product consistent with their reasonable expectations.

20       199.    Ledger's conduct as alleged herein causes injuries to consumers, who paid for a

21   secure system and whose PII was leaked as a result of Ledger's unlawful conduct.

22       200.    The injuries caused by Ledger's conduct as alleged herein outweigh any benefits.

23       201.    Ledger's conduct, as alleged in the preceding paragraphs, is false, deceptive,

24   misleading, and unreasonable and constitutes an unfair business practice within the meaning of

25   California Business and Professions Code Section 17200.

26       202.    Ledger could have furthered its legitimate business interests in ways other than by

27   unfair conduct.

28

203.    Ledger's conduct threatens consumers by misleadingly advertising their systems as "secure" and exposing consumers' PII to hackers. Ledger's conduct also threatens other companies, large and small, who play by the rules. Ledger's conduct stifles competition and has a negative impact on the marketplace and reduces consumer choice.

204.    All of the conduct alleged herein occurs and continues to occur in Ledger's business. Ledger's wrongful conduct is part of a pattern or generalized course of conduct repeated on approximately thousands of occasions daily.

205.    Pursuant to Business and Professions Code Sections 17203, Plaintiffs, the Classes, and the Subclasses seek an order of this Court enjoining Ledger from continuing to engage, use, or employ its unfair business practices.

206.    In fact, to date, Ledger continues to market and advertise its faulty products and systems to consumers, while knowing that it failed and continues to fail to deliver on its promises – of providing a secure system and products.

207.    Ledger failed to implement and maintain reasonable security measures to protect Class and Subclass members' personal information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach. Ledger failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents. This conduct, with little if any utility, is unfair when weighed against the harm to Class and Subclass members whose personal information has been compromised.

208.    Ledger's failures to implement and maintain reasonable security measures also were contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures.

209.    Ledger's failures to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Ledger's inadequate security, consumers could not have reasonably avoided the harms that Ledger caused.

210.   Plaintiffs and Class and Subclass members,  have suffered injury-in-fact and have lost money or property as a result of Defendants' unfair conduct. Among other things, Plaintiffs and members of the Classes and Subclassespaid an unwarranted premium for these Products, which they would not have purchased had they known that Ledger has not adhered to the security measures it claimed it would. Specifically, Plaintiffs and members of the Classes and Subclassespaid for products and services advertised as secure when Ledger in fact failed to institute adequate security measures and neglected vulnerabilities that led to a data breach. Plaintiffs and members of the Classes and Subclasses  would not have purchased the Products and services, or would not have given Ledger their PII, had they known that their PII was vulnerable to a data breach. Likewise, Plaintiffs and the members of the Classes and Subclasses seek an order mandating that Ledger implement adequate security practices to protect consumers' PII. Additionally, Plaintiffs and the members of the Classes and Subclasses seek and request an order awarding Plaintiff and the Classese and Subclasses restitution of the money wrongfully acquired by Ledger by means of Ledger's unfair and unlawful practices.

**b.    "Unlawful" Prong**

211.   California Business and Professions Code Section 17200, et seq., identifies violations of any state or federal law as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp*., 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

212.   Ledger's unlawful conduct, as alleged in the preceding paragraphs, violates California Civil Code Section 1750, et seq.

213.   Ledger's conduct, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes unlawful conduct.

214.   Ledger knew or should have known of its unlawful conduct.

215.   In fact, Ledger's failure to implement and maintain reasonable security measures to protect Class and Subclassmembers' personal information from unauthorized disclosure, and identify foreseeable security risks, or even remedy/improve the security risks, were a direct and proximate cause of the Data Breach.

216.    Ledger's failures to implement and maintain reasonable security measures also were contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5.

217.    Ledger has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification); California's Consumers Legal Remedies Act, Cal. Civ. Code § 1780, *et seq.*; the FTC Act, 15 U.S.C. § 45; and California common law.

### c.    "Fraudulent" Prong

218.    Ledger's various representations and omissions, including but not limited to its statements of Ledger's security implementations, assurances regarding trustworthiness and reliability of measurements implemented by Ledger, and even subsequent representations regarding lack of the data breach (assurances that the breach was just a rumor), and misrepresentations regarding the extent of the breach constitute false, misleading, and deceptive statements intended to deceive the consumers within the meaning of §17200.

219.    Ledger's express false promises regarding security measurements, and yet failure to implement and maintain reasonable security and privacy measures to protect consumers and Plaintiffs' and members of the Classes and Subclasses' PII and secure the valuable crypto-assets, and failure to identify foreseeable security and privacy risks constitute fraudulent business practices.

220.    Ledger's representations and omissions were material because they were likely to deceive reasonable consumers about the value of Ledger's services and the adequacy of Ledger's data security, ability to protect the confidentiality of consumers' personal information, and ability to protect the confidentiality of the fact that consumers had purchased a Ledger and/or owned crypto-assets.

221.    As a direct and proximate result of Ledger's deceptive and unlawful acts and practices, the Class members are entitled to restitution in an amount to be proven at trial, for, among

1   other things, the loss of the benefit of their bargain with Ledger, as they would not have paid Ledger

2   for goods and services or would have paid less for such goods and services but for Ledger's

3   misconduct.

4      222. The Class members seek all monetary and non-monetary relief allowed by law,

5   including restitution of all revenues stemming from Ledger's unfair, unlawful, and fraudulent

6   business practices or use of their Personal Information; declaratory relief; reasonable attorneys' fees

7   and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate

8   equitable relief.

9      223. Plaintiffs,the Classes, and Sublcasses seek restitution and injunctive relief.

10   Restitution would provide Plaintiffs, the Classes, and Subclasses with damages for past harm, while

11   the injunctive relief is necessary to cease misconduct and dispel misperception. Injunctive relief is

12   appropriate because Ledger continues to misrepresent that their security features should be trusted

13   and is necessary to prevent Ledger from continuing to engage in the unfair, fraudulent, and/or

14   unlawful conduct and prevent future harm. The restitution will not provide adequate remedy for

15   what happened due to the fact that some damages (such as continuous risk of harm/identity

16   theft/ongoing phising scams and other damages) cannot be remedied through a restitution, and

17   injunctive relief would prevent some future harm – such as future misrepresentations and harm.

18      224. Furthermore, Plaintiffs, the Classes, and the Subclasses seek attorneys' fees, costs,

19   and expenses (pursuant to Cal. Code Civ. P. § 1021.5).

20              **FIFTH CAUSE OF ACTION**

21         **CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
           **Cal. Civ. Code § 1750,** *et seq.*

22   **(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, the Nationwide, UK,
and Israel Phishing Subclass, and the Nationwide Consumer Class and, Alternatively**

23   **on Behalf of the California Subclass, California Phishing Subclass and California
Consumer Class)**

24              **(Against Ledger Only)**

25      225. Plaintiffs incorporate the preceding paragraphs.

26      226. The Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA"), is a

27   comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair

28

and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

227.    Ledger is "persons" as defined by California Civil Code §§ 1761(c) and 1770, and have provided "goods" and/or "services" as defined by California Civil Code §§ 1761(b) and 1770.

228.    California Civil Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities [which] they do not have[.]"

229.    California Civil Code § 1770(a)(7) prohibits one who is involved in a transaction from "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another."

230.    Class members are "consumers" as defined by California Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" as defined by California Civil Code §§ 1761(e) and 1770.

231.    Ledger's acts and practices were intended to and did result in the sales of products and services to Class and Subclass members in violation of California Civil Code § 1770.

232.    Ledger's acts and practices were intended to and did result in the sales of products and services to Class and Subclass members in violation of California Civil Code § 1770, including, but not limited to, the following:

      a.   Representing that goods or services have characteristics that they do not have;

      b.   Representing that goods or services are of a particular standard, quality, or grade when they were not;

      c.   Advertising goods or services with intent not to sell them as advertised; and

      d.   Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

233.    Ledger's representations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Ledger's data security and ability to protect the confidentiality of consumers' personal information, including the confidentiality of the fact that consumers purchased a Ledger devices or service and, therefore, owned crypto-assets.

234.    If Ledger disclosed to the Class members that their data systems were not secure and, thus, vulnerable to attack, Ledger would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

235.    Instead, Ledger received, maintained, and compiled Class and Subclass members' personal information as part of the services Ledger provided without advising Class and Subclass members that Ledger's data-security practices were insufficient to maintain the safety and confidentiality of  Class and Subclass members' personal information. Accordingly, Class and Subclass members acted reasonably in relying on Ledger's misrepresentations and omissions, the truth of which they could not have discovered.

236.    As a direct and proximate result of Ledger's violations of California Civil Code § 1770, Class and Subclass members are entitled to injunctive relief. Plaintiffs have provided the notice required by California Civil Code § 1782(a) and, Ledger has not cured or taking any action to cure its representations/actions.

237.    Thus, Plaintiffs and Class and Subclass members seek all monetary and non-monetary relief allowed by law, including damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

238.    The restitution and injunctive relief will provide for different damages. The restitution will provide damages for past harm; however, injunctive relief would prevent future misreprespresentations and prevent future injustice.

### **SIXTH CAUSE OF ACTION**

### **DECEIT BY CONCEALMENT**
**Cal. Civ. Code § 1709, 1710 *et seq.***
**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, the Nationwide, UK< and Israel Phishing Subclass, and the Nationwide Consumer Class and, Alternatively on Behalf of the California Subclass, California Phishing Subclass and California Consumer Class)**

239.    Plaintiffs incorporate the preceding paragraphs.

240.    Ledger and Shopify knew or should have known that their security measures were inadequate to protect the PII of consumers, or safeguard personal information in their possession.

241.    Ledger and Shopify had a duty to disclose to consumers that their security systems were not adequate to safeguard consumers PII, and protect their information in possession of Ledger and Shopify from being compromised.

242.    Ledger is well familiar with  its security systems and knew or should have known that there was a significant gap in its security systems which existed nearly two years before the data breach occurred. As a company that primarily works to protect consumers' cryptocurrency assets and claims to implement the highest levels of seuurity, Leger was uniquely obligated to follow through its own representations. Ledger also had an obligation to disclose to consumers that it did not have adequate security systems to safeguard consumers' PII.

243.    Shopify similarly was in a unique position, handling consumers' private data, and yet it failed to protect the consumers' PII, and further failed to disclose that the breach had occurred, and in fact, it concealed the breach after it had known of the breach of data.

244.    Ledger and Shopify failed to take reasonable precautions against the data breach, concealed the data breach, and then failed to take any reasonable measures to minimize the exposure/harm of the breach.

245.    California Civil Code §1710 defines deceit as, (a) "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true"; (b) "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true"; (c) "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"; or (d) "[a] promise, made without any intention of performing it." Ledger's and Shopify's conduct as described herein therefore constitutes deceit of Plaintiffs, the Classes, and the Subclasses.

246.    California Civil Code §1709 mandates that in willfully deceiving Plaintiffs, the Classes, and the Subclasses with intent to induce or alter their position to their injury or risk, Defendants are liable for any damage which Plaintiffs, the Classes, and Subclasses thereby suffer.

247.    As described above, Plaintiffs, the Classes, and Subclasses have suffered significant harm as a direct and proximate result of Ledger's and Shopify's deceit and other unlawful conduct. Specifically, Plaintiffs, the Classes, and the Subclasses have been subject to numerous attacks,

including phishing scams and ransom threats, as well as severe emotional distress. Ledger and Shopify are liable for these damages.

**SEVENTH CAUSE OF ACTION**

**GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**O.C.G.A § 10-1-370, *et seq.***
**(On Behalf of the Georgia Subclass, Georgia Phishing Subclass, and Georgia Consumer Subclass)**
**(Against Ledger Only)**

248.    Plaintiffs incorporate the preceding paragraphs.

249.    Ledger, and the Georgia Subclass members are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

250.    Ledger engaged in deceptive trade practices in the conduct of its business, in violation of Georgia Code ("O.C.G.A.") § 10-1-372(a), including, but not limited to:

    a.    Representing that goods or services have characteristics that they do not have;

    b.    Representing that goods or services are of a particular standard, quality, or grade when they were not;

    c.    Advertising goods or services with intent not to sell them as advertised; and

    d.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

251.    Ledger's deceptive trade practices include, but are not limited to:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect the Georgia Subclass members' Personal Information, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Baton and the Georgia Subclass members' Personal

Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of the Georgia Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of the Georgia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the Georgia Subclass members' Personal Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of the Georgia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*

252. Ledger's representations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Ledger's data security and ability to protect the confidentiality of consumers' personal information, including the confidentiality of the fact that consumers purchased a Ledger devices or service and, therefore, owned crypto-assets.

253. Ledger intended to mislead the Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

254. In the course of their businesses, Ledger engaged in activities with a tendency or capacity to deceive.

255. Ledger acted intentionally, knowingly, and maliciously to violate Georgia's UDTPA, and recklessly disregarded the Georgia Subclass members' rights.

256. If Ledger disclosed to the Georgia Subclass members that their data systems were not secure and, thus, vulnerable to attack, Ledger would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

257.     Instead, Ledger received, maintained, and compiled the Georgia Subclass members' personal information as part of the services Ledger provided without advising the Georgia Subclass members that Ledger's data-security practices were insufficient to maintain the safety and confidentiality of the Georgia Subclass members' personal information. Accordingly, the Georgia Subclass members acted reasonably in relying on Ledger's misrepresentations and omissions, the truth of which they could not have discovered.

258.     As a direct and proximate result of Ledger's deceptive trade practices, the Georgia Subclass members have suffered and will continue to suffer monetary and non-monetary damages, in an amount to be proven at trial, for injuries that include at least the following ascertainable losses of money or property:

    a.   the loss of the benefit of their bargain with Ledger, as they would not have paid Ledger for goods and services or would have paid less for such goods and services but for Ledger's misconduct;

    b.   losses from fraud and theft;

    c.   costs for credit monitoring, identity protection services, or other services or products to attempt to recover stolen crypto-assets, protect crypto-assets, or protect personal information;

    d.   time and expenses incurred and to be incurred in monitoring their financial accounts for fraudulent activity;

    e.   time and money spent attempting to recover stolen crypto-assets, protect crypto-assets, or protect personal information;

    f.   loss of value of their personal information;

    g.   time and money spent attempting to replace or replacing the hardware and services that Ledger was supposed to provide but failed to provide; and

    h.   an increased, imminent risk of fraud and identity theft.

259.     The Georgia Subclass members seek all relief allowed by law, injunctive relief, and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

**EIGHTH  CAUSE OF ACTION**

**GEORGIA FAIR BUSINESS PRACTICES ACT**
**O.C.G.A § 10-1-393, *et seq.***
**(On Behalf of the Georgia Subclass, Georgia Phishing Subclass, and Georgia Consumer Subclass)**
**(Against Ledger Only)**

260.   Plaintiffs incorporate the preceding paragraphs.

261.   Georgia Fair Business Practices Act ("FBPA") prohibits unlawful, unfair, and deceptive practices in consumer transactions, including but not limited to (10-1-393):

    a.   Causing actual confusion or actual misunderstanding as to the approval or certification of goods and services;

    b.   Representing that goods or services have sponsorship, approval, characteristics . . . uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he or she does not have;

    c.   Representing that goods or services are of a particular standard, quality, or grade when they were not; and

    d.   Advertising goods or services with intent not to sell them as advertised.

262.   Ledger's deceptive trade practices include, but are not limited to:

    a.   Advertising its products and services of being the most secure, and advertising themselves as a company well familiar with data breach issues surrounding crypto technology and knowing how to avoid it;

    b.   Despite advertising itself and its services/products as being most secure and trustworthy technology, failing to implement and maintain reasonable security and privacy measures to protect the Georgia Subclass members' Personal Information, which was a direct and proximate cause of the Data Breach;

    c.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    d.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Baton and the Georgia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    e.   Misrepresenting that it would protect the privacy and confidentiality of the Georgia Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;

    f.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of the Georgia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*;

    g.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the Georgia Subclass members' Personal Information; and

    h.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of the Georgia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*

263.    Ledger's representations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Ledger's data security and ability to protect the confidentiality of consumers' personal information, including the confidentiality of the fact that consumers purchased a Ledger devices or service and, therefore, owned crypto-assets.

264.    Ledger intended to mislead the Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

265.    In the course of their businesses, Ledger engaged in activities with a tendency or capacity to deceive.

266.    Ledger acted intentionally, knowingly, and maliciously to violate Georgia's FBPA, and recklessly disregarded the Georgia Subclass members' rights.

267.   If Ledger disclosed to the Georgia Subclass members that its data systems were not secure and, thus, vulnerable to attack, Ledger would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

268.   Instead, Ledger received, maintained, and compiled the Georgia Subclass members' personal information as part of the services Ledger provided without advising the Georgia Subclass members that Ledger's data-security practices were insufficient to maintain the safety and confidentiality of the Georgia Subclass members' personal information. Accordingly, the Georgia Subclass members acted reasonably in relying on Ledger's misrepresentations and omissions, the truth of which they could not have discovered.

269.   As a direct and proximate result of Ledger's deceptive trade practices, the Georgia Subclass members have suffered and will continue to suffer monetary and non-monetary damages, in an amount to be proven at trial, for injuries that include at least the following ascertainable losses of money or property:

    a.  the loss of the benefit of their bargain with Ledger, as they would not have paid Ledger for goods and services or would have paid less for such goods and services but for Ledger's misconduct;

    b.  losses from fraud and theft;

    c.  costs for credit monitoring, identity protection services, or other services or products to attempt to recover stolen crypto-assets, protect crypto-assets, or protect personal information;

    d.  time and expenses incurred and to be incurred in monitoring their financial accounts for fraudulent activity;

    e.  time and money spent attempting to recover stolen crypto-assets, protect crypto-assets, or protect personal information;

    f.  loss of value of their personal information;

    g.  time and money spent attempting to replace or replacing the hardware and services that Ledger was supposed to provide but failed to provide; and

    h.  an increased, imminent risk of fraud and identity theft.

FIRST AMENDED CLASS ACTION COMPLAINT

270.    The Georgia Subclass members seek all relief allowed by law, examplarly damages (including treble damages), injunctive relief, and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-399.

### NINTH CAUSE OF ACTION

### NEW YORK DECEPTIVE TRADE PRACTICES ACT,
**N.Y. Gen. Bus. Law § 340, *et seq.***
**(On Behalf of the New York Subclass, New York Phishing Subclass, and New York Consumer Subclass)**
**(Against Ledger Only)**

271.    Plaintiffs incorporate the preceding paragraphs.

272.    New York General Business Law Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state…."

273.    Similarly, New York General Business Law Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]."

274.    Ledger committed unfair business acts and practices in violation of the New York General Business Law § 349 *et seq,* by:

    i.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Collinger and the New York Subclass members' Personal Information, which was a direct and proximate cause of the Data Breach;

    ii.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    iii.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Collinger and the New York Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    iv.   Misrepresenting that it would protect the privacy and confidentiality of the New York Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;

    v.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of the New York Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*;

    vi.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the New York Subclass members' Personal Information; and

275.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of the New York Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

276.   As a result of Ledger's actions and omissions, Plaintiff Collinger and the New York Subclass suffered damages, and seek damages, equitable and injunctive relief, as well as reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

On behalf of themselves, the Classes, and the Subclasses, Plaintiffs request as follows:

(a) That the Court determines that this Action may be maintained as a Class Action, that Plaintiffs be named as Class Representatives of the Classes and Subclasses, that the undersigned be named as Lead Class Counsel of the Classes and Subclasses, and that notice of this Action be given to Class and Subclass members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the laws set forth above;

(c) That the Court award Plaintiffs, the Classes, and Subclasses damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs, the Classes, and Subclasses are entitled, including but not limited to restitution and an Order requiring Defendants to cooperate and financially support civil and/or criminal asset recovery efforts;

FIRST AMENDED CLASS ACTION COMPLAINT
71

1    (e) That the Court award Plaintiffs, the Classes, and Subclasses pre- and post-judgment

2        interest (including pursuant to statutory rates of interest set under State law);

3    (f) That the Court award Plaintiffs, the Classes, and Subclasses their reasonable

4        attorneys' fees and costs of suit;

5    (g) That the Court award treble and/or punitive damages insofar as they are allowed by

6        applicable laws; and

7    (h) That the Court award any and all other such relief as the Court may deem just and

8        proper under the circumstances.

9                                    **JURY TRIAL**

10       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by

11   jury for all claims.

12   Dated: June 9, 2021                          Respectfully submitted,

13   */s/ Todd M. Scheider*                        */s/ Kyle W. Roche*
14   Todd M. Scheider (SBN 158253)               Kyle W. Roche (*pro hac vice*)
     Jason H. Kim (SBN 220279)                   Richard Cipolla (*pro hac vice*)
15   Matthew S. Weiler (SBN 236052)              Jolie Huang (*pro hac vice*)
     SCHNEIDER WALLACE                           ROCHE FREEDMAN LLP
16   COTTRELL KONECKY LLP                        99 Park Avenue, 19th Floor
     2000 Powell Street, Suite 1400              New York, NY 10016
17   Emeryville, California 94608                Telephone: (646) 970-7509
18   Telephone: (415) 421-7100                   Email: kyle@rcfllp.com
     Email:                                      Email: rcipolla@rcfllp.com
19   tschneider@schneiderwallace.com             Email: jhuang@rcfllp.com
     Email: jkim@schneiderwallace.com
20   Email: mweiler@schneiderwallace.com

21                                                Velvel Freedman (*pro hac vice*)
      */s/ Ryan J. Clarkson*                       Constantine P. Economides (*pro hac vice*)
22   Ryan J. Clarkson, Esq.                      ROCHE FREEDMAN LLP
     Bahar Sodaify, Esq.                         200 South Biscayne Boulevard
23   Yana Hart, Esq.                             Miami, FL 33131
     Christina N. Mirzaie, Esq.                  Telephone: (305) 971-5943
24   CLARKSON LAW FIRM, P.C.                     Email: vel@rcfllp.com
     9255 Sunset Blvd., Suite 804                Email: ceconomides@rcfllp.com
25   Los Angeles, CA 90069
26   Telephone: (213) 788-4050
     Email: rclarkson@clarksonlawfirm.com
27   Email: bsodaify@clarksonlawfirm.com         *Counsel for Plaintiffs*
     Email: yhart@clarksonlawfirm.com
28   Email: cmirzaie@clarksonlawfirm.com

                          FIRST AMENDED CLASS ACTION COMPLAINT