Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Email: tschneider@schneiderwallace.com
Email: jkim@schneiderwallace.com
Email: mweiler@schneiderwallace.com

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
Bahar Sodaify (SBN 289730)
Yana Hart (SBN 306499)
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Email: rclarkson@clarksonlawfirm.com
Email: bsodaify@clarksonlawfirm.com
Email: yhart@clarksonlawfirm.com

Richard Cipolla (*pro hac vice*)
Freedman Normand Friedland LLP
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 970-7509
Email: tnormand@fnf.law
Email: rcipolla@fnf.law

Velvel Freedman (*pro hac vice*)
Freedman Normand Friedland LLP
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Telephone: (305) 971-5943
Email: vel@fnf.law

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM SEIRAFI, EDWARD BATON, ANTHONY COMILLA, BRETT DEENEY, and ABRAHAM VILINGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEDGER SAS, SHOPIFY (USA) INC., SHOPIFY INC., and TASKUS, INC.<br><br>Defendants. | Case No. 21-cv-02470-EMC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1. NEGLIGENCE;<br>2. NEGLIGENCE PER SE;<br>3. DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF;<br>4. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.*;<br>5. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CIVIL CODE SECTION 1750, *et seq.*;<br>6. NEW YORK DECEPTIVE TRADE PRACTICES ACT, N.Y. Gen. Bus. Law § 349 *et seq.* |

SECOND AMENDED CLASS ACTION COMPLAINT

Individually and on behalf of all others similarly situated, Plaintiffs Naeem Seirafi ("Seirafi"), Edward Baton ("Baton"), Anthony Comilla ("Comilla"), Brett Deeney ("Deeney"), and Abraham Vilinger ("Vilinger"), (collectively, "Plaintiffs"), bring this Action against Defendant Ledger SAS ("Ledger"), Defendants Shopify Inc. and Shopify (USA) Inc. ("collectively, "Shopify"), and Defendant TaskUs, Inc ("TaskUs") (collectively, "Defendants"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## I.    **INTRODUCTION**

*"We know security means never standing still."*[1]

-Ledger.

*"Shopify strongly believes in protecting personal information, and understands that doing so is critical in helping you preserve the trust and confidence of your customers."*[2]

-Shopify.

*"TaskUs's culture embraces having a robust, nucleus-focus on security and privacy. Nothing less is acceptable in today's modern business world."*[3]

-TaskUs.

1.    Plaintiffs seek redress for the substantial, class-wide damages that Ledger's, Shopify's, and TaskUs's misconduct caused in connection with a massive 2020 data breach that those companies negligently allowed, recklessly ignored, and then intentionally sought to cover up. The breach has publicly leaked approximately 272,000 pieces of detailed personally identifiable information ("PII"), including consumers' full names, email addresses, postal addresses, and telephone numbers.

---

[1] *Ledger*, CypherHunter, https://www.cypherhunter.com/en/p/ledger/ (last accessed Nov. 9, 2023)
[2] *Privacy*, Shopify, https://help.shopify.com/en/manual/privacy-and-security/privacy (last accessed Nov. 9, 2023).
[3] *TaskUs Security & Compliance,* TaskUs (Oct. 2017), https://www.taskus.com/wp-content/uploads/2016/10/TaskUS_WhitePaper_Security-Compliance_1.4.pdf (last accessed Nov. 9, 2023)

1

SECOND AMENDED CLASS ACTION COMPLAINT

2.      With Shopify assisting as its e-commerce vendor, Ledger purports to provide "the highest level of security for crypto assets." Its primary products are hardware wallets ("Ledger wallets") that store the "private keys" of an individual's crypto-assets. These private keys are akin to a bank-account password in that access to the private keys allows an individual to transfer one's crypto-assets. But unlike a bank-account transaction, crypto-asset transactions are non-reversible: whoever gains access to the private keys associated with a crypto-asset can then transfer or spend that asset with impunity. Ledger purports to provide owners of crypto-assets with the best security to protect private keys from hackers and other bad actors.

3.      Ledger's sale platform is built on security and trust. As Ledger describes, "we are a unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software."[4]

4.      Ledger thus knows that anonymity is necessary to protect against hacking attempts. Crypto-asset transactions are publicly visible on the underlying blockchain, but using solely public information, nefarious actors cannot identify the owner of particular crypto-assets. Without personally identifying information, hackers face an immense obstacle to targeting an individual's crypto-assets. Conversely, when a hacker knows the identity of a crypto-asset owner, the hacker can construct a workable attack catered to a target.

5.      Consequently, to the world of hackers, Ledger's customer list is a gold mine. It is a list of people who have converted substantial wealth into anonymized crypto-assets that are transferrable without a trace. Using that list, hackers can manipulate or compel those owners to make untraceable and irreversible transfers of the crypto-assets into the hackers' accounts. The stakes of security for crypto-assets are thus enormous. With anonymity, owning a Ledger wallet is a cutting-edge method of securing crypto-assets. But without anonymity, owning a Ledger device simply creates a target for hackers.

---

[4] *We Are Ledger: A Brand Vision*, LEDGER (Nov. 22, 2019) https://www.ledger.com/we-are-ledger (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

6.      Ledger understands these realities and purports to account for them. As Ledger claims in its advertising: "If you don't want to get hacked, get a Ledger wallet."[5] Ledger advertises that it has the "highest security standards," that it "continuously look[s] for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security," and that its products provide "the highest level of security for crypto assets." Ledger has built a reputation of the highest possible trust, protection, and security for consumers. Based on Ledger's advertising claims, consumers expect that their personal data, along with their cryptocurrency assets, will remain anonymous, secure, and private. With that expectation, consumers specifically seek out the products and services provided by Ledger. True and correct screenshots of Ledger's advertising claims on its website are depicted below:



_____

[5] *Enjoy Security, Ownership and Ease of Use for Your Crypto with Ledger* , LEDGER, https://www.ledger.com/ (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

## The highest security standards

### The first & only certified hardware wallet on the market

Ledger is the first and only certified hardware wallet on the market, certified for its security by ANSSI, the French cyber security agency.

### Integrates a Secure Element (SE), the most secured chip

Ledger hardware wallets integrate a certified chip, designed to withstand sophisticated attacks, and capable of securely hosting cryptographic data such as private keys.

### The only device with a custom Operating System for more protection

Ledger wallets are the only hardware wallet to have their own custom OS (BOLOS) to protect the device against malicious attacks and isolate applications from each other.

### Genuine check to assure your device integrity at all time

The genuine check developed by Ledger is an authentication ensuring that your Ledger device has not been tampered with or compromised by a third party.

### Key takeaways

– Ledger hardware wallet, combined with the Ledger Live application, is the best solution to secure and control your crypto assets
– Ledger hardware wallets are designed with the highest security standard to keep your crypto secure at all time
– Ledger Live app is the one-stop-shop for your crypto: buy, sell, exchange, stake and lend your assets with our partners, easily & securely
– With Ledger you can secure and manage a wide range of crypto assets – 1500+ crypto assets supported
– The most popular hardware wallets: more than 2 millions units sold all over the world

4

SECOND AMENDED CLASS ACTION COMPLAINT





SECOND AMENDED CLASS ACTION COMPLAINT

7.      Despite its repeated promises and world-wide advertising campaign touting state of the art security for its customers, Ledger repeatedly and profoundly failed to protect its customers' identities, causing targeted attacks on thousands of its customers' crypto-assets and causing Class members to receive far less security than they thought they purchased with a Ledger wallet. Without the needed security, Ledger wallets are valueless or, at the very least, of much lower value. Plaintiff Serafi and other similarly situated California consumers would not have purchased Ledger wallets had they known that Ledger has failed to utilize the promised security measures, employed multiple vendors, and failed to oversee such vendors' and their handling of the data.

8.      Between approximately September 2019 and August 2020, Ledger employed Shopify to handle payments for Ledger wallets and allowed access to a vast amount of customer data, even after the wallets were sold. Shopify, in turn, employed TaskUs—a U.S. based outsourcing company registered to conduct business in California, that provides a number of internet-based content services and outsources support from the Philippines. Shopify hired TaskUs to provide customer support and data security consulting services for Ledger's sales website and the Ledger Live services, in which Ledger customers could obtain live support for their investments and effectuate transfers of their assets on Ledger's website.

9.      Specifically, TaskUs was entrusted with the information collected by the Ledger Live service and the Ledger website via the Shopify Defendants' collection of the data through their e-commerce services to Ledger. TaskUs therefore had access to, and was entrusted with, the sensitive user PII that would ultimately allow cybercriminals to target Plaintiffs and Class members with sophisticated phishing attacks.

10.      Between April and June of 2020, certain "rogue" TaskUs employees took advantage of the Ledger customer information provided to the company through the Shopify Defendants' e-commerce services and acquired and exported Plaintiffs' and Class members' customer transactional records. The TaskUs employees also obtained data relating to other merchants.

11.      On September 22, 2020, the Shopify Defendants announced that "two rogue members of our support team were engaged in a scheme to obtain customer transactional records of certain merchants," involving "the data of less than 200 merchants" and that their support teams had

6
SECOND AMENDED CLASS ACTION COMPLAINT

"been in close communication with affected merchants to help them navigate this issue and address any of their concerns." This announcement made it clear that the Shopify Defendants were aware of the Data Breach before the day of the announcement and even had time to "conduct an investigation" and notify affected merchants.

12.    On February 19, 2021, a federal grand jury indicted a California man for wire fraud related to the Data Breach because he paid an employee of a Shopify vendor (TaskUs) to provide him with Shopify's merchant data.[6]

13.    The two customer support agents working for the Shopify vendor, TaskUs, obtained merchant and customer data of Shopify's customers, including Ledger. Using this access, the California man obtained a list of Ledger's customers, as well as email addresses and other contact information. TaskUs negligently hired their agents and failed to oversee them, resulting in this security breach.

14.    Ledger knew or should have known of TaskUs's involvement. Ledger and Shopify failed to oversee the handling of the data, including the handling of the data by TaskUs' agents in the Philippines, resulting in the instant security breach. By May/June 2020, Ledger's customer list and their sensitive data had made its way onto the internet's black market, making Ledger wallet owners vulnerable.

15.    The circumstances grew much worse over the next six (6) months. From June 2020 through December 2020, at least one of the hackers who had acquired the data published it online, providing over 270,000 names, physical addresses, phone numbers, and order information, as well as email addresses that were used to purchase the Ledger Wallets, to every hacker in the world. Upon information and belief, other sensitive data was accessed as well, including but not limited to dates of birth, amount of crypto-assets and type of crypto-assets; Defendants have made a collective effort to cover up the full extent of the affected data they failed to protect. As a direct result, the attacks on Ledger's customers grew exponentially, with customers losing money, facing threats of

---

[6] *See* Criminal Indictment, *United States v. Heinrich*, 8:21-cr-22-JLS (C.D. Cal. 2021), Docket No. 16 at 2.

SECOND AMENDED CLASS ACTION COMPLAINT

physical violence, and even feeling vulnerable in their own homes. Ledger wallet owner continue to be targeting by scammers, receiving counterfeit hardware wallets at their home addresses feigning to be an updated, "safe" device from Ledger itself, but is actually designed for malware delivery.[7] Indeed, using the customer shipping addresses and other sensitive PII that Ledger, Shopify, and TaskUs had failed to protect, hackers threatened to enter the homes of and attack Ledger customers unless those customers made untraceable ransom payments with the crypto-assets Ledger was supposed to secure.

16.    In the face of these obviously emergent circumstances, rather than acting to protect its customers, Defendants Ledger, Shopify, and TaskUs collectively stood still. In fact, Shopify's head of privacy and data protection officer paid no attention to the publicized articles and reports about the data breach and made no effort to timely investigate the scope of the alleged data breach, prevent and stop the data breach from happening, or notify the affected customers. Ledger used a different approach: it utterly denied that any breach had occurred and continued to claim its products provided the best possible protection for crypto-assets. Defendants did not even inform the affected Ledger's customers of the breach. According to Ledger, it learned of the Data Breach on July 14, 2020, but failed to promptly issue a statement or notify any affected Ledger customers of the Data Breach. On July 29, 2020, Ledger partially admitted that it was involved in the Data Breach, yet Defendants continued to withhold any attempts to notify affected Ledger customers of the Data Breach. When Ledger finally announced that its marketing and e-commerce database had been exposed in June of 2020, it vastly underestimated the breadth of affected customers (estimating 9,500 affected).[8] As the customer list began to spread on the dark web, only in December of 2020 did Ledger finally admit the existence of the breach but nevertheless disputed its publicly-reported scope, and instead significantly minimized the extent of the data breach.

---

[7] *Inside The Scam: Victims Of Ledger Hack Are Receiving Fake Hardware Wallets,* NASDAQ (June 17, 2021), https://www.nasdaq.com/articles/inside-the-scam:-victims-of-ledger-hack-are-receiving-fake-hardware-wallets-2021-06-17 (last accessed Nov 9, 2023).

[8] *See Ledger Breach Vastly Underestimated*, 270,000 Clients Data Leaked, CRYPTOBRIEFING (Dec. 21, 2020), https://cryptonews.net/en/news/security/439897/.

SECOND AMENDED CLASS ACTION COMPLAINT

17.     By December 21, 2020, however, Ledger could no longer cover up the data breach that all Defendants had known or should have known for at least six (6) months. On that day, the hacked customer list was posted publicly and became widely available. In a message posted on its website from its CEO, Ledger finally admitted to the scope of the attack, stating that the company "very deeply regret[s] this situation."[9] Ledger's CEO further acknowledged that, as a result of the hack, "many [Ledger customers] have been targeted by e-mail and SMS phishing campaigns and that it's clearly a nuisance."[10]

18.     Ledger's, Shopify's, and TaskUs's misconduct, failure to prevent the data breach, and failure to take action for six (6) months (if not longer), has made targets of Ledger customers, with their identities known or available to every hacker in the world. Ledger's persistently deficient response compounded the harm. In failing to individually notify every affected customer or admit to the full scope of the breach, Ledger left customers unaware of the data breaches and concomitant hacking risks. The natural and foreseeable result was that many customers fell victim to hackers' phishing emails disguised as emails from Ledger. Further, with their PII now in hackers' hands as a result of the Data Breach, Plaintiffs and Class members are no longer in possession of a secure cryptocurrency portfolio.

19.     Ledger's deficient response to the data breach included a failure to provide any support for customers who had been targeted by the breach or who feared they would be targeted in the future. Users are informed that "Ledger does not provide phone support." Instead, customers are directed to contact Ledger by submitting a written complaint in an online form or by email, to which Ledger would respond after weeks (if it responded at all). Following the December breach, customers reported emailing Ledger dozens of times with no response. Users reported through Twitter that they submitted customer service requests that went unanswered for several weeks, several months, and hundreds of days. Ledger acknowledged its deficient response times, claiming

---

[9] *Message by Ledger's CEO-Update on the July Data Breach*, LEDGER (Dec. 21, 2020), https://www.ledger.com/message-ledgers-ceo-data-leak#:~:text=We%20are%20aware%20that%20many,security%20for%20your%20digital%20assets (last accessed Nov 9, 2023).
[10] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

after the breach "[w]e are facing an increase in requests which may result in a longer reply time from Ledger Support. We apologize for the delay while we work to provide you the best service."

20.     But Ledger never provided "the best service." It did not even provide a minimum level of service. Instead, Ledger had become the primary source of vulnerability to owners of crypto-assets and then left those customers without the help they needed. For those seeking to secure crypto-assets, it had become safer to have never purchased a product or service from Ledger. And all the while, Ledger stood still. Thus, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and complete lack of timely customer support, Ledger customers would not have purchased Ledger wallets or would not have paid as much as they did for Ledger wallets.

21.     On behalf of the Class and Subclasses of California Ledger wallet purchasers and as nationwide individuals affected by the data breach described herein, Plaintiffs seek, under state common law and consumer-protection statutes, to redress Defendants' misconduct occurring from April 1, 2020, to the present (the "Class Period").

## II.     PARTIES

### Plaintiffs

22.     **Plaintiff Seirafi** is an individual residing in Los Angeles, California. Seirafi purchased the Ledger Nano X for use as a digital wallet to control his cryptocurrency assets. On or around March 2019, Seirafi saw advertisements online for Ledger's services and hardware. Relying on Ledger's representations, Seirafi purchased the Ledger Nano X hardware wallet from Ledger's official website for approximately $120. In doing so, Seirafi was required to provide Ledger with his first and last name, email address, telephone number, and postal address. In making his purchase decision, Seirafi reasonably relied upon the data security services advertised by Ledger, believing Ledger's corresponding services to be safer, better protected, and more secure as a result. Seirafi would not have purchased the Ledger Nano X if he knew that the sensitive information collected by Ledger would be at risk. Seirafi has suffered damages and remains at a significant risk now that his PII has been leaked online.

SECOND AMENDED CLASS ACTION COMPLAINT

23.    **Plaintiff Baton** is a resident of Georgia. In July 2017, he purchased a Ledger Nano S from the Ledger online store for use as a digital wallet to control his cryptocurrency assets. He subsequently purchased a second Ledger Nano S from the Ledger online store. In making those purchases, he reasonably relied on Ledger's misrepresentations about the security of its products. He would not have purchased the products if he had known that his sensitive information collected by Ledger would be at risk or that his purchase would become public knowledge. On December 21, 2020, Ledger informed him that his data had been part of a breach. Baton has suffered damages from the breach as set forth below.

24.    **Plaintiff Comilla** is a resident of Albany, New York. Comilla purchased the Ledger Nano X from the Ledger online store for use as a digital wallet to control his cryptocurrency assets on or about June 2, 2020. In doing so, Comilla was required to provide Ledger with his first and last name, phone number, postal address, and email address. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products, believing that that Ledger Nano X was his safest and best option for storing his cryptocurrency. Comilla would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Comilla has suffered damages from the breach as set forth below.

25.    **Plaintiff Deeney** is a resident of London in the United Kingdom. Deeney purchased a Ledger "Back-Up Pack," consisting of a Ledger Nano X and a Ledger Nano S, on or about February 21, 2020 through Ledger's official website for € 114.16 (excluding tax) for use as a digital wallet to control his cryptocurrency assets. In doing so, Deeney was required to provide Ledger with his first and last name, the email address he used exclusively for crypto-asset transactions, his telephone number, and his postal address including unit number. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products. Deeney would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Deeney has suffered damages from the breach as set forth below.

26.    **Plaintiff Vilinger** is a resident of Tel Aviv, Israel. Vilinger purchased the Ledger Nano S from the Ledger online store for use as a digital wallet to control his cryptocurrency assets on or about January 15, 2018. In doing so, Vilinger was required to provide Ledger with his first

and last name, phone number, postal address, and email address. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products, believing their ads and website that indicated the Ledger Nano S was a "cold" offline, secure, and not hackable wallet. Vilinger would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Vilinger has suffered damages from the breach as set forth below.

### Defendants

27. Defendant Ledger SAS is a French simplified joint-stock company headquartered in Paris, France. Ledger SAS maintains its principal place of business at 1 Rue du Mail, 75002 Paris, France. It also has offices located at 121 2nd St., #4, San Francisco, CA 94105.  Defendant Ledger SAS offers the hardware wallet Products to secure and control cryptocurrency assets on an online international marketplace, including the State of California. Ledger SAS, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Ledger SAS is the owner and distributor of the products at issue, was entrusted with the PII of Plaintiff and the Class, and is the company that created and/or authorized the false, misleading, and deceptive advertisements and promises (jointly and severally with Ledger Technologies, Inc.).

28. Defendant Shopify Inc. is a Canadian Corporation with offices at 151 O'Connor Street, Ground floor, Ottawa, Ontario, K2P 2L8.

29. Defendant Shopify (USA) Inc. is a Delaware corporation registered to do business in California with its principal place of business in Ottawa, Canada. It is a wholly-owned subsidiary of Shopify Inc.

30. Defendant TaskUs, Inc., at all material times hereto, was a Delaware corporation headquartered in California and moved its residence to Texas in 2021. TaskUs, at all relevant times herein was registered to do business in California, and previously headquartered at 3400 Airport Ave, Bldg. D, Santa Monica, CA 90405. TaskUs has now moved to 1650 Independence Drive, Suite 100, New Braunfels, Texas, 78132.

### III.    JURISDICTION AND VENUE

31.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, there are more than 100 class members, and the matter is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

32.    This Court has personal jurisdiction over all parties because all Defendants conduct business in the State of California, and the substantial events leading up to the breach at issue have occurred in California.

33.    This Court also has personal jurisdiction over Ledger SAS because Ledger SAS solicits customers, including Plaintiffs and Class members, in the United States and California/ Ledger SAS directly ships a substantial amount of its hardware wallets into the United States and California. But for those sales and soliciting those purchases, it would not have collected the PII that was compromised in this case. In fact, 33% of the compromised two hundred and seventy-three thousand (273,000) accounts with address information belonged to Class members with U.S. addresses.

34.    This Court also has personal jurisdiction over Ledger SAS because Shopify (USA) acted as that entity's agent for the conduct giving rise to Plaintiffs' claims. With respect to the breached data of Ledger SAS's customers, the responses to the breaches, and the conduct giving rise to Plaintiffs' causes of action, Ledger SAS had the right to control the conduct of Shopify and TaskUs, which acted as Ledger's agent and was authorized to act on Ledger SAS's behalf with respect to Ledger's customers.

35.    The Ninth Circuit has concluded that this Court has jurisdiction over Ledger with respect to Plaintiffs' California consumer law claims. Plaintiffs' claims arise out of their purchase of Ledger wallets, which requires their agreement to the Sales Terms and Conditions, Privacy Policy, and Ledger Live Terms of Use. Each agreement includes a broad forum-selection clause which is enforceable, except with respect to Plaintiffs who are "California resident plaintiffs

SECOND AMENDED CLASS ACTION COMPLAINT

bringing class action claims under California consumer law." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009).[11]

36.     This Court also has personal jurisdiction over TaskUs because, at all material times hereto, TaskUs was headquartered in California (albeit it negligently hired and also failed to oversee its agents in Philippines). TaskUs was responsible for the negligent hiring and oversight of the agents who abused their access to merchant and customer data of Shopify's customers, including Ledger. This security breach caused Ledger wallet owners' data to be released to the internet's black market, compromising their PII.

37.     This Court also has personal jurisdiction over Shopify and Shopify (USA) because they solicit customers and transact business in California, including with Ledger and those who purchased products or services from Ledger.

38.     The Shopify entities had access to Ledger's customer's private information and failed to secure the received PII or implement any security measures or even screening measures to ensure that its agents, support representatives, and other individuals to whom Shopify entrusted the private PII data would ensure secure handling of the data.

39.     Before and leading up to the data breach, Shopify USA employed Vivek Narayandas as the "Data Protection Officer" and global head of privacy for all Shopify entities, including Shopify, Inc., in California. The Data Protection Officer was the first dedicated privacy hire in Shopify's in-house legal team.

40.     Shopify Inc. Chief Legal Officer and Corporate Secretary Joe Frasca interviewed and ultimately decided to hire the Data Protection Officer.

41.     As the Data Protection Officer, Vivek Narayandas performed acts in California that caused Plaintiffs' injury. As set forth in further detail below, the Data Protection Officer was responsible for "building" out the privacy functions for all of Shopify. With regards to this data breach, the Data Protection Officer had roles in both (1) Shopify's failure to oversee its vendor who was hacked and (2) Shopify's failure to timely communicate the hack to affected consumers.

---

[11] *See* Memorandum Opinion, Dkt. 53-1, *Baton et al. v. Ledger SAS et al*, D.C. No. 3:21-cv-02470-EMC, Case No. 21-17036 (9th Cir. 2022).

SECOND AMENDED CLASS ACTION COMPLAINT

42. As the first data privacy hire, the Data Protection Officer was responsible for building out the privacy functions across Shopify, including overseeing Shopify's efforts to comply with laws such as the California Consumer Privacy Act and the European Union's General Data Protection Regulation ("GDPR"). Indeed, the title "Data Protection Officer" is a required position taken from the GDPR regulations to ensure compliance with the GDPR and comes with certain duties. The Data Protection Officer was also the Head of Privacy for the Shopify entities.

43. Part of building out privacy functions involved working directly with Shopify product teams to comply with laws like GDPR but also to implement a privacy-by-design philosophy and baseline privacy expectations, even for jurisdictions and data not subject to GDPR regulations.

44. The Data Protection Officer also drafted privacy policies and reviewed vendor agreements for privacy issues, provided training to Shopify employees on privacy issues, and was responsible for performing regular assessments and audits to ensure compliance with the GDPR, creating processes for Shopify's "incident response teams," and performing protection impact assessments.

45. The Data Protection Officer also oversaw the operational and legal responses to security incidents and data breaches. For instance, after the TaskUs data breach came to light, the Data Protection Officer was involved in communicating with TaskUs, drafting communications with merchants, communicating with law enforcement, responding to regulator inquiries, ensuring Shopify International Limited complied with disclosure requirements, hiring, and managing outside counsel to address the effects of the data breach, and managing the investigation into the data breach.

46. The Data Protection Officer admitted that he was responsible for at least some controls that would apply to TaskUs.

47. The Data Protection Officer also advised senior management at Shopify Inc., on issues related to privacy and data protection, though much of his work was "self-directed."

48. The Data Protection Officer also regularly reported to and attended board meetings of Shopify Inc.

15
SECOND AMENDED CLASS ACTION COMPLAINT

49.     Mr. Narayandas was an authorized agent and the Data Protection Officer of Shopify from the moment he was hired. He was paid by the Shopify entity located in California, while taking actions and acting on behalf of both entities with respect to the privacy-related decisions, including his steps and missteps taken as they relate to the data breach at issue.

50.     The Data Protection Officer performed all this work from California from July of 2018 until the Data Protection Officer resigned from Shopify in December 2021. When Shopify originally hired the Data Protection Officer, it wanted to fill the role in Canada (for all Shopify entities). At all times herein, all entities had knowledge that the Data Protection Officer would be located in California and directing actions from California.

51.     The Data Protection Officer maintained a home office in California and worked there. When performing these job duties in California, the Data Protection Officer was an agent of Shopify, and directed the work of Shopify's employees related to privacy and data handled by Shopify.

52.     After Frasca left Shopify, the Data Protection Officer replaced Frasca for a time. The Data Protection Officer was also one of two co-leads of Shopify's entire legal team while it searched for a new general counsel in 2021.

53.     The Data Protection Officer also managed Shopify Inc. employees. Among his twenty direct and indirect reports, the Data Protection Officer managed three individuals that made up Shopify's in-house privacy team. Two of the individuals worked for Shopify in Canada (almost certainly for Shopify Inc.), and the other for Shopify in Ireland at Shopify International Limited. That is, from California, the Data Protection Officer was directing the daily activities of subordinates in Ireland and Canada for other Shopify entities.

54.     In contrast, although employed by Shopify USA, the Data Protection Officer did not report to anyone for Shopify USA. The Data Protection Officer had no job duties specific to only Shopify USA but processed all customer data for Shopify entities.

55.     Shopify Inc. and Shopify USA use the same email signatures, share employees (such as the Data Protection Officer who performed daily tasks for Shopify Inc, while also overseeing all privacy related aspects for all Shopify entities). The Data Protection Officer was never required to

SECOND AMENDED CLASS ACTION COMPLAINT

separate his duties as a Shopify Inc. Data Protection Officer from the Assistant General Counsel for Shopify USA, and was, at all times acting on behalf of both entities.

## IV.    FACTUAL ALLEGATIONS

### A.  Data Breaches and the Market for PII

56.    Data breaches in the United States have become commonplace – from nearly 125 million breaches in just the fourth quarter of 2020, to approximately 15 million breaches in the third quarter of 2022 (increasing 167% compared to the previous quarter) – with the goal of criminals being to monetize the stolen data.[12]

57.    When a victim's data is compromised in a breach, the victim is exposed to serious ramifications regardless of the sensitivity of the data—including but not limited to identity theft, fraud, decline in credit, inability to access healthcare, as well as legal consequences.[13]

58.    The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that resolution of those problems could take more than a year.[14]

59.    The U.S. Government Accountability Office has concluded that it is common for data thieves to hold onto stolen data for extended periods of time before utilizing it for identity theft.[15] In the same report, the Government Accountability Office noted that while credit monitoring services can assist with detecting fraud, those services do not stop it.[16]

---

[12] Ani Petrosyan, *Number of Data Records Exposed Worldwide From 1st Quarter 2020 to 3rd Quarter 2022*, STATISTA, https://www.statista.com/statistics/1307426/number-of-data-breaches-worldwide/ (last accessed Nov. 9, 2023).

[13] *2017 Annual Data Breach Year-End Review*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/wp-content/uploads/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf (last accessed Nov. 9, 2023).

[14] Erika Harrell, *Victims of Identity Theft, 2014,* U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last accessed Nov. 9, 2023).

[15] U.S. Government Accountability Office Report to Congressional Requesters, *Data Breaches – Range of Consumer Risks Highlights Limitations of Identity Theft Services* (March 2019), https://www.gao.gov/assets/700/697985.pdf (last accessed Nov. 9, 2023).

[16] *Id.*

60.     When companies entrusted with people's data fail to implement industry best practices, cyberattacks and other data exploitations can go undetected for a long period of time. This worsens the ramifications and can even render the damage irreparable.

61.     PII is a valuable commodity for which a black market exists on the dark web, among other places. Personal data can be worth from $1,000 - $1,200 on the dark web[17, 18] and the legitimate data brokerage industry is valued at more than $250 billion dollars. The value is even higher for the PII that cannot be changed.

62.     In this black market, criminals seek to sell the spoils of their cyberattacks to identity thieves who desire the data to extort and harass victims, take over victims' identities to open financial accounts, and otherwise engage in illegal financial transactions under the victims' names.

63.     PII has a distinct, high value—which is why legitimate companies and criminals seek to obtain and sell it. As alleged in more detail below, there is a growing market for individuals' data.[19]

64.     The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that resolution of those problems could take more than a year.

65.     As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and financial fraud.[20] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the "dark web."

---

[17] Ryan Smith, *Revealed-how much is personal data worth on the dark web*?, INSURANCE BUSINESS MAGAZINE (May 1, 2023), https://www.insurancebusinessmag.com/ca/news/cyber/revealed--how-much-is-personal-data-worth-on-the-dark-web-444455.aspx (last accessed Oct. 26, 2023).

[18] Maria LaMagna, *The sad truth about how much your Google data is worth on the dark web*, MARKETWATCH (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-facebook-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20 (last accessed Nov. 9, 2023).

[19] Emily Wilson, *The Worrying Trend of Children's Data Being Sold on the Dark Web*, TNW (Feb. 23, 2019), https://thenextweb.com/contributors/2019/02/23/children-data-sold-the-dark-web/ (last accessed Nov. 9, 2023).

[20] *What To Know About Identity Theft*, FEDERAL TRADE COMMISSION, https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

66. Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

**B. Defendants' Duty to Safeguard User's Private Information**

67. Defendants were prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

68. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.

69. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[21] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

70. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

71. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and

---

[21] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Nov. 9, 2023).

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA 15 U.S.C. § 45.

72.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

73.    The FTC recommends that businesses have a comprehensive communication plan that reaches all affected audiences—employees, customers, investors, business partners, and other stakeholders—in the case of a data breach.  This plan should be designed to quickly notify people that their personal information has been compromised so that they can take steps to reduce the chance that their information will be misused.

74.    The FTC also instructs businesses to provide detailed notices to affected parties that "clearly describe what you know about the compromise." This information, at a minimum, should include: "how it happened; what information was taken; how the thieves have used the information (if you know); what actions you have taken to remedy the situation; what actions you are taking to protect individuals, such as offering free credit monitoring services; and how to reach the relevant contacts in your organization."[22]

## C.  **Bitcoin and Crypto-Assets**

75.    A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

76.    Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most popular crypto-asset, with a market capitalization exceeding $700 billion as of the filing of this complaint.[23] (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.

---

[22]*Data Breach Response: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business    (last accessed Nov. 9, 2023).

[23]   *Cryptocurrency Prices Today By Market Cap,* FORBES, https://www.forbes.com/digital-assets/crypto-prices/?sh=385f823b2478 (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

77.    At its core, Bitcoin is a ledger of addresses and transfer amounts that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain. The blockchain is completely public.

78.    Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve a similar goal of decentralization.

79.    In April 2013, there were only seven crypto-assets listed on coinmarketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, the site monitors more than 8,825 crypto-assets.[24]

i.    Transacting with Bitcoin and Blockchain Addresses

80.    Because all blockchain addresses and transfers are public, the way to verify ownership of an address is through public and private keys.

81.    Each address has one public key and one private key associated with it. With the private key, one can control the address and can move bitcoin in or out of the account. The public key is more like a digital signature that is used to verify ownership and transfers of funds. The blockchain address, public key, and private key are often mathematically related to one another.

82.    The private key is, however, the only mechanism that allows for the transfer of crypto-asset. With the private key—and nothing more—a person can implement an untraceable transfer of the crypto-asset from one digital address to another. Without the private key, the crypto-asset can never be transferred. In other words, anyone with the private key has total control over the funds. Thus, to safeguard crypto-assets, one must keep the private key private.

---

[24] *Today's Cryptocurrency Prices by Market Cap*, COIN MARKET CAP, https://coinmarketcap.com/?page=89 (last accessed Nov. 21, 2023)

ii.    Security and Crypto-Assets

83.    It is the cryptographic principles behind the use of public and private keys that give crypto-assets their name. Cryptography is at the heart of blockchain transactions, and security is one of the chief advantages and selling points of the technology.

84.    Nonetheless, since the inception of crypto-assets, there have been high-profile hacks to steal them. One of the first large Bitcoin exchanges (handling over 70% of all Bitcoin transactions at the time) lost a staggering 850,000 bitcoins to theft, with a value exceeding $31 billion USD today.

85.    It has been estimated that over $4 billion crypto-assets were lost to theft and related crimes in 2019.[25] That risk of theft continues today.

86.    Because it is nearly impossible to guess a user's private key, hackers employ various methods to gain access to private keys. Once a hacker obtains the private key for an address, the hacker controls its funds. Unlike traditional accounts housed at banks, there are no approvals or fraud monitoring warnings for moving crypto-assets out of an account. Moreover, any transfer is effectively untraceable and irreversible, leaving the recipient immune from identification or claw-back.

87.    Given this constant threat of theft, security over an individual's private keys is paramount.

**D.  Ledger and Hardware Wallets**

88.    Ledger is a $1.41 billion[26] corporation that is used world-wide for its unique hardware cryptocurrency wallets that allow consumers to secure and manage their cryptocurrency assets. Ledger's line of hardware security devices quickly gained popularity and positioned Ledger

---

[25] Jeb Su, *Hackers Stole Over $4 Billion From Crypto Crimes In 2019 So Far, Up From $1.7 Billion In All Of 2018*, FORBES (Aug. 15, 2019), https://www.forbes.com/sites/jeanbaptiste/2019/08/15/hackers-stole-over-4-billion-from-crypto-crimes-in-2019-so-far-up-from-1-7-billion-in-all-of-2018/?sh=42ef46855f58 (last accessed Nov. 9, 2023).

[26] *Crypto wallet company Ledger raises another $108 million,* TECHCRUNCH (Mar. 30, 2023), https://techcrunch.com/2023/03/30/crypto-wallet-company-ledger-raises-another-108-million/ (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

as a global leader in the market with 1,000,000 units sold in more than 165 countries. Ledger designs and sells the Ledger Nano X and the Ledger Nano S, both hardware wallets, along with a corresponding application and other services for consumers to control and track their assets. Ledger advertises that its technologies constitute a "unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software."

89.    As set forth above, Ledger offers solutions to consumers to keep their crypto-assets safe. Ledger's main product offerings are "hardware wallets." These are physical consumer items that appear similar to a USB storage device. This is an example of a Ledger hardware wallet:



90.    Despite being named a "wallet," such wallets do not "hold" cryptocurrency in the way a traditional wallet stores cash. Rather, consumers store their private keys on these physical devices, which are never connected to the internet (at least in the case of Ledger's products).

91.    The wallet itself can be accessed only by entering a PIN. Simply misplacing the wallet thus poses no risk of theft.

92.    Ledger also produces "Ledger Live," a software product designed to interact with devices. This screenshot shows its core functionality, in that a user can use the software to buy, sell, send, and receive various crypto-assets:



93.     Ledger has been highly successful selling these devices and services. Having raised $88 million in funding, it is one of the market leaders for crypto-asset security.

94.     Ledger collects and processes the personal data of all consumers who purchase Ledger products, including, but not limited to, first and last names, e-mail addresses, post addresses, and telephone numbers.

95.     This PII was collected by Ledger when Plaintiff and the Class purchased the Products. Ledger's privacy policy, which was updated on July 28, 2020, outlines the security measures used to protect consumer's PII and what this information is used for.[27] Under the privacy policy, Ledger claims to implement:

> "[N]ecessary technical and organizational measures, in order to

---

[27] *Privacy Policy*, LEDGER (April 2022),   https://shop.ledger.com/pages/privacy-policy (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

> ensure the security and confidentiality of your personal data collected and processed, and particularly, to prevent your personal data from being distorted, damaged or communicated to unauthorized third parties, by ensuring an appropriate level of security with regards to the risks associated with the processing and the nature of the personal data to be protected."

### i.    Hacking Hardware Wallets

96.    Users of hardware wallets generally face discrete risks of theft by hacking because private keys exist only where the owners store them. If an owner stores the private keys only on a hardware wallet with no internet connectivity—and not on a personal computer—then traditional hacking cannot reveal those private keys. Instead, the main sources of risk are: (1) "phishing" attacks to trick a user into revealing the private PIN to their hardware wallet; or (2) physical intimidation that forces users into paying money or revealing that information to a hacker.

97.    Phishing is the practice of purporting to be a legitimate institution and contacting targets with the goal of soliciting passwords, banking information, or other sensitive information. Common examples of this practice include mass spam emails sent to mimic the look and feel of a banking website. The email recipient receives the email, believes she needs to link to the account to update information, clicks a link in the email that goes to a sham website made to look like the real bank website, and enters real login information into the sham website. The owners of the sham website then possess that victim's real banking login and password.

98.    Internet users are becoming more and more savvy to phishing, however, requiring hackers to craft attacks that are increasingly realistic and personalized and less reliant on large-scale mass efforts.

99.    Phishing attacks are also generally harder to accomplish against Ledger users, who are typically more skeptical and security conscious and, in turn, savvier to phishing practices. For example, Ledger users will commonly create special email addresses used just for interacting with accounts that manage their crypto assets. And Ledger users will often have a separate dedicated phone number to use for dual-factor authentication when interacting with their crypto assets.[28] These

---

[28] Dual authentication is a method in which a user is granted access to some system or device only

SECOND AMENDED CLASS ACTION COMPLAINT

dedicated email addresses and phone numbers add another layer of protection to avoid phishing attacks. Users know that crypto-asset-related emails, texts, or calls to any "main" email address or phone number are illegitimate.

100. Similarly, using a separate phone number can protect users from other attacks, such as SIM swap attacks.[29] A SIM swap attack occurs when an attacker gains control of an individual's phone number by convincing the individual's mobile carrier to switch it to a new SIM card—one that the attacker possesses. Once attackers gain control of that phone number, they can then bypass dual-factor authentication requirements.

101. Plaintiff Baton—who has a professional background, including in technology—was as savvy as anyone buying crypto assets and hardware wallets as far back as 2017. Accordingly, in addition to buying multiple Ledger products for storing his crypto assets, Plaintiff Baton took other precautions. For example, he acquired a separate mobile phone and always interacted with crypto assets using a virtual private network to encrypt communications and shield his IP address.

102. Similarly, Plaintiff Deeney is an experienced, sophisticated, and security-savvy crypto asset investor. He used a dedicated email address for his crypto asset transactions.

103. As to physical intimidation, even the savviest internet user cannot insulate himself from such threats. A hacker can contact an owner of crypto-assets and threaten the owner with physical violence unless an effective ransom is paid (usually in the form of an untraceable transfer of crypto-assets transfer to the hacker). These threats are rare. Without knowing an owner's home address, physical location, or even phone number, a hacker would have difficulty making a credible threat prompting payment from the victim. And hackers cannot identify viable targets by simply looking up publicly listed names, phone numbers, and addresses. Crypto-assets have not yet been widely adopted; therefore, attackers have no way of knowing whether would-be targets own crypto-assets or hardware wallets. In addition, for owners of crypto-assets, there is no analog for the

---

after successfully presenting two or more pieces of evidence of rightful access, such as unique knowledge (*e.g.*, a password) or unique possession (*e.g.*, a key).

[29] SIM stands for "subscriber identification module," and a SIM card is a physical circuit that is used to securely store the unique identifier of any user on a cellular network.

SECOND AMENDED CLASS ACTION COMPLAINT

physical bank ATM—where would-be attackers could potentially wait, identify victims with funds, and intimidate those victims.

104. For these reasons, the single greatest point of vulnerability for owners of Ledger wallets is public disclosure of the information that a particular person owns the wallet. If hackers know the names and/or email addresses of people who own Ledger wallets, then hackers can target those people with sophisticated phishing schemes and tailored threats.

105. Accordingly, by operating in the crypto-asset security space, Ledger places itself between user's funds and would-be hackers. The anonymity of its customer list is a key and obvious element of the security that Ledger offers. By analogy, a manufacturer of state-of-the-art lock safes would not publish its customer list, which is valuable to would-be thieves seeking to identify targets possessing high-value items. Similarly, public disclosure of Ledger's customers puts those individuals in the crosshairs of the very hackers the company seeks to impede.

106. Furthermore, PII, such as names and email addresses, may be combined with other sources of information to de-anonymize Ledger account holders. Not only may this information be used, as it was here, to create sophisticated "phishing" attacks, but it may also be used to de-anonymize user wallets and (through analysis of blockchain data) individual transactions.

107. A great deal of information about Plaintiffs and Class Members is already available on the dark web. The availability of Plaintiffs' and Class Members' content and information on the dark web imposes further uncompensated costs on those individuals. The dark web permits criminals further access to users' content and information that make the thefts that occurred here more easily accomplished.

108. As reported by CBS News, "The little drips of personal data leaked from every major data breach—your name, email, phone number, Social Security number, and mailing address—pool in a murky corner of the internet known as the dark web. Some of these leaks might seem relatively insignificant, but criminals exploit your personal data for profit and to help other criminal operations prosper. The dark web is where these transactions happen."

109. The content and information exposed in the Ledger data breach certainly amplified the value of information already available on the dark web. On the dark web, "personal information

27
SECOND AMENDED CLASS ACTION COMPLAINT

was mixed in with wholesale data dumps of information about thousands of people," allowing the information to be aggregated into "packages" that have street value.[30]

### ii. Ledger Advertises State-of-the-Art Security for Crypto-Assets

110. Ledger's consistent message to consumers is that Ledger wallets offer the best possible protection for crypto-assets. Their tagline embodies this value proposition: "If you don't want to get hacked, get a Ledger wallet." Ledger represented to consumers, prior to the data breach at issue, the following:

> Critical digital assets are the new oil and securing them is the most important challenge for the coming years.
>
> That's where we come in. We are Ledger.
>
> We are a unique digital security ecosystem that provides protection and is *built on verifiable trust across our people, hardware and software.* And in today's world, we know that trust deserves proof. This is why we provide transparency into how our technology works.
>
> *We relentlessly stress-test our own technology solutions*. Our Ledger Donjon team is made up of world-class experts with extensive backgrounds in the security and smartcard industries. *They continuously look for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security. We know security means never standing still.*

(emphasis added).

111. Ledger further and publicly asserted, prior to the data breach at issue:

- "At Ledger we are developing hardware wallet technology that provides the highest level of security for crypto assets;"

- "Ledger hardware wallet, combined with the Ledger Live application, is the best solution to secure and control your crypto assets;"

- "Ledger hardware wallets are designed with the highest security standard to keep your crypto secure at all time;"

- "Ledger enables resilience through verifiable trust. Knowing trust is the greatest way to make our world truly move forward and progress."

---

[30] Dan Patterson, *We found our personal data on the dark web. Is yours there, too?,* CBS News (March 25, 2019) https://www.cbsnews.com/news/we-found-our-personal-data-on-the-dark-web-is-yours-there-too/ (Last accessed Nov. 21, 2023)

SECOND AMENDED CLASS ACTION COMPLAINT

112.    Ledger also republished, prior to the data breach at issue, acknowledgments from reputable third-party commentators:

- "French Crypto Wallet Ledger Is Solving Bitcoin's Biggest Flaw" (as featured in Forbes);

- "Ledger makes sure private keys never become accessible to thieves, online or anywhere else" (as featured in Bloomberg);

- "Ledger removes the risk of being hacked" (as featured on CNBC).

113.    Through those statements, Ledger conveyed to consumers that Ledger wallets, coupled with Ledger's services, provide the highest standard of security for owners of crypto-assets. Ledger further conveyed that it was tirelessly assessing its wallets and supporting services for vulnerabilities, while adapting to protect against those threats. By buying a Ledger wallet, consumers purportedly were buying into a comprehensive security support system that maximized protections against threats to crypto-assets.

114.    Making the forgoing, unequivocal representations, Ledger sold California Subclass members the Ledger Nano X wallet for $119 and the Ledger Nano S wallet for $59. California Consumer Subclass members would not have purchased these products at all, or would have paid significantly less for them, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and failure to provide timely customer support.

**E.   Ledger Uses Shopify as an E-commerce Vendor**

115.    Ledger sells its Nano products through a number of distributors, including retailers like Amazon and Walmart. It also sells directly to consumers through https://shop.ledger.com/ (the "Shopping Website").

116.    Shopify powers Ledger's Shopping Website. Shopify is an e-commerce giant. Over one million businesses use its platform, and over $61 billion of sales occurred on its platform through these businesses in 2019. By market capitalization it is one of the top 10 publicly-traded company in Canada and was at one time Canada's largest company by market capitalization.

117.     Shopify's success is based on providing services to allow companies to easily operate online stores. Shopify provides e-commerce solutions for businesses to allow them to easily

29

create digital storefronts. For example, Shopify allows you to create a well-designed web layout, provides a payment provider to accept credit card payments, and makes various profit and inventory applications available. These solutions are essentially a software product to which companies subscribe to host digital stores.

118.    When users purchase directly from Ledger on its Shopping Website, they must provide certain personal information before placing an order, such as their physical address, phone number, and email address. Because Ledger uses Shopify's services, Shopify acts as an intermediary between Ledger and purchasers of Ledger's products. Therefore, Shopify also has access to the personal information that purchasers provide.

119.    Shopify's terms of service obligate it to "take all reasonable steps" to protect the disclosure of confidential information, including "names, addresses and other information regarding customers and prospective customers."

**F.  Shopify, in Turn, Uses TaskUs, Which Suffers a Data Breach**

120.    TaskUs, Inc., is a third-party company that provided customer support services to Shopify. TaskUs employees based in the Philippines had access to Shopify's customer data, and specifically Ledger's data because of its contract with Shopify Inc. subsidiary, Shopify International Limited.

121.    In around 2019, the California man began conspiring with employees of TaskUs to obtain information regarding the customers of merchants, like Ledger, that used Shopify. At some point in the 2020s, the California man obtained access to the personal information of Ledger's customers and acquired and exported Ledger's customer transactional records (the "Data Breach"). The California man also obtained data relating to other merchants from the TaskUs employees.

122.    TaskUs failed to make any efforts to notify anyone of the Data Breach.

123.    On September 22, 2020, Shopify announced that: (1) "two rogue members of our support team were engaged in a scheme to obtain customer transactional records of certain merchants;" (2) the "incident involv[ed] the data of less than 200 merchants;" and (3) "Our teams have been in close communication with affected merchants to help them navigate this issue and

address any of their concerns."[31] This announcement made it clear that Shopify was aware of the data breach before the day of the announcement and even had time to "conduct an investigation" and notify affected merchants.

124.    On February 19, 2021, a federal grand jury indicted the California man for wire fraud for his role in causing the data breach. The indictment alleges that starting in May 2019, he paid an employee of a Shopify vendor (TaskUs) to provide him with Shopify's merchant data. The unnamed vendor acted as Shopify's agent, providing customer support services to Shopify customers on its behalf. Upon information and belief, the vendor was TaskUs.

125.    The Data Breach in fact involved the data of approximately 272,000 people,[32] approximately a third of whom live in the United States.[33] Hackers copied information such as names, order details, email addresses, physical addresses, and phone numbers.[34] And for many more users, hackers obtained the email address users used when buying their Ledger.[35]

126.    By the time it publicly announced the breach in September, Shopify notified every affected merchant that rogue employees had stolen their data, but neither Shopify nor Ledger warned the hundreds of thousands of vulnerable Ledger customers harmed by the Data Breach. Instead, as the timeline below explains, Ledger attempted to cover up and downplay the scale of the Data Breach, while Shopify did nothing to protect the owners of the data Shopify had failed to secure.

[31] *Incident Update*, SHOPIFY (Sept. 22, 2020), https://community.shopify.com/c/shopify-discussions/incident-update/td-p/888971 (last accessed Nov. 9, 2023).

[32] *E-commerce and Marketing data breach – FAQ*, LEDGER, https://support.ledger.com/hc/en-us/articles/360015559320-E-commerce-and-Marketing-data-breach-FAQ (last accessed Nov. 9, 2023).

[33] Larry Cermak, *A detailed look at the Ledger data leak and other recent incidents*, THE BLOCK (Dec. 21, 2020), https://www.theblockcrypto.com/genesis/88706/a-detailed-look-at-the-ledger-data-leak-and-other-recent-incidents (last accessed Nov. 9, 2023).

[34] *Id.*

[35] *Id.*

**G. <u>Ledger and Shopify's Deficient Response to Early Warning Signs About the Breach</u>**

i.   <u>April – June 2020: Ledger Initially Denies the Data Breach</u>

127.   In May 2020, public rumors arose concerning the Data Breach. The rumors were that Ledger's consumer information from Shopify had been hacked.[36]

128.   This publicly-stated concern was an opportunity for Ledger to get ahead of the problem. Ledger should have, at a minimum: (1) disclosed the breach; (2) notified all impacted and potentially impacted users; (3) offered services to help impacted users transition to new accounts; (4) monitored for suspicious transactions; (5) hired third-party auditors to conduct security testing; (6) trained employees to identify and contain similar breaches; and (7) trained and educated their users about the threats they faced.

129.   Instead, Ledger's immediate reaction was to deny that there was a breach impacting Ledger's customers. Ledger falsely stated that "**Rumors pretend** our Shopify database has been hacked through a Shopify exploit. Our e-commerce team is currently checking these allegations by analyzing the **so-called** hacked [database], and so far **it doesn't match** our real [database]. We continue investigations and are taking the matter seriously."[37] During this time, the risks and damages to Ledger's customers were only increasing; a prompt and proper response from Ledger, including full disclosure to all customers, would have mitigated those risks and damages.

130.   Despite the explicit references to Shopify, Ledger's disclosures and the related press raised in May 2020—and the implications for the security of Shopify's own systems—never made it to Shopify's Data Protection Officer's desk. That is, either Ledger improperly failed to notify

---

[36] Jamie Redman, *Hacker Attempts to Sell Data Allegedly Tied to Ledger, Trezor, Bnktothefuture Customers*, BITCOIN (May 24, 2020), https://news.bitcoin.com/hacker-attempts-to-sell-data-allegedly-tied-to-ledger-trezor-bnktothefuture-customers/ (last accessed Nov. 9, 2023. @UnderTheBreach, TWITTER (May 24, 2020) https://twitter.com/underthebreach/status/1264460979322138628?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1264460979322138628%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fnews.bitcoin.com%2Fhacker-attempts-to-sell-data-allegedly-tied-to-ledger-trezor-bnktothefuture-customers%2F

[37]   @Ledger,   TWITTER   (May   24,   2020), https://twitter.com/Ledger/status/1264506360735174657.

Ledger, the controls the Data Protection Officer was responsible for failed to give the notification the attention it deserved, or both.

ii.    July 2020: Ledger Admits the Data Breach Occurred, but Downplays Its Scale

131.    On July 29, 2020, Ledger made partial admissions that exacerbated, rather than mitigated, the harm caused by the Data Breach.

132.    After researchers informed Ledger of a potential data breach on its website, Ledger announced that its marketing and e-commerce database had been exposed in June 2020:

> **What happened**
> On the 14th of July 2020, a researcher participating in our bounty program made us aware of a potential data breach on the Ledger website. We immediately fixed this breach after receiving the researcher's report and underwent an internal investigation. A week after patching the breach, we discovered it had been further exploited on the 25th of June 2020, by an unauthorized third party who accessed our e-commerce and marketing database – used to send order confirmations and promotional emails – consisting mostly of email addresses, but with a subset including also contact and order details such as first and last name, postal address, email address and phone number. **Your payment information and crypto funds are safe.**
>
> To be as transparent as possible, we want to explain what happened. An unauthorized third party had access to a portion of our e-commerce and marketing database through an API Key. The API key has been deactivated and is no longer accessible.
>
> **What personal information was involved?**
> Contact and order details were involved. This is mostly the email address of our customers, approximately 1M addresses. Further to investigating the situation we have also been able to establish that, for a subset of 9500 customers were also exposed, such as first and last name, postal address, phone number or ordered products. Due to the scope of this breach and our commitment to our customers, we have decided to inform all of our customers about this situation.
>
> Those 9500 customers whose detailed personal information are exposed will receive a dedicated email today to share more details.
>
> **Regarding your ecommerce data, no payment information, no credentials (passwords), were concerned by this data breach. It solely affected our customers' contact details**.
>
> **This data breach has no link and no impact whatsoever with our hardware wallets nor Ledger Live security and your crypto assets, which are safe and have never been in peril. You are the only one in control and able to access this information**.

(emphasis in original).

33

SECOND AMENDED CLASS ACTION COMPLAINT

133.    Ledger's disclosure and responsive measures were flawed and misleading.

134.    *First*, as Ledger admitted, it failed to immediately warn its customers and instead waited on the results of its "internal investigation with third party experts before warning [its] community."[38] This delay in issuing even a warning was reckless, or at least negligent.

135.    *Second*, Ledger did not disclose that this breach had anything to do with the Shopify breaches, which involved insiders stealing information for personal profit. Ledger never even mentioned Shopify. This incomplete disclosure was reckless, or at least negligent.

136.    *Third*, Ledger was not clear as to the status and dissemination of the stolen data. Ledger explained that "[w]e are actively monitoring for evidence of the database being sold on the internet, and have found none thus far." Ledger also explained that they "immediately fixed this breach" and were undertaking an "internal investigation," choosing to eschew third party auditors. Ledger also took pains to repeatedly reiterate to consumers that the breach had "no impact whatsoever with our hardware wallets nor Ledger Live security and your crypto assets." In other words, Ledger's message was that, after an exhaustive internal investigation, they had identified a limited hack and had rectified the situation. This patently inaccurate disclosure was reckless, or at least negligent.

137.    *Fourth*, Ledger sent follow-up notifications only to the 9,500 customers who they determined had additional personal information exposed. In doing so, Ledger failed to notify its one million other customers whose email information had been exposed. This patently incomplete follow-up was reckless, or at least negligent.

138.    Despite the obvious references to Ledger's marketing database (Shopify), Ledger's disclosures and the press about these issues in July 2020—and the implications for the security of Shopify's own systems—never made it to Shopify's Data Protection Officer's desk. That is, either: (1) Ledger improperly failed to notify Shopify, (2) the controls the Data Protection Officer was responsible for failed to give the notification the attention it deserved, or (3) both.

[38] *Addressing the July 2020 e-commerce and marketing data breach — A Message From Ledger's Leadership*, LEDGER (July 29, 2020), https://www.ledger.com/addressing-the-july-2020-e-commerce-and-marketing-data-breach (last accessed Nov. 9, 2023)

SECOND AMENDED CLASS ACTION COMPLAINT

## H. **Attacks on Ledger Users Intensify**

i. August – December 2020: Hacking Attacks Increase on Ledger Users

139.    By the fall of 2020, even after Shopify had notified merchants about the breach, Ledger and Shopify were still failing to respond appropriately to the severe threats that customers faced or to the damages they had incurred. Ledger still had not disclosed that its customers had any connection to the Shopify breaches. It had not contacted every customer whose email address had been exposed to hackers. It had not provided sufficient disclosures or resources to assist customers in protecting against rising phishing schemes. Meanwhile, Shopify sat back and did nothing to protect the owners of the data it had lost even though several media reports signaled that Ledger's customers were under attack as a result of the Data Breach.

ii. Ledger Users are Bombarded with Digital Phishing Scams

140.    Phishing scammers use emails and text messages to trick people into disclosing personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $57 million to such scams in 2019 alone.[39]

141.    Plaintiffs and other Ledger consumers began receiving a high-volume of phishing scams/emails that were designed to look like emails sent from Ledger. Such emails are intended to trick consumers into giving account information, passwords, and other valuable personal information to scammers. This activity significantly increases the risk of further substantial damages to Plaintiffs and the putative class, including both monetary and identity theft.

142.    In October 2020, for example, a Ledger user reported a phishing attempt by hackers posing as Ledger Support team members and asking Ledger customers to download fake versions of the Ledger Live software. The fake email looked very convincing:

---

[39] *See* Federal Trade Commission. Consumer Information. "How to Recognize and Avoid Phishing Scams".    May    2019.    https://www.consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams. *See also* Federal Bureau of Investigation. "2019 Internet Crime Report Released". February 11, 2020.    https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120

SECOND AMENDED CLASS ACTION COMPLAINT

143. Other Ledger users responded to the report by confirming that they had received and been tricked by the fake email. One user reported: "Wow this looked really legit, so much so I used Contact Us form to ask Ledger if it was real. I am normally pretty good at sniffing things like this out – this was by far the most convincing attempt I have ever seen."[40]

144. Plaintiff Seirafi also received similar phishing emails, which appeared to be from Ledger:

---

[40] Benjamin Powers, *'Convincing' Phishing Attack Targets Ledger Hardware Wallet Users,* COINDESK (Oct. 27, 2020), https://www.coindesk.com/phishing-attack-ledger-cryptocurrency-wallet (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT



145.    More phishing emails to Plaintiff Seirafi followed:

This message was identified as junk. We'll delete it after 8 days. It's not junk

FEDEX SHIPPING COMPNAY <westafricamonetaryangencyw@gmail.com>
Mon 1/4/2021 7:47 PM

Head Office
70 International Airport Road
741 Rue Des Franciscans Adidogome
Benin Republic/Lome broade
P.O Box 9263
Direct Online Office Telephone: +229 9811 4898
Customers Service Hours--Monday to Saturday: Office Hours Monday to
Sunday:

This is FedEx courier Delivery Company of Benin, the management of this
company wishes to inform you that, we received a Consignment box valued
sum $950,000USD with some vital documents attached to it, for safety delivery to your
residential address in your country. This Consignment was brought to us this morning
by the dIrector of United Bank Of Africa Benin Republic, with the below information's, please reconfirm
the below information, to avoid delivery your Consignment to wrong
person.

Full names:

City:

Country:

Zip Code:

Nationality:

Tele Phone #:

Occupation:

SECOND AMENDED CLASS ACTION COMPLAINT

146. The hackers behind this fake email were of course armed with Ledger's customer lists and email addresses and, therefore, knew they were targeting Ledger owners. Accordingly, the hackers invested the time and resources to create convincing—and, unfortunately, successful—fakes. Worse yet, because of Ledger's false and misleading statements and omissions regarding the Data Breach, Ledger's customers did not know that their email addresses had been compromised. Ledger thus deprived them of the opportunity to increase their wariness and/or take other precautions to avoid such hacking.

147. The phishing attempts were not limited to emails. Ledger users began to report the receipt of SMS/text phishing messages, again claiming to be from Ledger, such as the below:



148. Other hackers used a different phishing attempt, attempting to pose not as Ledger, but as other entities such as the Stellar Development Foundation ("Stellar"), an entity affiliated with the creator of the Stellar Lumen token purchased by Plaintiff Baton. Under this scheme, hackers sent an extremely sophisticated email posing as Stellar and soliciting users such as Baton to "stake" Stellar Lumen tokens—a well-known form of deposit that pays interest.

149.    These emails and websites were effective in part because they looked like Stellar's actual website, using real assets, articles, features, and other content from Stellar's email and website. In order to stake Lumens, a user would have to transfer the Lumens to a staking address. But the staking "address" provided to deposit the funds was not actually associated with Stellar, and once the funds were transferred, the hackers absconded with it. Critically, this phishing strategy did not require the disclosure of any private keys and increased a victim's trust in the malicious site.

150.    Creating such convincing versions of Stellar's website and emails required a significant amount of effort, which paid off because the hackers knew they could target the emails of likely cryptocurrency holders such as Plaintiff Baton.

### iii.    Sim-Swap Attacks on Ledger Users

151.    The data leak can also lead to SIM-swap attacks against the Class.[41]  A SIM-swap attack occurs when the scammer tricks a telephone carrier to porting the victim's phone number to the scammer's SIM card. By doing so, the attacker is able to bypass two-factor authentication accounts, as are used to access cryptocurrency wallets and other important accounts. The type of personal information that has been leaked poses a profound tangible risk of SIM-swap attacks for the Class.

152.    But for Defendants' unlawful conduct, scammers would not have accessed Plaintiffs' and the putative class members' contact information. Defendants' unlawful conduct—including active attempts to conceal the breach and minimize the extent of the breach or damages—has directly and proximately resulted in widespread digital attacks against Plaintiffs and the putative class.

153.    In response to these reports, Ledger should have devoted substantial resources and taken responsibility for being the source of the leak that allowed this precision targeting from hackers. Instead, Ledger continued to tout its security credentials and prevaricated about whether the increased phishing and hacking attempts arose from a data breach.

---

[41] Benjamin Powers, *From SIM-Swaps to Home-Invasion Threats, Ledger Leak Has Cascading Consequences,* YAHOO FINANCE (Dec. 23, 2020), https://finance.yahoo.com/news/sim-swaps-home-invasion-threats-213016265.html (last accessed Nov. 9, 2023)

SECOND AMENDED CLASS ACTION COMPLAINT

154.    On November 2, 2020, Ledger refused to acknowledge the Data Breach was the source of the rising attacks on its customers:

> As soon as we discovered the data breach on Ledger's website in July 2020, we immediately patched it. Since then, we led two penetration tests with a third-party consultancy to verify and improve the security of our clients' data. For two weeks, some of Ledger's customers have been experiencing continuous phishing scams through various channels, including email and SMS. We've issued several scam alerts through our Twitter, email, and other channels to notify our users during the past two weeks.
>
> The internal task force is investigating these attacks, and as of now, **we can't state that scammers are using Ledger's marketing database**, and therefore, these attacks resulted from July's data breach.[42]

155.    Ledger's efforts to cover up and downplay the actual and potential scale of the Data Breach in the months leading up to its widespread public disclosure caused disastrous harm to its customers. During that time, many crypto-asset investors lost massive sums of money. Had Ledger acted responsibly during this period, much of that loss could have been avoided.

iv.    Ledger Users Received Ransom Threats Demanding Money or Risk Physical Attack

156.    Plaintiff Seirafi and members of the Class have also received ransom demands for monetary payment to prevent physical attacks in their homes.[43] A true and correct representation of a threat Plaintiff Seirafi received by text message is set forth below.

---

[42] Benjamin Powers, *'Convincing' Phishing Attack Targets Ledger Hardware Wallet Users,* COINDESK (Oct. 27, 2020), https://www.coindesk.com/phishing-attack-ledger-cryptocurrency-wallet (last accessed Nov. 9, 2023).

[43] *See* Coin Telegraph. "Ledger data leak: A 'simple mistake' exposed 270K crypto wallet buyers". December 24, 2020. https://cointelegraph.com/news/ledger-data-leak-a-simple-mistake-exposed-270k-crypto-wallet-buyers; *see also,* Somag News. "The threat of 'raid home' to a Ledger user." December 22, 2020. https://www.somagnews.com/the-threat-of-raid-home-to-a-ledger-user/

SECOND AMENDED CLASS ACTION COMPLAINT



SECOND AMENDED CLASS ACTION COMPLAINT

157.    In fact, in a Twitter statement, Ledger corroborated ransom threats like the above, stating that "there has been a new wave of phishing attacks taking place since yesterday, threatening our users physically."[44]

158.    On platforms such as Reddit.com, some class members have also reported emailed threats of home invasion if the class member fails to provide a monetary payment.[45] True and correct representations of some Reddit users' posts regarding ransom threats they have received are set forth below.



---

[44]  TWITTER,  https://twitter.com/Ledger/status/1341303521371680769?s=20  (last  accessed Nov. 9, 2023).

[45]    REDDIT.COM,    https://www.reddit.com/r/ledgerwallet/comments/kh8q82/fantastic/; https://www.reddit.com/r/ledgerwallet/comments/kipk68/i_received_a_home_invasion_threat_email/ (last accessed Nov. 9, 2023).



159.    Plaintiffs and many Class members' home addresses are now public online. The Class is a group of people that are especially ripe for ransom demands because the attackers are aware that every member has cryptocurrency assets. This dire situation is analogous to a safe company posting online the name, phone number, email address, and physical address of its customers with safes most likely to contain cash, jewels, and gold bullion. With crypto-assets, the customer is even more vulnerable, because the attackers can force immediate untraceable payments of those assets.

160.    But for Defendants' unlawful conduct, such criminals would not have access to the home or other postal addresses of Plaintiffs and the Class. This access has resulted in, at minimum, an invasion of Plaintiffs' and the Class' privacy and can lead to even greater damages, including theft or violent physical attacks.

SECOND AMENDED CLASS ACTION COMPLAINT

## v.    Raid of Plaintiff Seirafi's Home as Confirmed by Local Law Enforcement

161.    In addition to the threat of home invasion sent by e-mail to Plaintiff Seirafi and other Class members, on February 13, 2021, the Glendale Police Department received a 911 call by an unknown male stating he had shot his friend. Police were dispatched to Plaintiff's home, setting up a containment zone around the area Plaintiff Seirafi's house is located. While the police determined the call to be a false alarm, Plaintiff Seirafi and Plaintiff Seirafi's parents were frightened by this occurrence. One of the officers to whom Plaintiff Seirafi's counsel spoke confirmed that the caller had a European accent and that the address was traced to a European IP address. Attached as **Exhibit 1** is a true and correct copy of the Glendale Police Department report, No. 21-2025.

162.    Similarly, other Ledger consumers have expressed physical safety concerns. For instance, the founder of DeFi, a company located in London, reportedly moved homes after receiving physical threats, stating that "Ledger's customer base is all over the world. In certain countries the likelihood of an armed robbery could be higher. Ledger does not have the expertise to tell people they are safe."[46]

### vi.    Severe Emotional Distress and Fear Experienced by Ledger Users

163.    The damages described herein have resulted in severe emotional distress for Plaintiffs and the Class. Plaintiffs and the Class have lost all security and privacy now that their personal information, including the fact that they own crypto-assets, is available online for any attacker to access. Plaintiffs fear digital attacks, as well as the possibility of physical attacks at their homes.

164.    Plaintiff Seirafi's fear, unfortunately, came to fruition with the raid to his home that took place after his PII information was leaked during the breach.

165.    Plaintiff Deeney and his girlfriend were forced to move in or about January 2021 because of their fear of a home invasion targeting access to Deeney's crypto assets. Prior to the

---

[46] City A.M., "Ledger customers exposed as personal data is leaked." https://www.cityam.com/ledger-customers-exposed-as-personal-data-is-leaked/ (last visited on March 26, 2021).

move, it was apparent that individuals were routinely intercepting mail sent to his home to mine further private information about him.

166.    Plaintiffs and the Class remain on edge and alert as they are bombarded with phishing emails and other scams. Plaintiffs are suffering from the mental and emotional distress associated with such insecurity and uncertainty caused by the data breach. After news of the data breach had been widely publicized, Ledger informed Plaintiff Comilla that he was one of the subset of users who had had "all" of their personal information disclosed. Comilla has been in a state of depression since the breach and theft happened, and his personal and professional relationships have suffered. Beyond the huge financial loss and mental anguish caused to Plaintiff Vilinger, the disclosure of his personal information and subsequent theft has caused him to suffer from stress, anxiety, depression and financial problems as a result. Their emotional suffering is all to common among the Class.

167.    For instance, another Reddit user posted that they are worried about their home address being leaked and their family being harmed. A true and correct representation of this user's post is set forth below.



SECOND AMENDED CLASS ACTION COMPLAINT

168.    Another Reddit user posted a text message threat they received about getting "killed" if they do not pay in cryptocurrency. A true and correct representation of this post is set forth below:



169.    Another Reddit user shared his experience of receiving threats, fearing for his life for the first time if he did not transfer money. This user also stated that after going to the police in his local precinct, he learned that he was the second person who came in that day. A true and correct representation of this post is set forth below:



SECOND AMENDED CLASS ACTION COMPLAINT

170.    So long as Plaintiffs and the Class members' PII is accessible on the internet, Plaintiffs and the Class will remain at substantial risk. Ledger has not offered any solutions to remedy the damages to Plaintiffs and the Class. Plaintiffs and the Class members will remain at permanent risk unless they take on the significant time and expense to change all of their personal information that was exposed.

171.    Because of Defendants' unlawful conduct, Plaintiffs and the Class are in constant fear and anxiety resulting from the leak of their PII and consistent barrage of scams and threats.

vii.    December 2020: In the Face of Widespread Public Disclosure, Ledger Admits to the Scale of the Data Breach

172.    By early December 2020, reports continued to escalate about phishing attempts on Ledger's users. By that time, Ledger's inaction had provided an opportunity for the hackers to increase the sophistication and effectiveness of phishing attempts. For example, some of the phishing attempts referenced breaches and then instructed users, as a security measure, to install fake versions of Ledger Live that asked for their private key information:

SECOND AMENDED CLASS ACTION COMPLAINT

**December 4th — Important Security Update**

Dear client,

We regret to inform you that we have been alerted of a data breach affecting confidential data belonging to approximately 115,000 of our customers, which includes personal information, PIN-encrypted private and public keys, as well as the amount of each cryptocurrency stored inside the wallet.

You're receiving this message because the e-mail address (-) associated with your wallet has been found to be within the affected compromised data.

**What happened?**

On Wednesday, December 9th 2020, our security researchers detected an unauthorized third party gaining access to one of the Ledger Live's internal servers. We immediately fixed the breach and undertook an internal and external investigation of the situation.

**What we know**

As of today, it's not technically possible to conclusively assess the scope of the security breach. While there was no clear evidence of user wallets being affected, due to the nature of the breach, **we have to assume that your cryptocurrency assets could be compromised**.

**What you should do**

If you're receiving this email, you're affected by the breach. We have no evidence of user wallets being affected, but it's smart to place security over convenience. In order to make sure your assets are safe, install the latest version of Ledger Live and follow the instructions to secure your wallet with a new PIN.

Yours sincerely,
Pascal Gauthier, Ledger CEO

Download latest version

173.    Users reported losing significant sums of crypto-assets as a result of such phishing. Plaintiff Baton lost about 150,000 Stellar Lumens, worth approximately $72,000 at today's market prices. Plaintiff Comilla lost all his crypto assets due to a successful phishing attack, 2.6 bitcoin and 8 ether, worth about $115,000 at today's market prices. Plaintiff Vilinger also lost all his crypto

SECOND AMENDED CLASS ACTION COMPLAINT

assets after the breach, 6.4 bitcoin worth about $225,000 at today's market prices, even though he only connected this Ledger product to the Internet every few months. On information and belief, he was the victim of de-anonymization of his Ledger wallet as set forth above. Plaintiff Deeney lost $145,000 when account manipulation caused by the data breach caused one of his trading accounts to be temporarily frozen, preventing him from closing out a short position on XRP.

174.    The phishing attempts were sufficiently successful—and notorious—so that, through December 20, 2020, the going rate among hackers for the compromised list of Ledger customer data was approximately $100,000.[47]

175.    On December 20, 2020, a hacker published the Ledger customer data online. This publication included the personal information of more than 270,000 Ledger customers. In fact, the contents of the Ledger database were distributed on Raidforums. Raidforums is a database sharing and marketing forum that distributes leaked information online. This leak of 272,000 pieces of detailed PII of consumers is significantly greater than he amount of data estimated by Ledger – of 9,500, an estimate reported by Ledger in July 2020.

176.    Consumers and reporters justly criticized Ledger, stating that the company, in its prior statements, had "vastly underestimated" the Data Breach.[48]

177.    With the data made publicly available for free, many Ledger customers started receiving frightening threats. Ledger customers immediately started receiving spam phone calls, emails, and even death threats. Many of these customers shared their experiences online:

---

[47]    @UnderTheBreach, TWITTER (Dec. 20, 2020,), https://twitter.com/UnderTheBreach/status/1340735356375851009.

[48] Vishal Chawla, Liam Kelly, *Ledger Breach Vastly Underestimated, 270,000 Clients Data Leaked*, CRYPTO BRIEFING (Dec. 21, 2020), https://cryptobriefing.com/ledger-breach-clients-data-leaked/ (last accessed Nov. 9, 2023).

> **r/ledgerwalletleak** · Posted by u/goldcakes 49 minutes ago
>
> ### received phone call threatening kidnapping and murder over my ledger.
>
> Earlier today I have received a phone call from a fake number (it appeared as the phone number of m local police station).
>
> A male, Anglo-accent caller asked if I was <my full name> and claimed to be a drug addict, and gave me my full address, and said he knows I have a lot of bitcoins. When asked how, he said my information has been leaked on the dark web. I played dumb and he eventually says I purchased a ledger hardware wallet and "only loaded c*nts" buy them.
>
> He told me a sob story about how he is addicted to meth, is about to run out, and needs monero to buy more. He demanded 10 XMR and said if it's not sent by midnight, he will show up at my house, kidnap me, and "stab to death" any relatives living at my address. I was able to record this phone call as I put him on speaker phone.
>
> I have went to the police and filed a police report. They are going to try and trace the caller and has sent a police car to wait outside which I am very grateful for. All of my doors etc are locked and I have the officer's phone on speed dial.
>
> I just want to warn everyone about the dangers of Ledger's recklessness. If there is a class action lawsuit I will gladly join and submit this as evidence.

178.     Scammers continue to harass Ledger wallet users, sending counterfeit hardware wallets to Ledger users home addresses. Security researcher Mike Grover investigated the device, which appears to be "a simple flash driver strapped on to the Ledger with the purpose [. . .] of malware delivery."[49] The shipments of counterfeit wallets are accompanied with a letter purportedly signed by Ledger's CEO, claiming to have sent an updated devices for security purposes following the cyberattack.

---

[49] *Inside The Scam: Victims Of Ledger Hack Are Receiving Fake Hardware Wallets,* NASDAQ (June 17, 2021), https://www.nasdaq.com/articles/inside-the-scam:-victims-of-ledger-hack-are-receiving-fake-hardware-wallets-2021-06-17 (last accessed Nov 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT



179.    Plaintiffs Seirafi, Batton, Comilla, Deeney, and Vilinger like many members of the Class, also received spam emails, phone calls, and texts which, *inter alia,* attempted to phish for additional personal information and sell prurient content. Plaintiffs' PII is now available for other parties to sell and trade, and they continue to risk receiving more harm for the indefinite future. In fact, the U.S. Government Accountability Office found that, "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[50]

---

[50] *Report to Congressional Requester*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 9, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

180.    The breach has also exposed the location of the purchased Products, by allowing access to Plaintiff and the Class' home addresses, which inherently impacts the security of the Products and, in turn, creates actual harm and a threat of future harm.

181.    Ledger's CEO, Pascal Gauthier, has refused to provide compensation to users whose PII information was leaked in the breach arguing that "It's just an online scam to scare you with these tactics."[51]

182.    Ledger knew of and advertised the importance of protecting its customers' personal information, but before and after the Data Breach, it failed to take reasonable steps to protect its customers. Before the breach, Ledger should have regularly deleted or archived customer data or should have otherwise protected that information from online accessibility. After the breach, for over *five* months, Ledger repeatedly failed to provide critical information to its customers, compounding the harm to Plaintiffs and the Class.

183.    Shopify similarly failed to protect Ledger's customer data. Shopify employees, rogue or not, had no need for direct access to Ledger customer data. Shopify should have: (1) limited employee access to customers' data in a way that prevented the rogue employees' access; (2) monitored employees' suspicious copying of customer data; (3) assisted Ledger with its investigation to determine the scope of the Data Breach; and (4) notified Ledgers' users of the Data Breach.

viii.    Shopify and TaskUs Should Have Increased Data Security, and Defendants Should Have Known Their Customers' Data Would Be a Target for Cyberattacks.

184.    In the years immediately preceding the Data Breach, Defendants knew or should have known that its computer systems were a target for cybersecurity attacks.

185.    For example, in April 2020, ZDNET reported that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools

---

[51] *Ledger Won't Reimburse Users After Major Data Hack*, DECRYPT (Dec. 21, 2020), https://decrypt.co/52215/ledger-wont-reimburse-users-after-major-data-hack (last accessed Nov. 9, 2023).

to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[52]

186.    Thousands of similar articles, warnings, White Papers, studies, and reports on data security for businesses have publicized the increasing threat of data breaches to companies of all sizes.

187.    The FBI, FTC, GAO, U.S. Secret Service, United States Cybersecurity and Infrastructure Security Agency, State Attorney General Offices and many other government and law enforcement agencies, and hundreds of private cybersecurity and threat intelligence firms, have issued warnings that put Defendants on notice, long before the Data Breach, that (1) cybercriminals were targeting large, public companies such as Defendants Ledger and Shopify; (2) cybercriminals were ferociously aggressive in their pursuit of large collections of PII like that in possession of Defendants; (3) cybercriminals were selling large volumes of PII and corporate information on Dark Web portals; and (4) the threats were increasing.

188.    Had Defendants been diligent and responsible, they would have known about and acted upon warnings published in 2017 that 93% of data security breaches were avoidable and the key *avoidable* causes for data security incidents are:

- Lack of a complete risk assessment, including internal, third-party, and cloud-based systems and services;
- Not promptly patching known/public vulnerabilities, and not having a way to process vulnerability reports;
- Misconfigured devices/servers;
- Unencrypted data and/or poor encryption key management and safeguarding;
- Use of end-of-life (and thereby unsupported) devices, operating systems, and applications;
- Employee errors and accidental disclosures — lost data, files, drives, devices, computers, improper disposal;
- Failure to block malicious email; and
- Users succumbing to business email compromise (BEC) and social exploits.[53]

[52] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year* (Apr. 30, 2020), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed May 19, 2023).

[53] Gretel Egan, *OTA Report Indicates 93% of Security Breaches Are Preventable*, PROOFPOINT (Feb. 7, 2018), available at https://www.proofpoint.com/us/security-awareness/post/ota-report-indicates-93-security-breaches-are-preventable (last accessed May 19, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

189.    Defendants knew, or should have known, that the PII of individuals is highly valuable to criminals, selling at $40 to $200 for names, addresses, credit histories, and phone numbers.[54] Experian publishes selling prices for individual items of PII and reported that stolen credit card or debit card numbers can sell for $5 to $10 apiece on the Dark Web.[55] TECHREPUBLIC reported in 2021 that the average price for PII in the U.S. was $8, but there could be a wide range of values for data packages with multiple pieces of data for each individual, such as that stolen from Defendants.[56]

190.    In light of the information and warnings readily available to Defendants before the Data Breach, Defendants had reason to be on guard and to increase data security to avoid an attack.

191.    Prior to the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated and published as the result of a cyberattack.

192.    Prior to the Data Breach, Defendants knew or should have known that it should encrypt the sensitive data elements within the PII it collected so that it would be protected against publication and misuse in the event of a data breach.

193.    Data security experts advise that "the vast majority of data breaches are preventable" if companies follow widely-available advice on data security practices, including "continually audit[ing] and reevaluat[ing]" their data security practices; being aware of and working proactively

---

[54] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed May 19, 2023).

[55] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN CYBERSECURITY (Dec. 6, 2017), available at https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/    (last accessed May 19, 2023).

[56] Jonathan Greig, *How much is your info worth on the Dark Web? For Americans, it's just $8*, TECHREPUBLIC (Feb. 8, 2021), available at https://www.techrepublic.com/article/how-much-is-your-info-worth-on-the-dark-web-for-americans-its-just-8/#:~:text=Personal%20information%20from%20US%20citizens,from%20tech%20research%20firm%20Comparitech. (last accessed May 19, 2023).

to counter cybercriminals' evolving techniques and approaches; and training and re-training their employees.[57] Upon information and belief, Defendants did not follow this advice.

## I. **Plaintiffs Suffered Damages**

194.    Plaintiffs Seirafi, Baton, Comilla, Deeney, and Vilinger and the Class have suffered damages as a result of the Data Breach. These injuries include, but are not limited to: (i) lost value of PII, a form of property that Ledger obtained from Plaintiffs and Class Members; (ii) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering, and other unauthorized use of their PII; (iii) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) the continued, long term, and certain increased risk that unauthorized persons will access and abuse Plaintiffs' and Class Members' unencrypted PII that is available on the dark web; (v) the continued and certain increased risk that the PII that remains in Defendants' possession is subject to further unauthorized disclosure for so long as Defendants fails to undertake proper measures to protect the PII; (v) invasion of privacy and increased risk to personal safety; (vi) theft of their PII and the resulting loss of privacy rights in that information; and (vii) the price premium associated with the purchase of Ledger wallets for the California Consumer Subclass.

195.    As a direct and proximate result of the Data Breach and Defendants' failure to protect their PII, Plaintiffs and Class Members have been injured by facing ongoing, imminent, impending threats of identity theft crimes, fraud, scams, social engineering, and other misuses of their PII, as well as an increased risk to their personal safety; ongoing monetary loss and economic harm, including loss of value of their PII; loss of value of privacy and confidentiality of the stolen PII; illegal sales of the compromised PII; mitigation expenses and time spent on credit monitoring; identity theft insurance costs; credit freezes/unfreezes; expense and time spent on initiating fraud alerts and contacting third parties; decreased credit scores; lost work time; and other injuries.

---

[57] Nate Nead, *How To Prevent A Data Breach In Your Company*, FORBES BUSINESS COUNSEL, FORBES        (Jul.        30,        2021)        available        at https://www.forbes.com/sites/forbesbusinesscouncil/2021/07/30/how-to-prevent-a-data-breach-in-your-company/?sh=3828f7b918da (last accessed May 19, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs and Class Members have a continuing interest in ensuring that their personal information is and remains safe, and they should be entitled to injunctive and other equitable relief.

196. Plaintiff Seirafi has received several spam messages since his email was leaked and his home was raided. Plaintiff Vilinger has received a huge amount of phishing and other scam emails, and his home was targeted in an attempted break-in. Plaintiff Baton had his email, physical address, and phone number compromised. He received regular spam calls, still receives spam emails, and had to change his phone number and where he receives packages—all as a result of this breach. The other Plaintiff suffered similar experiences.

197. If Ledger had timely disclosed the extent of the Data Breach, some Plaintiffs— sophisticated users with technology backgrounds and wary of scams—would have been on heightened alert and not fallen prey to these scams. Furthermore, others who may not have been as sophisticated in technology could also take steps to protect their privacy rights.

198. This breach has also exposed the location of the purchased Ledger products, by allowing access to Plaintiffs' and consumers' home addresses, which inherently impacts the security of the products themselves and creates actual harm and a threat of future harm.

199. Some Plaintiffs remain fearful of intruders due to their physical address being publicly leaked.

200. These leaks of personal information, in conjunction with the information that they were Ledger customers, have exposed Plaintiffs to additional risks of theft and threat.

201. In addition, Plaintiff Seirafi and members of the California Consumer Subclass would not have purchased Ledger's products at all, or would have paid significantly less for them, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and failure to provide timely customer service. Furthermore, had they known of Ledger's lax security practices, unhelpful customer service, and failure to report of the extent of the breach and other issues, they would not have provided any valuable PII to Ledger or stored any bitcoins or other forms of digital currency in Ledger wallets.

**J.    Shopify and its Data Protection Officer Failed to Supervise TaskUs's Handling of Shopify and Ledger's Data**

202.    As functional head of global privacy at Shopify, the Data Protection Officer was ultimately responsible for overseeing the controls and process for not only how Shopify handled data, but also how Shopify managed the way its own vendors and service providers handled the data Shopify provides to them.

203.    But not only do his general duties as global head of privacy implicate his responsibility to oversee vendor data, but had he been fulfilling his formal duties as Data Protection Officer under the GDPR, there would have been sufficient controls to catch the years-long data breach earlier.

204.    A data protection officer has the ultimate duty to "monitor compliance" with the GDPR and its data protection provisions, including the "assignment of responsibilities, awareness-raising and training of staff involved in processing operations, and the related audits." For this task, a data protection officer must be given all the support needed to carry out this task but cannot "receive any instructions regarding the exercise of those tasks." That is – the buck with monitoring compliance stops with the data protection officer.

205.    But by the Data Protection Officer's own admission, his monitoring was deficient. As stated above, Shopify's Data Protection Officer had no knowledge of the potential data breach until September, even though he is to be "properly and in a timely manner" be informed on "all issues with relate to the protection of personal data" under the GDPR.

206.    This was because Data Protection Officer performed no active role in monitoring what TaskUs did with Shopify data, essentially abdicating (as Ledger did with Shopify) responsibility with its data to TaskUs without any process to ensure there was proper oversight or audits of how TaskUs handled Shopify data or that it was fulfilling its contractual obligations on handling Shopify data. The Data Protection Officer only "occasionally" asked questions of vendors regarding handling of data, was not aware of the guidance given to vendors, did not keep a list of vendor agreements implicating data privacy issues, was not involved in performing or designing the

controls of security assessments of vendors, and essentially disclaimed any responsibility for overseeing vendor compliance with the GDPR, except in a handful of cases.

207. Ledger failed to adequately supervise Shopify, in accordance with the FTC's guidelines vis-à-vis limiting access to private data after the wallet purchase and not maintaining the PII longer than is needed for authorization of a transaction, for example. Shopify similarly failed to adequately oversee TaskUs and employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## V.    CLASS ALLEGATIONS

208. Plaintiffs bring this Action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following Class and Subclasses:

Nationwide, UK, and Israel Class: All persons residing in the United States, the UK, or Israel who provided Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

Nationwide, UK, and Israel Phishing Subclass: All persons in the Nationwide, U.K. and Israel Class who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal information disclosed as a result of a data breach between April 1, 2020, and the present.

California Subclass: All persons residing in California who provided Ledger or Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

California Phishing Subclass: All persons in the California Subclass who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal information disclosed as a result of a data breach between April 1, 2020, and the present.

California Consumer Subclass: All persons residing in California who purchased a Ledger Nano X wallet or a Ledger Nano S wallet from Ledger or an authorized reseller within the limitations period, as may be extended or tolled by any applicable rule of law or equitable doctrine.

New York Subclass: All persons residing in New York who provided Shopify with personal information that was accessed, compromised, stolen, or exposed in a data breach between April 1, 2020, and the present.

New York Phishing Subclass: All persons in the New York Subclass who suffered monetary damages in connection with a phishing or threatening communication by a third-party possessing those persons' personal

58
SECOND AMENDED CLASS ACTION COMPLAINT

information disclosed as a result of a data breach between April 1, 2020, and the present.

Accordingly, the Class Period is April 1, 2020, through the present except as to the Consumer Classes.

209.    Excluded from the Class and Subclasses are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

210.    Plaintiffs reserve the right to amend the Class and/or Subclass definitions if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

211.    **Numerosity.** The Class and Subclass members are so numerous that joinder of all members is impracticable.  The precise number of Class and Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

212.    **Ascertainability.** The Class and Subclass members are readily ascertainable and identifiable. They may be identified through contact information that was breached. They may be notified of the pendency of this Action by electronic mail using a form of notice customarily used in class actions.

213.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class and Subclass members, who are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the Class members.

214.    **Commonality.** Plaintiffs and the Class and Subclass members sustained damages and/or are entitled to restitution from data exposure caused by Defendants' unlawful conduct and/or for the diminution in value of the products they purchased revealed by Defendants' uniform and unlawful conduct. Common questions of law and fact include the following:

- Whether Defendants' conduct is an unlawful business act or practices within the meaning of Business and Professions Code section 17200, *et seq.*;

- Whether Defendants' conduct is an unfair business act or practice within the meaning of Business and Professions Code section 17200, *et seq.;*

- Whether Defendants' advertising is untrue or misleading within the meaning of Business and Professions Code section 17500, *et seq.;*

- Whether Defendants' represented to Plaintiffs and the Class that they would protect Plaintiffs and the Class members' PII;

- Whether Defendants' owed a duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

- Whether Defendants' breached a duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

- Whether Class members' PII was accessed, compromised, or stolen in the breach;

- Whether Defendants' conduct caused or resulted in damages to Plaintiffs and the Class;

- Whether Defendants failed to notify the public of the breach in a timely and adequate manner;

- Whether Defendants knew or should have known that its systems were vulnerable to a data breach;

- Whether Defendants adequately addressed the vulnerabilities that allowed for the data breach;

- Whether the precautions that Defendants took and failed to take with respect to the protection of the Class members' data;

- Whether the steps Defendants took and failed to take after learning of the Data Breach and the reasonableness (or rather unreasonableness) of those steps;

- The economic value of Ledger's wallets and services as advertised;

- The actual economic value of Ledger's wallets and services where, contrary to its advertising, Ledger failed to protect customers' personal information from nefarious actors;

- The quantification of the harm to Class members resulting from the exposure of their data to prospective hacking; and

60
SECOND AMENDED CLASS ACTION COMPLAINT

- The restitution and/or damages to which Class members are entitled as result of the fact that the actual value of the Ledger wallets was far less than the value of the wallets as advertised.

215. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for Class and Subclass members to individually redress the wrongs done to them. Furthermore, litigating tens of thousands of individual cases will inevitably lead to inconsistent rulings and results, burden the judicial and legal system, and magnify the delay and expense to all the parties and the court system because of multiple trials on the same factual and legal issues.

216. There will be no difficulty in the management of this Action as a class action.

217. Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Classes and Subclasses and, as such, final injunctive relief, or restitutionary relief with regard to the class members as a whole is appropriate pursuant to Fed. R. Civ. Proc. Rule 23(b)(2).

## VI.  CLAIMS FOR RELIEF

218. This action involves a unique set of events, where the actual data breach, and the conduct alleged herein causing injuries to not only California and Nationwide consumers but also to foreign consumers world-wide, occurred in California. *See e.g., Nortwest Mortg., Inc. v. Superior Court,* 72 Cal. App. 4th 214, 223-25, 85 Cal. Rptr. 2d 18 (1999) (holding that to assert a California state-law cause of action, an out-of state party must suffer injury from wrongful conduct that occurs in California.).

219. Ledger and Shopify are global entities, that conduct business nationwide and globally, servicing consumers in the United States and in many foreign countries. They also provide services in virtually every state and advertise their platforms and products online targeting word-wide consumers.

220. To enhance their brands and increase sales, Ledger and Shopify engage in high impact digital advertising worldwide, targeting consumers globally.

221. Regardless of where a person resides, that person saw Ledger's similarly stated promises regarding Ledger's robust security and the "root of trust" using the most secure mechanisms and measures to protect consumers' cryptocurrency as well as personal data.

222. Plaintiffs and the Class(es), while purchasing the Ledger's products from cloud-based software and relying on the uniform representations made by Ledger, were injured as a result of actions stemming from San Francisco, California, and thus, they suffered an injury from wrongful conduct that occurred in California.

223. Specifically, Shopify, Ledger, and TaskUs caused and then covered up a massive 2020 data breach that led to substantial damages for consumers. Shopify, previously headquartered in San Francisco, was one of the main actors/facilitators of the data breach. The data leak occurred through the use of Shopify's merchants and platforms.

224. TaskUs's rogue members of their support team obtained customer transactional records, including Ledger's customers. Shopify's agents then illegally exported customer transactional records in April and June 2020. Nevertheless, neither Shopify nor Ledger acknowledged the massive data breach, and they continued to cover up the rumors and incidents for the ensuing months.

225. The breach had occurred and stemmed from the actions taking place in California–where Shopify originally maintained a principal place of business, and where their actions regarding privacy and data protections stemmed from.

226. The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of California residents and out of state residents against a company conducting business and wrongdoings stemming from California. California has a greater interest than any other state in the nationwide claims and is most intimately concerned with the claims and outcomes of this litigation. The conspiracy to implement the data breach led to a federal indictment in California alleging conduct occurring in California. *See United States v. Heinrich*, 8:21-cr-000222-JLS (C.D. Cal.

SECOND AMENDED CLASS ACTION COMPLAINT

2021). Importantly, separating this litigation into a myriad of lawsuits through the entire U.S. while the conduct leading to the breach that occurred here stems from California will involve not only duplicative actions, duplicative discovery, traveling of individuals/witnesses from San Francisco (who have intimate knowledge of what happened), and ultimately lead to inconsistent rulings, and burden of the judicial system and the parties.

227.    Defendants' center of business activities related to privacy and data protection – their essential operations that allowed them to conduct business in the states – are in California. Ledger's and Shopify's breach of their duties to Plaintiffs and the Class(es) emanated from California; the Data Protection Officer was located in San Diego, California.

228.    Application of California laws to the Class with respect to Plaintiffs' and the Class' claims is neither arbitrary nor fundamentally unfair, because California has significant contacts and significant aggregation of contacts in this state and the injury to the Class and Plaintiffs happened in San Francisco, California.

229.    Under California's choice of law principles, the common law of California applies to the Class claims. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California Unfair Competition Law and Consumer Legal Remedies Act may be applied to non-resident plaintiffs.

230.    Furthermore, Plaintiffs seek recovery on behalf of the Class in the form of restitution, as well as punitive/exemplary damages, injunctive relief, and attorneys' fees and costs (pursuant to Cal. Code Civ. P. § 1021.5, FRCP 23). Ledger's and Shopify's misconduct, deceit, and concealment of material facts regarding the data breach at issue deprived Plaintiffs and the Class of legal rights, causing injury. In addition, Shopify's misconduct constitutes malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) because their actions depict a despicable conduct carried out with a willful and conscious disregard of the rights or safety of Plaintiffs and Class members and subjected Plaintiffs and Class Members to hardship. As a result, Plaintiffs and Class members are also entitled to punitive damages against Shopify under Cal. Civ. Code § 3294(a).

**FIRST CAUSE OF ACTION**

**NEGLIGENCE**

**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, and the Nationwide, UK, and Israel Phishing Subclass and, Alternatively, on Behalf of the Remaining Non-Consumer Subclasses)**

**(Against Defendants Shopify and TaskUs)**

231.    Plaintiffs incorporate the preceding paragraphs.

232.    Shopify and TaskUs owed a duty to the Class members, including Plaintiffs, to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their personal information in their possession from being compromised, lost, or stolen, and from being accessed, and misused by unauthorized persons.

233.    This duty included: (a) designing, maintaining, and testing Shopify's and TaskUs's security systems to ensure that the Class members' personal information was adequately secured and protected; (b) implementing processes that would timely detect a breach of their security systems; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; (d) maintaining data-security measures consistent with industry standards; and (e) timely and comprehensively notifying Class members of any potential or actual unauthorized access of their personal information.

234.    Shopify's and TaskUs's duties to use reasonable care, including vendor oversight, arose from several sources, including those described below. Shopify and TaskUs had a common law duty to prevent foreseeable harm to others, including Class members, who were the foreseeable and probable victims of any inadequate security practices. Shopify and TaskUs in fact knew that their failure to protect Class members' personal information would likely harm Class members, because they knew that hackers routinely attempt to steal such information and use it for nefarious purposes.

235.    Shopify's and TaskUs's duties also arose under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to use reasonable measures to protect personal information by

64

SECOND AMENDED CLASS ACTION COMPLAINT

companies such as Ledger. Various FTC publications and data security breach orders further form the basis of Shopify's and TaskUs's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

236. Shopify's duties also arose from Ledger's unique position in the burgeoning crypto-asset market. Ledger strove to create "the highest level of security for crypto assets," and Ledger was in a unique and superior position to protect against the harm to the Class members as a result of data breaches. As Ledger's e-commerce vendor entrusted with Ledger's data, Shopify was in the same unique and superior position to protect against this harm.

237. Shopify and TaskUs also had duties to safeguard the personal information of the Class members and to promptly notify them of a breach because of state laws and statutes that require Ledger to reasonably safeguard sensitive personal information. Timely notification was necessary to permit Class members to take appropriate measures to protect their identities as owners of crypto-assets, safeguard against threats to those crypto-assets, safeguard against personal threats, and take other steps to mitigate or ameliorate the damages caused by Ledger's and Shopify's misconduct.

238. Shopify and TaskUs breached their duties to the Class members and thus were negligent. Shopify and TaskUs breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the personal information of the Class members; (b) detect the breaches while they were ongoing; (c) maintain security systems consistent with industry standards; and (d) disclose that the Class members' personal information in Ledger's and/or Shopify's possession had been or was reasonably believed to have been stolen or compromised.

239. Shopify's and TaskUs's negligence was, at least, a substantial factor in causing the Class members' personal information to be improperly accessed, disclosed, and otherwise compromised, and in causing the Class members' other injuries as a result of the data breaches.

240. As a direct and proximate result of Shopify's and TaskUs's negligence, the Class members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial, for injuries that include at least the following:

SECOND AMENDED CLASS ACTION COMPLAINT

a. the theft of their personal information;

b. the diminished value and loss of the benefits of purchased Ledger devices, which now pose a security risk to the Class members;

c. the costs associated with the detection and prevention of phishing scams aimed at depriving the Class members of assets and funds;

d. the costs associated with purchasing new hardware and software to protect crypto assets and/or other assets and/or funds;

e. the costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breaches;

f. the imminent and impending injury flowing from potential fraud and theft posed by their personal information being placed in the hands of criminals;

g. the mental anguish from the stress and fear of receiving threats and other messages from internet users who have physical address information;

h. the damages to and diminution in value of their personal information entrusted, directly or indirectly, Shopify, and TaskUs with the mutual understanding that the Class members' data would be safeguarded against theft and not allow access and misuse of their data by others; and

i. the continued risk of exposure to hackers and thieves of their personal information, which remains in Ledger's possession and is subject to further breaches so long as Shopify and TaskUs fails to undertake appropriate and adequate measures to protect the Class members.

**SECOND CAUSE OF ACTION**

**<u>NEGLIGENCE PER SE</u>**

**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, and the Nationwide, UK, and Israel Phishing Subclass and, Alternatively, on Behalf of the Remaining Non-Consumer Subclasses)**

**(Against Defendants Shopify and TaskUs)**

66

SECOND AMENDED CLASS ACTION COMPLAINT

241. Plaintiffs incorporate the preceding paragraphs.

242. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Shopify and TaskUs of failing to use reasonable measures to protect personal information. Various FTC publications and orders also form the basis of Shopify's and TaskUs's duties.

243. Shopify and TaskUs violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect personal information and not complying with industry standards. Shopify's and TaskUs's conduct was particularly unreasonable given the nature and amount of personal information they obtained and stored and the foreseeable consequences of a data breach that disclosed customers' personal information, including the fact that those customers owned crypto-assets, to hackers and other third parties.

244. Shopify's and TaskUs's violations of Section 5 of the FTC Act (and similar state statutes) constitute negligence per se. This negligence was, at least, a substantial factor in causing the Class members' personal information to be improperly accessed, disclosed, and otherwise compromised, and in causing the Class members' other injuries as a result of the data breaches.

245. The Class members, including Plaintiffs, are within the class of persons that Section 5 of the FTC Act (and similar state statutes) was intended to protect. In addition, the harm that the Class members have suffered is the type of harm that the FTC Act (and similar state statutes) were intended to prevent. Indeed, the FTC has pursued over fifty enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same or similar harm suffered by the Class members.

246. As a direct and proximate result of Shopify's and TaskUs's negligence, the Class members have been injured as described herein and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**(On Behalf of Plaintiffs, the Nationwide, UK, and Israel Class, and the Nationwide, UK, and**

SECOND AMENDED CLASS ACTION COMPLAINT

**Israel Phishing Subclass and, Alternatively, on Behalf of the Remaining Non-Consumer Subclasses**)

**(Against Defendants Shopify and TaskUs)**

247.   Plaintiffs incorporate the preceding paragraphs.

248.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court also has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

249.   An actual controversy has arisen in the wake of the Data Breach regarding Shopify's and TaskUs's present and prospective duties to reasonably safeguard customers' and consumers' personal information and whether Shopify and TaskUs are maintaining data-security measures adequate to protect the Class members, including Plaintiffs, from further data breaches that compromise their personal information.

250.   Plaintiffs allege that Shopify's and TaskUs's data-security measures remain inadequate. Shopify and TaskUs deny these allegations. In addition, Plaintiffs continue to suffer injury as a result of the compromise of their personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

251.   Pursuant to its authority under the Declaratory Judgment Act, Plaintiffs ask the Court to enter a judgment declaring, among other things, the following:

i.   Shopify and TaskUs owe a duty to secure consumers' personal information and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

ii.   Shopify and TaskUs are in breach of these legal duties by failing to employ reasonable measures to secure consumers' personal information.

252.   Plaintiffs further ask the Court to issue corresponding prospective injunctive relief requiring Shopify and TaskUs to employ adequate security protocols consistent with law and industry standards to protect consumers' personal information.

253. If an injunction is not issued, the Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Shopify and/or TaskUs. The risk of another such breach is real, immediate, and substantial. If another breach at Shopify and/or TaskUs occurs, the Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

254. The hardship to the Class members if an injunction is not issued exceeds the hardship to Shopify and TaskUs if an injunction is issued. Among other things, if another massive data breach occurs at Shopify and/or TaskUs, the Class members will likely be subjected to substantial hacking attempts, physical threats, and other damage. On the other hand, the cost to Shopify and TaskUs of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Shopify and TaskUs have pre-existing legal obligations to employ such measures.

255. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing additional data breaches at Shopify and/or TaskUs, thus eliminating the additional injuries that would result to the Class members and the millions of consumers whose personal and confidential information would be further compromised.

### FOURTH CAUSE OF ACTION

**CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff Seirafi and the California Consumer Subclass)**
**(Against Defendant Ledger Only)**

256. Plaintiff Seirafi incorporates the preceding paragraphs.

257. Ledger is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

258. California's Unfair Competition Law (the "UCL") prohibits "unfair competition," which Ledger violated by engaging in unlawful, unfair, and deceptive business acts and practices.

**a.     "Unfair" Prong**

259. Under California's False Advertising Law, Cal. Bus. & Prof. Code Section 17200, *et seq.*, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provide to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

260. Ledger's conduct as alleged herein does not confer any benefit to consumers.

261. Ledger's conduct as alleged herein causes injuries to consumers, who do not receive a product consistent with their reasonable expectations.

262. Ledger's conduct as alleged herein causes injuries to consumers, who paid for a secure system and whose PII was leaked as a result of Ledger's unlawful conduct.

263. The injuries caused by Ledger's conduct as alleged herein outweigh any benefits.

264. Ledger's conduct, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes an unfair business practice within the meaning of California Business and Professions Code Section 17200.

265. Ledger could have furthered its legitimate business interests in ways other than by unfair conduct.

266. Ledger's conduct threatens consumers by misleadingly advertising their systems as "secure" and exposing consumers' PII to hackers. Ledger's conduct also threatens other companies, large and small, who play by the rules. Ledger's conduct stifles competition and has a negative impact on the marketplace and reduces consumer choice.

267. All of the conduct alleged herein occurs and continues to occur in Ledger's business. Ledger's wrongful conduct is part of a pattern or generalized course of conduct repeated on approximately thousands of occasions daily.

268. Pursuant to Business and Professions Code Sections 17203, Plaintiff Seirafi and the California Consumer Subclass seek an order of this Court enjoining Ledger from continuing to engage, use, or employ its unfair business practices.

269. In fact, to date, Ledger continues to market and advertise its faulty products and systems to consumers, while knowing that it failed and continues to fail to deliver on its promises – of providing a secure system and products.

270.    Ledger failed to implement and maintain reasonable security measures to protect Plaintiff Seirafi and the California Consumer Subclass members' personal information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach. Ledger failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff Seirafi and the California Consumer members whose personal information has been compromised.

271.    Ledger's failures to implement and maintain reasonable security measures also were contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures.

272.    Ledger's failures to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Ledger's inadequate security, consumers could not have reasonably avoided the harms that Ledger caused.

273.    Plaintiff Seirafi and the California Consumer Subclass members have suffered injury-in-fact and have lost money or property as a result of Defendants' unfair conduct. Among other things, Plaintiff Seirafi and the California Consumer Subclass members paid an unwarranted premium for these Products, which they would not have purchased had they known that Ledger has not adhered to the security measures it claimed it would. Specifically, Plaintiff Seirafi and the California Consumer Subclass members paid for products and services advertised as secure when Ledger in fact failed to institute adequate security measures and neglected vulnerabilities that led to a data breach. Plaintiff Seirafi and the California Consumer Subclass members would not have purchased the Products and services, or would not have given Ledger their PII, had they known that their PII was vulnerable to a data breach. Likewise, Plaintiff Seirafi and the California Consumer Subclass seek an order mandating that Ledger implement adequate security practices to protect consumers' PII. Additionally, Plaintiff Seirafi and the California Consumer Subclass seek and request an order awarding Plaintiff Seirafi and the California Consumer Subclass restitution of the money wrongfully acquired by Ledger by means of Ledger's unfair and unlawful practices.

**b.     "Unlawful" Prong**

274.    California Business and Professions Code Section 17200, et seq., identifies violations of any state or federal law as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp*., 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

275.    Ledger's unlawful conduct, as alleged in the preceding paragraphs, violates California Civil Code Section 1750, et seq.

276.    Ledger's conduct, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes unlawful conduct.

277.    Ledger knew or should have known of its unlawful conduct.

278.    In fact, Ledger's failure to implement and maintain reasonable security measures to protect Plaintiff Seirafi and the California Consumer Subclass members' personal information from unauthorized disclosure, and identify foreseeable security risks, or even remedy/improve the security risks, were a direct and proximate cause of the Data Breach.

279.    Ledger's failures to implement and maintain reasonable security measures also were contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5.

280.    Ledger has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification); California's Consumers Legal Remedies Act, Cal. Civ. Code § 1780, *et seq.*; the FTC Act, 15 U.S.C. § 45; and California common law.

**c.     "Fraudulent" Prong**

281.    Ledger's various representations and omissions, including but not limited to its statements of Ledger's security implementations, assurances regarding trustworthiness and reliability of measurements implemented by Ledger, and even subsequent representations regarding

lack of the data breach (assurances that the breach was just a rumor), and misrepresentations regarding the extent of the breach constitute false, misleading, and deceptive statements intended to deceive the consumers within the meaning of §17200.

282.    Ledger's express false promises regarding security measurements, and yet failure to implement and maintain reasonable security and privacy measures to protect consumers and Plaintiff Seirafi and the California Consumer Subclass members' PII and secure the valuable crypto-assets, and failure to identify foreseeable security and privacy risks constitute fraudulent business practices.

283.    Ledger's representations and omissions were material because they were likely to deceive reasonable consumers about the value of Ledger's services and the adequacy of Ledger's data security, ability to protect the confidentiality of consumers' personal information, and ability to protect the confidentiality of the fact that consumers had purchased a Ledger and/or owned crypto-assets.

284.    As a direct and proximate result of Ledger's deceptive and unlawful acts and practices, Plaintiff Seirafi and the California Consumer Subclass members are entitled to restitution in an amount to be proven at trial, for, among other things, the loss of the benefit of their bargain with Ledger, as they would not have paid Ledger for goods and services or would have paid less for such goods and services but for Ledger's misconduct.

285.    Plaintiff Seirafi and the California Consumer Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all revenues stemming from Ledger's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

286.    Plaintiff Seirafi and the California Consumer Subclass seek restitution and injunctive relief. Restitution would provide Plaintiff Seirafi and the California Consumer Subclass with damages for past harm, while the injunctive relief is necessary to cease misconduct and dispel misperception. Injunctive relief is appropriate because Ledger continues to misrepresent that their security features should be trusted and is necessary to prevent Ledger from continuing to engage in

the unfair, fraudulent, and/or unlawful conduct and prevent future harm. The restitution will not provide adequate remedy for what happened due to the fact that some damages (such as continuous risk of harm/identity theft/ongoing phishing scams and other damages) cannot be remedied through a restitution, and injunctive relief would prevent some future harm – such as future misrepresentations and harm.

287.    Furthermore, Plaintiff Seirafi and the California Consumer Subclass seek attorneys' fees, costs, and expenses (pursuant to Cal. Code Civ. P. § 1021.5).

**FIFTH CAUSE OF ACTION**

**CALIFORNIA CONSUMER LEGAL REMEDIES ACT**

**Cal. Civ. Code § 1750, *et seq.***

**(On Behalf of Plaintiff Seirafi and California Consumer Subclass)**

**(Against Defendant Ledger Only)**

288.    Plaintiff Seirafi incorporates the preceding paragraphs.

289.    The Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA"), is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

290.    Ledger is "persons" as defined by California Civil Code §§ 1761(c) and 1770 and have provided "goods" and/or "services" as defined by California Civil Code §§ 1761(b) and 1770.

291.    California Civil Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities [which] they do not have[.]"

292.    California Civil Code § 1770(a)(7) prohibits one who is involved in a transaction from "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another."

293.    The California Consumer Subclass are "consumers" as defined by California Civil Code §§ 1761(d) and 1770 and have engaged in a "transaction" as defined by California Civil Code §§ 1761(e) and 1770.

74

SECOND AMENDED CLASS ACTION COMPLAINT

294.    Ledger's acts and practices were intended to and did result in the sales of products and services to the California Consumer Subclass members in violation of California Civil Code § 1770.

295.    Ledger's acts and practices were intended to and did result in the sales of products and services to the California Consumer Subclass members in violation of California Civil Code § 1770, including, but not limited to, the following:

a.    Representing that goods or services have characteristics that they do not have;

b.    Representing that goods or services are of a particular standard, quality, or grade when they were not;

c.    Advertising goods or services with intent not to sell them as advertised; and

d.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

296.    Ledger's representations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Ledger's data security and ability to protect the confidentiality of consumers' personal information, including the confidentiality of the fact that consumers purchased a Ledger devices or service and, therefore, owned crypto-assets.

297.    If Ledger disclosed to the California Consumer Subclass members that their data systems were not secure and, thus, vulnerable to attack, Ledger would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

298.    Instead, Ledger received, maintained, and compiled the California Consumer Subclass members' personal information as part of the services Ledger provided without advising the California Consumer Subclass members that Ledger's data-security practices were insufficient to maintain the safety and confidentiality of the California Consumer Subclass members' personal information. Accordingly, the California Consumer Subclass members acted reasonably in relying on Ledger's misrepresentations and omissions, the truth of which they could not have discovered.

299.    As a direct and proximate result of Ledger's violations of California Civil Code § 1770, the California Consumer Subclass members are entitled to injunctive relief. Plaintiff Seirafi

has provided the notice required by California Civil Code § 1782(a) and, Ledger has not cured or taking any action to cure its representations/actions.

300.   Thus, Plaintiff Seirafi and the California Consumer Subclass members seek all monetary and non-monetary relief allowed by law, including damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

301.   The restitution and injunctive relief will provide for different damages. The restitution will provide damages for past harm; however, injunctive relief would prevent future misrepresentations and prevent future injustice.

**SIXTH CAUSE OF ACTION**

**NEW YORK DECEPTIVE TRADE PRACTICES ACT,**

**N.Y. Gen. Bus. Law § 349, *et seq.***

**(On Behalf of the New York Subclass and New York Phishing Subclass)**

**(Against Defendants Shopify and TaskUs)**

302.   Plaintiffs incorporate the preceding paragraphs.

303.   New York General Business Law Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state…."

304.   Shopify and TaskUs committed unfair business acts and practices in violation of the New York General Business Law § 349 *et seq,* by:

    i.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Collinger and the New York Subclass members' PII, which was a direct and proximate cause of the Data Breach;

    ii.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    iii.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Collinger and the New York Subclass members' PII,

76

SECOND AMENDED CLASS ACTION COMPLAINT

including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

iv.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the New York Subclass members' PII; and

305.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of the New York Subclass members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45.

306.   As a result of Shopify's and TaskUs's actions and omissions, Plaintiff Collinger and the New York Subclass suffered damages, and seek damages, equitable and injunctive relief, as well as reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

On behalf of themselves, the Classes, and the Subclasses, Plaintiffs request as follows:

(a) That the Court determines that this Action may be maintained as a Class Action, that Plaintiffs be named as Class Representatives of the Classes and Subclasses, that the undersigned be named as Lead Class Counsel of the Classes and Subclasses, and that notice of this Action be given to Class and Subclass members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the laws set forth above;

(c) That the Court award Plaintiffs, the Classes, and Subclasses damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs, the Classes, and Subclasses are entitled, including but not limited to restitution and an Order requiring Defendants to cooperate and financially support civil and/or criminal asset recovery efforts;

(e) That the Court award Plaintiffs, the Classes, and Subclasses pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

SECOND AMENDED CLASS ACTION COMPLAINT

(f) That the Court award Plaintiffs, the Classes, and Subclasses their reasonable attorneys' fees and costs of suit;

(g) That the Court award treble and/or punitive damages insofar as they are allowed by applicable laws; and

(h) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated: November 22, 2023                Respectfully submitted,

*/s/ Jason H. Kim*
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Email: tschneider@schneiderwallace.com
Email: jkim@schneiderwallace.com
Email: mweiler@schneiderwallace.com

Ryan J. Clarkson (SBN 257074)
Bahar Sodaify (SBN 289730)
Yana Hart (SBN 306499)
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Email: rclarkson@clarksonlawfirm.com
Email: bsodaify@clarksonlawfirm.com
Email: yhart@clarksonlawfirm.com

Richard Cipolla (*pro hac vice*)
Freedman Normand Friedland LLP
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 970-7509
Email: rcipolla@fnf.law

78
SECOND AMENDED CLASS ACTION COMPLAINT

Velvel Freedman (*pro hac vice*)
Freedman Normand Friedland LLP
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Telephone: (305) 971-5943
Email: vel@fnf.law

SECOND AMENDED CLASS ACTION COMPLAINT

# EXHIBIT 1

**Glendale Police Department Report**

21-2025

Supplement No
ORIG

# Glendale Police Dept.



131 N. Isabel St

Glendale, CA

91206

(818) 548-4840

Reported Date
02/13/2021
Rpt/Incident Typ
SUSPICIOUS CIRCUMSTANC
Member#/Dept ID#
KNUDSEN,DANIEL

Unauthorized Release of Information Prohibited - 13303

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| Glendale Police Dept. | | 21-2025 | ORIG | 02/13/2021 | 20:53 | 210213299 |

| Status | Rpt/Incident Typ |
|---|---|
| Report to Follow - In Process | SUSPICIOUS CIRCUMSTANCES |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| ██████████████ | ████████ | ████ | 170 |

| From Date | From Time | To Date | To Time | Member#/Dept ID# |
|---|---|---|---|---|
| 02/13/2021 | 20:53 | 02/13/2021 | 20:53 | 27926/KNUDSEN,DANIEL |

| Assignment | Entered by | Assignment | RMS Transfer | Prop Trans Stat | Approving Officer |
|---|---|---|---|---|---|
| PATROL | 27926 | PATROL | Successful | Successful | 22449 |

| Approval Date | Approval Time | RC Status |
|---|---|---|
| 02/15/2021 | 19:49:35 | Freeze Report |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | 148.3(A)PC | FALSE REPORT EMERGEN | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| SUB | 1 | I | SEIRAFI,NAEEM | 1208493 | | M | ████████ |
| SUB | 2 | I | LAHMI,MINA | 1101419 | | F | ████████ |
| SUB | 3 | I | SEIRAFI,HOSSEIN | 979917 | W | M | ████████ |
| SUS | 1 | I | ;UNKNOWN | | | | |

## Summary Narrative

Report of a swatting call

| Report Officer | Printed At | |
|---|---|---|
| 27926/KNUDSEN,DANIEL | 02/15/2021 19:50 | Page 1 of 3 |

21-2025          Supplement No
                 ORIG

# Glendale Police Dept.



## Subject 1: SEIRAFI,NAEEM

| Involvement | Invl No | Type | Name | | MNI | Sex |
|---|---|---|---|---|---|---|
| Subject | 1 | Individual | SEIRAFI,NAEEM | | 1208493 | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|
| ▉ | ▉ | No | ▉ | ▉ | ▉ | ▉ | ▉ |

| Type | Address | | City |
|---|---|---|---|
| HOME ADDRESS | ▉ | | ▉ |

| State | ZIP Code | Date |
|---|---|---|
| CALIFORNIA | ▉ | 02/13/2021 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | ▉ | CALIFORNIA |

| Phone Type | Phone No | Date |
|---|---|---|
| CELL | ▉ | 02/13/2021 |

## Subject 2: LAHMI,MINA

| Involvement | Invl No | Type | Name | | MNI | Sex |
|---|---|---|---|---|---|---|
| Subject | 2 | Individual | LAHMI,MINA | | 1101419 | FEMALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|
| ▉ | ▉ | No | ▉ | ▉ | ▉ | ▉ | ▉ |

| Type | Address | | City |
|---|---|---|---|
| HOME ADDRESS | ▉ | | ▉ |

| State | ZIP Code | Date |
|---|---|---|
| CALIFORNIA | ▉ | 02/13/2021 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | ▉ | CALIFORNIA |

## Subject 3: SEIRAFI,HOSSEIN

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| Subject | 3 | Individual | SEIRAFI,HOSSEIN | | 979917 | WHITE | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|
| ▉ | ▉ | No | ▉ | ▉ | ▉ | ▉ | ▉ |

| Type | Address | | City |
|---|---|---|---|
| HOME ADDRESS | ▉ | | ▉ |

| State | ZIP Code | Date |
|---|---|---|
| CALIFORNIA | ▉ | 02/13/2021 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | ▉ | CALIFORNIA |

## Suspect 1: ;UNKNOWN

| Involvement | Invl No | Type | Name | PRN |
|---|---|---|---|---|
| Suspect | 1 | Individual | ;UNKNOWN | ▉ |

## Modus Operandi

| Crime Code(s) |
|---|
| SUSPICIOUS CIRCUMSTANCES |

## Narrative

On 02/13/2021 at 2055 hours, I (Ofc. Knudsen) was dispatched to the listed location regarding an unknown male stating he just shot his friend and that he still has the gun. The unknown male stated his friend is not breathing and that they are located in the rear bedroom. The unknown male then disconnected the phone line and no further details were provided.

Once on scene, assisting Ofc. Cowell, Ofc. West. Ofc. Munoz, Ofc. Jacoy. Ofc. Valencia, Ofc. Tarverdians, Ofc. Gharibian, Ofc. Macatangay, and Sgt. Mcdonald set a containment around the listed property. Dispatch was able to contact the resident at the listed location (SUB/SEIRAFI,NAEEM). Naeem advised dispatch that he was out of his town but his father should be at his sister's house in unit #2. I contacted the residents at Unit #2 who were able to call the residents at the unit in question. Naeem's parents (later identified as SUB2/LAHMI,MINA and SUB3/SEIRAFI,HOSSEIN) ultimately came out of the unit and the unit was cleared and no evidence of a crime existed.

It should be noted there was a similar incident earlier in the afternoon at 1442 hours at 1264 Thompson. Refer to DR #21-2008.

Based on the above circumstances, I determined the unknown suspect reported a false emergency to GPD dispatch in violation of 148.3(a)PC.

| Report Officer | Printed At | |
|---|---|---|
| 27926/KNUDSEN,DANIEL | 02/15/2021 19:50 | Page 2 of 3 |

**21-2025**

Supplement No
ORIG

# Glendale Police Dept.

## Narrative

Audio recording of both 911 calls were uploaded to Evidence.com

The incident was captured on my Axon body worn camera.

D. Knudsen #27926

| Report Officer | Printed At | |
|---|---|---|
| 27926/KNUDSEN,DANIEL | 02/15/2021 19:50 | Page 3 of 3 |