UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| NAEEM SEIRAFI, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | **NO. 3:21-CV-02470-EMC** |
| ) | |
| LEDGER SAS, et al. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

San Francisco, California
Thursday, December 19, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

SCHNEIDER, WALLACE, COTTRELL, KONECKY, LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
BY: **JASON H. KIM, ATTORNEY AT LAW**

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
BY: **TIARA AVANESS, ATTORNEY AT LAW**

For Defendants:

MORRISON & FOERSTER, LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017
BY: **PURVI G. PATEL, ATTORNEY AT LAW**
**MATTHEW J. WYATT, ATTORNEY AT LAW**

(Appearances continued to following page.)

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**APPEARANCES (CONT.'D):**

For Defendants:
                    DAVIS, WRIGHT, TREMAINE, LLP
                    350 South Grand Avenue, Suite 27th Floor
                    Los Angeles, CA 90071
          **BY:  SPENCER S. PERSSON, ATTORNEY AT LAW**

Thursday - December 19, 2024                    2:10 p.m.

**P R O C E E D I N G S**

---o0o---

1     **THE COURTROOM DEPUTY:**  The next case the Court will
2     be hearing is Baton, et al. versus Ledger, Case Number 21-2470.
3     Counsel, please state your appearance for the record beginning
4     with the plaintiff.

**MR. KIM:**  Good afternoon, Your Honor.  Jason H. Kim
from Schneider Wallace appearing on behalf of plaintiffs.

**THE COURT:**  All right.  Good afternoon, Mr. Kim.

**MS. AVANESS:**  Good afternoon, Your Honor.  Tiara
Avaness on behalf of plaintiffs.

**THE COURT:**  Ms. Avaness.

**MS. PATEL:**  Good afternoon, Your Honor.  Purvi Patel
from Morrison & Foerster on behalf of defendant Ledger.  And
per the Court's encouragement, my colleague, Matt Wyatt, will
handle the hearing for Ledger as a less experienced attorney
today.

**THE COURT:**  Good.  Thank you.  Welcome.

**MR. WYATT:**  Good afternoon, Your Honor.  Matthew
Wyatt from Morrison & Foerster on behalf of Ledger.

**THE COURT:**  All right.  Welcome, Mr. Wyatt.

**MR. PERSSON:**  Good afternoon, Your Honor.  Spencer
Persson on behalf of defendant TaskUs.

**THE COURT:**  All right.  Thank you, Mr. Persson.

1    So let's take up -- there are several issues.  Let's take

2    up the TaskUs motion to dismiss based on forum non conveniens.

3    It seems to me that for the same reasons Shopify I found was --

4    could fall under the ambit, within the ambit of the forum

5    selection clause.  Why shouldn't TaskUs also given the

6    interrelationship?  I know they're one step away, but given

7    their involvement, alleged involvement in the transaction, and

8    the contractual privy that's exists and the overlapping issues,

9    doesn't it make sense for one jurisdiction to hear the claims

10   against both TaskUs and Shopify?  I mean, I'm inclined to, in

11   other words, grant the motion to dismiss based on forum non

12   conveniens for much the same reasons why I so ruled as to

13   Shopify.

14       You can come up to the podium if you'd like.

15           **MS. AVANESS:**  Good afternoon, Your Honor.

16           **THE COURT:**  Good afternoon.

17           **MS. AVANESS:**  Tiara Avaness on behalf of plaintiffs.

18       And the central issue here as to why TaskUs should not be

19   permitted to exercise this contractual right that is in

20   Ledger's contract with the consumers is because it's not

21   supported by case law when we're considering the nature of

22   their role as a vendor of a vendor.  And it's essential to

23   understand here that there is no basis for TaskUs to be able to

24   exercise this contractual right where the only contracts that

25   we have presented in the record that even reference or relate

1   to TaskUs is one that was executed in 2016 between TaskUs and

2   Shopify that predates the Ledger contract by two years, and it

3   also contains a non-assignment clause.

4        It also contains a non-assignment clause in the Ledger and

5   Shopify contract.

6        So there's no assignment of rights.  It's unclear the

7   extent to which TaskUs is seeking to establish that change of

8   agency that doesn't exist.  There needs to be some type of

9   link, and that doc' --

10       **THE COURT:**  Well, isn't the link -- I mean, it is a

11  subcontractor.  TaskUs ultimately is a subcontractor.  Right?

12       **MS. AVANESS:**  TaskUs is the vendor Shopify, and

13  Shopify is the directly-named e-Commerce vendor of Ledger.

14       And as the Court acknowledged and analyzed at length in

15  its motion, in its order on the motion to dismiss the second

16  amended complaint, the nature of Shopify's involvement with

17  Ledger is important.  The details in which Shopify powered the

18  website had a direct contractual link.  In fact, I believe it's

19  on page 50 of the Court's order where it identifies that it's a

20  vendor of the Ledger contract.  And the reason that's important

21  is because when we look at the case law, it's this closely-

22  related doctrine is narrowly tailored, and it's not typically

23  broadened by courts.

24       For example, in cases where we have, for example, *Manetti*,

25  which is involving several Gucci entities.  There, there was a

1    similar web of entities.  Furthermore, Gucci America in that

2    case had a separate consent agreement that was signed,

3    consenting to the terms of the agreement that contained the

4    forum selection clause.

5        In *Pat Pellegrini*, there was a declaration that

6    specifically identified the extent to which they were involved

7    in all of these in the contraction, and, in fact, described

8    them as merely --

9            **THE COURT:**  Isn't it alleged here that's TaskUs

10   performed many of the key functions that Shopify performed for

11   Ledger, and indeed part of the claim is that Ledger, one of its

12   faults and one of the claims against it is the failure to apply

13   and enforce its security measures not only to Shopify, but to

14   its subcontractors, including those who were outside the United

15   States.  It's part of the claim that they should have revealed

16   this to everybody that we're not enforcing this against people,

17   including whether it's vendor or sub vendor, whoever's doing

18   all this work should be subject to it.

19       So it's hard to see how TaskUs is easily segregated from

20   this whole process.

21           **MS. AVANESS:**  Respectfully, Your Honor, they are,

22   because their role -- yes, absolutely they had access to the

23   information that was ultimately compromised here that result in

24   significant injury.  And, you know, plaintiff Comilla alone

25   suffered over a hundred thousand dollars-worth in their

1   cryptocurrency that was compromised.  Furthermore, in today's
2   market that's close to 300,000.

3       So these were real injuries, and it was certainly a result
4   of the information and data in TaskUs' possession.  However,
5   we're not in the same position as Shopify, and especially when
6   it comes to the contractual analysis here, because when we're
7   assessing a contractual right and the enforcement of that
8   right, there needs to be that link.  There needs to be
9   foreseeability that the nonsignatory to the agreement would
10  exercise this forum selection clause that they are not a
11  signator to, and that's what's missing.

12      It may be a document that links TaskUs, and then, if so,
13  that would be absolutely relevant to the discussion analysis,
14  but that hasn't been presented to the record to date, and so
15  it's plaintiffs' position that it doesn't exist.  And it may
16  not be a document, it may be something more, it may be
17  something other than, but it's still remains that there's that
18  barrier to establishing the ability to exercise this
19  contractual right, and I'm happy to turn to some additional
20  points.

21          **THE COURT:**  Well, before you go any further, let me
22  hear a response to what's been said so far so we can kind of
23  tackle one item at a time here.

24          **MR. PERSSON:**  Spencer Persson on behalf of TaskUs.
25  Thank you, Your Honor.

1    The point that it's not supported by the case law, TaskUs

2 disagrees.  The case law, what it says about non-signatories is

3 is the conduct closely related to the purpose of the contract?

4 Did the nonsignatory play an active role in the transaction?

5    And here you have these allegations that TaskUs performed

6 customer sort for Ledger for their customers, interacted with

7 their customers; provided data consulting for the Ledger site

8 where the Ledger wallets were purchased or entrusted with the

9 personal information of the Ledger plaintiffs; and provided

10 general support for that Ledger website.  So just as Shopify

11 handled PII, just as Your Honor said in the prior order on

12 page 50, since plaintiffs believe they were entrusting Ledger

13 with their PII, and therefore any Ledger's vendors who had

14 access to their PII, it is foreseeable that said vendors would

15 be able to enforce their forum selection clause in plaintiffs'

16 agreement with Ledger.

17    That's what you said in the last order, and it's still

18 true now.

19    What you look at in the nonsignatory context is what is

20 the position that the nonsignatory plays in relation to the

21 contract, and --

22        **THE COURT:**  The contract that contains the clause.

23        **MR. PERSSON:**  Yes, exactly; the contract that

24 contains the clause.  Yeah, I understand that they're talking

25 about other contracts.

As far as the non-assignment, that's talking about assignment of contractual rights.  That's not talking about whether Shopify can ask TaskUs to do discrete task support for entities that it works for.  In fact, if you look at the Shopify contract with Ledger and you look at the Shopify contract with TaskUs, it talks about the handling of PII.  It talks about doing various functions, customer service functions, et cetera.

So the non-assignment is a very distinct legal analysis there of can you assign contractual rights, not can you assign duties and tasks.

**THE COURT:**  What about an argument that, unlike Shopify, which had a direct contract with Ledger, as a vendor they had an expectation of being able to engage in legal -- had legal rights vis-a-vis Ledger, and then arguably, you know, there's reciprocally, you know, you gotta take the burdens with the benefits if they would be -- they might be subject to certain things that -- or certain advantages that Ledger might have.  At least there was a contractual relationship between Ledger and Shopify.  Where here we're one step removed.  There is no contractual, direct contractual relationship between TaskUs and Ledger, and therefore maybe one could argue their expectations of being able to take advantage of the Ledger contract, there's an intervening step there, and therefore to the extent expectations might have some role in the figuring

out who gets to use and the benefit of a forum selection

clause, that step removed may be a material fact.

What's your response to that?

**MR. PERSSON:**  One, there's no case that says that.
It's not about the relationship.  It's not about privity.  The
cases say that it's about how do you impact the contract, not
what is your specific relationship to the contract.  I mean,
Your Honor, we argued some of what you just said in our prior
motion and that motion was denied, when we said that there was
no special relationship, there was no duty, things like that,
and it was denied on different grounds obviously, but I think
that those arguments, you know, that are being made now by
plaintiff are inconsistent with what they argued before.  And
that's why we made the judicial estoppel argument as well.  You
know, now, they're saying there is no privity, and where before
they said, no absolutely, there's a special relationship, and
there was privity and they owed a duty.

So as far as the contract with TaskUs predating, I mean,
there's no question that TaskUs works for other clients of
Shopify, but we're not talking about those contracts.  We're
just talking about the Ledger contract.  If we were talking
about the other contracts, we'd be talking about choice of law
provisions in Ontario and New York.  That's all we're talking
about.

It's about the contract that the plaintiffs agreed to.

1          THE COURT:  So the question is I stated before is

2     whether the connection to the conduct at issue is closely

3     related to the signatories of the contract with the forum

4     selection clause and that contract's terms and enforcement, and

5     given TaskUs' substantial delegated role pursuant to its

6     relationship with Shopify, that close relationship closely

7     related to the signatories, namely Ledger and -- well, Ledger,

8     there's still a close -- even though they're one step removed,

9     there's still a close relationship given the nature of the

10    duties that they are performing essentially for Ledger.

11         MR. PERSSON:  Yes, Your Honor, that's exactly right.

12    And we don't actually see us as being in a different position

13    than Shopify.  Shopify wasn't a signatory to that contract

14    either.  Both Shopify and TaskUs were doing work relating to

15    the Ledger plaintiffs.

16         THE COURT:  And you'd also argue that given their

17    role, it's foreseeable that somebody in TaskUs' position might

18    be sued if they mishandle the PII in performing its duties for

19    Shopify on behalf of Ledger, and therefore reciprocally they

20    should be able to enforce the forum selection clause.

21         MR. PERSSON:  That's exactly what you told us in your

22    last order, Your Honor.

23         THE COURT:  You want a chance to respond to that

24    argument?

25         MS. AVANESS:  Yes, absolutely.  Thank you, Your

1  Honor.

2  So first and foremost, plaintiffs' allegations are not --

3  seem to be all that TaskUs is relying on to establish what

4  they're referring to as privity on a contractual basis.

5  There's a difference between contractual privity to establish a

6  contractual right and plaintiffs' allegations in support of

7  their cause of actions when we're concerning these --

8  **THE COURT:** Plaintiffs' claims are not just based on

9  privity through Shopify and TaskUs, it's based on the fact that

10  they had control over this PII and basically, you know, didn't

11  take precautions.

12  **MS. AVANESS:** Yes, Your Honor is correct. However,

13  that doesn't establish the ability to exercise this right in

14  the forum selection clause.

15  **THE COURT:** But it shows they're closely related,

16  because they're closely related to the conduct and closely

17  related to the parties. I mean, it is they're doing something

18  that causes the whole reason why Ledger is being sued in the

19  first place.

20  **MS. AVANESS:** Actually, respectfully, no, Your Honor.

21  When we look closely at the contract, the relationship between

22  TaskUs and Shopify is actually at Shopify's Dublin entity, and

23  the contracts that Shopify has with Ledger and that the

24  consumers have with Ledger is ultimately separate entities. So

25  TaskUs would first have to make the threshold inquiry and

establish that they have an agency relationship with all
Shopify entities beyond the one that they've contracted with,
and then be able to exercise, now, Ledger's forum selection
clause.  And plaintiffs' allegations are not inconsistent here.
TaskUs did not power Ledger's shopping website.  It had no
direct contact with Ledger.  And TaskUs' general contract is
with a separate Shopify subsidiary in Dublin.

So it remains that TaskUs is not like Shopify at all.  It
had no active role in that Ledger consumer contract, the
Ledger/Shopify, and they were not part of the larger
contractual relationship here that the consumers made with
Ledger.

**THE COURT:**  But at the end of the day, even if we put
aside the forum selection clause as the sole basis, just based
on normal principles of forum non conveniens, the claim that is
being brought against Ledger is based on what Ledger didn't do,
in part, with respect to making sure that its contractors and
those who performed the various tasks for it were bound by its
security principles.  And that would apply to Shopify, that
would apply to Shopify's subcontractors.

I mean, that's why they're -- that's ... TaskUs is being
sued in this case by the plaintiffs.  And part of it is because
of what they did, but part of the claim against Ledger is,
Ledger, you didn't supervise all these folks down the line.
You shipped it off to the Philippines, or wherever, and you

1  didn't require that they ensure compliance with the

2  regulations, that sort of thing.  So, and that claim's going

3  forward, I've already held, against Shopify in France, I

4  believe.  So it doesn't make sense to have that claim -- and

5  that's going to be closely related to the claim that arises out

6  of TaskUs' work on this.

7      Doesn't it make sense to have one forum hold?  Because

8  there may be cross claims.  I don't know what's going to

9  happen.  But, I mean, they're all sort of related to the same

10  transaction.  Doesn't it make sense to have one forum, whether

11  it's the United States, whether it's the Philippines, or

12  whether it was in France?  You would think it makes sense to

13  have one forum deal with these related, interrelated claims.

14      **MS. AVANESS:**  Well, the central question remains,

15  Your Honor, whether it was foreseeable to Ledger consumers that

16  TaskUs, a nonsignatory to this agreement, would exercise their

17  right to the forum selection clause.  And Shopify was in a

18  different position certainly, because they were consumer --

19  they had that consumer-facing relationship with respect to

20  powering their website, processing payments.  They were in a

21  different position.  TaskUs was not.  It's not foreseeable that

22  they would have now sought down the line, after having multiple

23  opportunities to raise this, to now seek to enforce a forum

24  selection clause after an unfavorable motion to dismiss order.

25      And courts do caution against an overly liberal

1    application of forum selection clauses to nonsignatory

2    defendants particularly when this involvement wasn't

3    foreseeable, and it's -- it supported that this type of

4    enforcement is not appropriate when it's not foreseeable by

5    virtue of the relationship between the signatory and the

6    nonsignatory.  And here we just don't have that link, and

7    there's not a single case that TaskUs has cited to where a

8    party in their position, a vendor of a vendor, is able to

9    exercise this contractual right.  And that's --

10           **THE COURT:**  All these -- this whole doctrine we're

11   talking about is the right of a nonsignatory to use a forum

12   selection clause.  So by definition it's not a contractual

13   right they have.  It's based on an equity principle.  It's

14   based on practical principle.  It's not based on contract.  By

15   definition, we're talking about non-signatories' rights to

16   enforce something in a contract that they're not signatory to.

17           **MS. AVANESS:**  But arguably -- and that doesn't need

18   to be a document or a contract, but there needs to be an active

19   role, and that's still missing.  Because at what point do we

20   draw the line?  If a vendor of a vendor can exercise the

21   clause, then are we going to extend that as well if we find the

22   agents in the Philippines that also absconded with the data and

23   resulted in it being compromised?  It has to be -- it's a

24   narrowly tailored doctrine, and has to be applied as a narrowly

25   tailored doctrine.

1    **THE COURT:** Well, I think that's formed in part by

2  how the claim is framed, and the claim is framed as, Ledger,

3  you screwed up because you didn't~--- you know, the people who

4  had formal rights to this data and the handling of this data

5  should have been subject to the various security protocol.

6    Now, once it's stolen it's in the dark web. Obviously

7  Ledger policies are not going to work. But if part of your

8  claim, and part of your claim is as I understand, that they

9  didn't comply, they didn't ensure that the people handling this

10  data would comply with all this -- with the requirements,

11  security requirements.

12    And whether it's the subcontractor or the contractor or,

13  you know, one of those, it seems like they are all -- there is

14  blame being laid at Ledger because of its failure to exercise

15  control over both Shopify and TaskUs.

16    **MS. AVANESS:** And the issue remains that the case law

17  doesn't have -- doesn't support that type of conclusion. When

18  we look at what we have available to us in precedent, it's

19  simply situations in which you have a third-party beneficiary,

20  for example, to a contract, or, for example, involving, for

21  example involving -- for example, in Robison (phonetic) it

22  involved a school district, and so the forum selection clause

23  then extended to the school district's current or former

24  employees or members of the board.

25    **THE COURT:** Are doctrines limited to third-party

1 beneficiaries?

2 **PLAINTIFF'S ATTORNEY:** No, not limited to third-party

3 beneficiaries exclusively, but oftentimes that's what we see in

4 these cases. And it is part of the -- it is part of the

5 standard, Your Honor, that third-party benefits are typically

6 what the -- give me one moment.

7 So it is whether they had an active role in the

8 transaction between signatories; whether the nonsignatory had

9 an active role in the company that was the signatory; or

10 furthermore --

11 **THE COURT:** The first one is the one that's the

12 issue, were they had an active role in the contractual thing

13 that's contracted between the signatories. Here Ledger is a

14 signatory. And did Shopify and TaskUs have an active role.

15 And depending on the scope of the delegation and what was --

16 what it was prepared to -- supposed to do, one of its

17 contractual obligations, not with Ledger necessarily but just

18 what they were obligated to do, had a lot to do with what's

19 happening here.

20 **MS. AVANESS:** The issue is that the case law doesn't

21 craw that link and doesn't broaden the scope of this closely

22 related doctrine. It's narrow. And we don't have a set of

23 facts to establish that they had some touch point or some link

24 sufficient --

25 **THE COURT:** Well, we have the principle, as you just

1  articulated, that seems to apply here.  Maybe there's no other

2  case exactly on point, but it doesn't mean that the principle

3  doesn't apply.

4      Let me go back to you, Mr. Persson.  Is there a forum non

5  conveniens argument that's not tied to the forum selection

6  clause, or is everything contingent on the enforceability of

7  the forum selection clause?

8      **MR. PERSSON:**  It hinges on the enforceability of the

9  forum selection clause, and I think that's already been decided

10  by the Ninth Circuit.

11      **THE COURT:**  All right.  All right.  Well, I'll take

12  your comments under submission.

13      **MS. AVANESS:**  Respectfully, Your Honor, the analysis

14  remains as to the fact that they had no active role.  But first

15  and foremost, TaskUs has waived their right to enforce this

16  forum selection cause.

17      **THE COURT:**  Yeah, I understand they have, and if

18  you've gone too far in the litigation you can't hedge your

19  bets.  And the question is whether having gone through one

20  motion to dismiss, we're here in prediscovery, whether that is

21  now too late.  I understand the argument.  So, thank you.  I'll

22  --

23      **MS. AVANESS:**  Am I able to provide a bit more

24  coloring on the waiver argument?

25      **THE COURT:**  I want to move on to the next issue.

1  I've got a calendar.  So, thank you.

2          **MR. PERSSON:**  Thank you, Your Honor.

3          **THE COURT:**  All right.  So I want to get to the

4  question, the core question here about the adequacy of the

5  fraud claim here.  And after looking at the complaint, it

6  appears to me that there is both an affirmative misstatement

7  claim and an omissions claim.  I'm looking at paragraph 242 in

8  particular, in which Ledger represents that it implements, you

9  know, all these things.  We ensure that personal security is

10 secure, et cetera, et cetera.

11         There's also I think in the privacy version there is

12 comments that will implement sort of safeguards to secure data.

13 And one of the things it says that's a little more specific is:

14 We ensure that the security providers acting on their behalf

15 provide for the necessary guarantees with respect to the

16 general data protection regulation, the GDPR, which is

17 something fairly specific.  And if, in fact, that is the

18 affirmative claim that is allegedly not true, that they didn't

19 provide, make sure all the service providers provided that

20 compliance with the GDPR, that's a traditional fraud claim.

21 It's an affirmative claim, it seems to me, that you've

22 represented something and it didn't happen, and maybe the

23 intent was we never intended to make sure that happened.  I'm

24 sure there's an argument that, well, "service providers" means

25 "X," means "Y."

1        But the problem with that affirmative theory, although

2   that might be sufficiently specific for Rule 9(b) fraud claims

3   because it does, at least with respect to saying -- implying

4   compliance with the GDPR, is that unless the plaintiff or

5   unless the claimant read that privacy policy, hard to show a

6   reliance on that in a typical fraud.  So that's a problem.

7        Now, to get around the reliance problem, there's a -- if

8   there's an omission, then there's nothing to see.  So you don't

9   have to say, I never saw it.  It's like, well, it should have

10  been told, but it was never put in any kind of form, so we

11  never got to see it.  And here the claim is not that we ensure

12  compliance with the GDPR, for instance, but it's more that, as

13  paragraph 242 states, that Ledger didn't disclose that

14  sensitive customer information would be entrusted to an

15  outsourcing operation that oversees places, like the

16  Philippines, for which Ledger provided no meaningful oversight

17  of the subcontractors, which is the point we were just talking

18  about.

19       There that is an omission, and there there's no

20  requirement that you see any particular ad or the private

21  policy.  And so then the question is is that specific enough,

22  that allegation of the omission and what was omitted, specific

23  enough to satisfy the pleading requirements of Rule 9, since

24  it's essentially a fraud claim.  And it seems to me that it's

25  pretty specific.

1    Now, I know there's an argument that there's a disclaimer
2  that nothing on the Internet is guaranteed, we can't guarantee
3  full protection, et cetera.  And I know I did cite that in my
4  earlier order.  But given the specifics of this, I don't think
5  that alone would warrant dismissal at this stage, because you
6  can't just always say, hey, by the way, nothing's guaranteed,
7  we can't guarantee everything, the Internet is the Internet,
8  and it gets you out of a very loose practice of throwing the
9  data out there to subcontractors overseas and doing absolutely
10  nothing and not telling the consumer that.
11    So it seems to me that the affirmative claim may be
12  problematic for reliance reasons, but this omission, which is
13  specifically about outsourcing without oversight, particularly
14  overseas, is one that could survive.  It's a very -- it's
15  somewhat narrow, it's very focused, but it is a specific
16  complaint here.  And of course, this is exactly what implicates
17  both Shopify and TaskUs in particular.
18    So I want to get your reaction.  Maybe I'll start with the
19  plaintiff, because I'm saying I am sceptical about the
20  assertions in the privacy policy that begins to look like some
21  degree of specificity, but then you run into the reliance
22  problem.  And I don't know how you certify a class.  If you
23  have to have read the policy, I don't know if that's a
24  certifiable issue, because that seems like an individual issue
25  about who read the privacy policy.  Maybe not, I don't know.

1    But with respect to omissions, which gets around sort of the

2    reliance problem, there is something specific here that to me

3    looks like it could be enough to be specific.

4         So I'll let you react to that, Mr. Kim.

5              **MR. KIM:**  Thank you, Your Honor.

6         You know, that's right, but I did want to clarify one

7    thing.

8              **THE COURT:**  Yeah.

9              **MR. KIM:**  I think our intent was very much as we

10   recast this before this third amended complaint based on what

11   Your Honor said and based on the arguments that Ledger rose to

12   make this really about the omissions.  Right?  But even though

13   the case is about the omissions, you only have an obligation to

14   disclose something if there is some connection to something

15   that was represented.  So to the extent we do have specific

16   represents here, it's -- they're less relevant as expressed

17   misrepresentations and more relevant to, here's what they did

18   say, and having said that much, that becomes a half truth,

19   because there is, you know, information relevant to that

20   statement that was omitted.

21        Now, going to the reliance point --

22             **THE COURT:**  Yes.  So if you rely on the half truth,

23   misleading, that as you said, something, but you didn't tell us

24   the rest of it --

25             **MR. KIM:**  Sure.

1          **THE COURT:**  -- and you have to have seen the first

2     part of it.

3          **MR. KIM:**  Well, that's what I was going to get

4     through, Your Honor, because I don't think that's -- the rule

5     that you're advocating is logical, and one would think that may

6     be the case.  But if you look at the two cases that actually --

7     and, you know, I was looking through this.  We were not as

8     clear about as much of our focus is on omissions even in the

9     papers than we could have been, right, but I was looking at the

10    two cases that Ledger cited on reliance, right, and in both

11    those cases they set out the rule where the omission is -- you

12    know, the rule for reliance on omissions is you can't rely on

13    anything that's not there.  The rule is had this been

14    disclosed, you would have acted differently.

15         **THE COURT:**  Yeah.

16         **MR. KIM:**  Now, under the facts of those cases as I

17    read them, they're similar here, right, because they're

18    still -- like an example, *Ziegler* (phonetic) *versus WellPath*.

19    Right?  So the allegation in that case, the omission was, you

20    know, there are these minerals and chemicals in the dog food.

21    But, you know, the reason -- I think the theory of that case is

22    the reason that that needed to be disclosed was because the

23    overall representative of the product is, you know, that it was

24    natural, healthy, et cetera.

25         And there's -- and so I'm going back.  I understand the

1  point you're making, and that would make sense as the rule,

2  that if you're -- if the omission is tied to an express

3  statement, you need to prove reliance on that express

4  statement.  But if you look at the way that the rule of

5  reliance or omissions is stated in the *Hall* case and in the

6  *Zeiger* case, that's not what's stated there.  It simply says

7  that if it's based on an omission, that the rule is whether --

8  had that information been disclosed, whether the plaintiff

9  would have acted differently.

10     And so I'm sure that Ledger will say, yes, because, you

11  know, the omission is directly tied to what was stated.  You

12  have to prove reliance on what's stated.  I don't think that's

13  the rule in California.  And I ...

14     You know, and in terms of characterizing this as a half

15  truth, I guess I wanted to be a little bit more nuanced.  I

16  mean, I think that there are numerous representations that

17  given overall, both on the website and in the various privacy

18  policies that overall given impression of not just the hardware

19  and the cost software secure, but the entire ecosystem, the

20  organization, the employees, the contractors, and in light of

21  those taken as a whole and the overall impression, that gave

22  rise to the obligation to disclose what we allege was omitted.

23     So we are still in that, the pure omission rule, which is

24  that reliance is not required because you can't rely on what

25  you don't know.

1           **THE COURT:**  So do you know, does public or the

2   consumer have to know that overall message, like the dog food

3   is healthy, blah, blah, blah, and this is generally a safe

4   product in terms of, you know, the security of PII, is that a

5   predicate to the omission theory?

6           **MR. KIM:**  I wouldn't say a predicate.  I would say

7   it's the context.  Right?

8       And so a point that we've made in our briefing here is,

9   you know, unlike other data security cases that arise,

10  cellphones, hotels, et cetera, I mean, the whole purpose of

11  buying this product is for security, and that is completely the

12  thrust of all of the advertising messages is security.  In

13  light of that being the thrust of the product, it is, you know,

14  the product is only secure, or the ecosystem as they call it,

15  is only as secure as the weakest link.

16      So when the overall message relates to safety, there's an

17  obligation to disclose, you know, like what they're saying in

18  the briefing here is, we have -- we take no responsibility for

19  anything.  Once the -- our customers' data is sent to Shopify,

20  Shopify sends it to Ledger -- I'm sorry, TaskUs and TaskUs

21  sends it to the Philippines, we have nothing to do with that,

22  we have no responsibility, we have no accountability.  Well, if

23  that's going to be their view and that's what's going to be

24  happening, I would think that that's something the customers

25  would consider important.

1    You know, we've alleged in detail why even the identity

2  and e-mails of Ledger Wallet purchasers are very sensitive.  If

3  you're buying this product is it within your reasonable

4  expectation that someone in the Philippines, three levels

5  removed from Ledger, has complete access, and there's

6  apparently no, you know, supervision or oversight from Ledger

7  on that, and that Ledger disclaims any responsibility for

8  anything that happens because it's done by its contractor and

9  its subcontractor, not by Ledger directly, given the overall

10  message of safety, that is well beyond the reasonable

11  expectation of the customer.  That is why there should have

12  been some disclosure about the fact that your confidential data

13  is being turned over to contractors and subcontractors and

14  people in foreign countries, and we take no responsibility for

15  that.

16    **THE COURT:**  And have you specified somewhere in this

17  complaint what the security precautions that should have been

18  undertaken or that for which there was an omission, not telling

19  people about, but what is the thing that should have been done

20  that would have prevented this thing from happening where you

21  have kind of a rogue employee?

22    **MR. KIM:**  Sure.

23    So what we've alleged here, as the Court, you know, is

24  well aware because we just talked about it quite at length, you

25  know, what we do allege is there's a failure to supervise all

1    the way down the chain from Ledger, to Shopify, to TaskUs, to

2    the Filipino person.

3              **THE COURT:**  But what kind of supervision would have

4    prevented this rogue employee from doing whatever they --

5              **MR. KIM:**  Sure.

6         Well, you would want to minimize the number of individuals

7    who have access to that area.  You'd want to log, have a system

8    where you log who was accessing the data.  You would want some

9    kind of screening of the individuals who are going to have

10   access to that data.  You know, again, these individuals in the

11   Philippines, I don't know, you know, we'd need to go into

12   discovery, but, you know, did TaskUs do any kind of vetting of

13   these people?

14        Are they just hiring people off the street and giving them

15   access to, you know, confidential information?

16        So a lot of it is is organizational, it's not

17   technological.  But it's common sense, and if you look at our

18   briefing and our opposition, you know, we do cite provisions,

19   including in our prayer for relief, where we've asked for sort

20   of injunctive relief.  Some of the things that we asked to be

21   done there relate to things that could have prevented this.

22        And so that's the main point.

23        As a secondary more technical point, you know, as this

24   Court found previously, there's the unfair, unlawful prongs of

25   the UCL, and we've alleged those.  And whether it's unfair,

1 unlawful misrepresentation, or, I'm sorry, you know, the other
2 false prong of the UCL, I'm not aware of a pleading requirement
3 where you need to plead, you know, exactly what could have been
4 done to prevent a statement from being misleading or to
5 prevent, you know, this practice from being unfair or unlawful.
6     But to the extent that is necessary, I think if you look
7 in our papers you can see the citations to where that's
8 necessary.
9     And again -- and I know, you know, Ledger has said this
10 our third time trying this.  Well, you know, it's really not.
11 But, you know, this is a new argument that they have made in
12 terms of causation.  You know, they could have made it last
13 time; they didn't.  We've never had any reason to amend the
14 unfair and unlawful aspects of the UCL claim because those
15 weren't challenged.
16     So if the Court has a concern about, you know, more detail
17 about what could have been done, you know, I would ask that,
18 because that is a new issue that was raised, even though it
19 could have been raised earlier, that we be allowed to address
20 that.
21     **THE COURT:**  Let me ask you with respect to the
22 privacy policy's reference to the GDPR --
23     **MR. KIM:**  Yes.
24     **THE COURT:**  Is there something in the GDPR that
25 addresses the kind of supervision you're talking about of

1   access to PII?

2         MR. KIM:  Your Honor, let me find that, because I do

3   believe that is addressed.  Me colleague wrote that section and

4   knows much more about the specifics of the GDPR than I do.  Let

5   me find that.

6         So if you look on page 8 of our brief, you know, we

7   address some state -- which, I know it's not exactly the

8   question you asked, but we address the Massachusetts and New

9   York regulations that talk about maintaining appropriate

10  parties to -- appropriate safeguards with respect to

11  contractors.

12        THE COURT:  Well, I reference the GDPR because that's

13  what you refer to in the privacy policy.

14        MR. KIM:  Yes.

15        Okay.  If you look at, on page 8, footnote 1 we talk about

16  Recital 39 to the GDPR, which states:  That imposes limitations

17  on how and when data is and should be processed to prevent

18  unauthorized access, and a requirement that personal data

19  should be stored for a strict minimum period.

20        So the GDPR does specifically, you know, require parties

21  subject to it to, you know, take reasonable measures to prevent

22  unauthorized access.

23        I think it's kind of -- if you look at the scenario here,

24  there was unauthorized access, right, by this person in the

25  Philippines who then sold the data to someone in California,

1  kind of res ipso loquitur.  I think it's reasonable at the

2  pleading stage to say that either no or inadequate, you know,

3  provisions to restrict access to sensitive data.

4         **THE COURT:**  All right.  Let me hear the

5  counterargument.

6      Thank you, Mr. Kim.

7      So it sounds like the theory is really an omissions

8  theory, and the omissions is the failure to reveal that there

9  was no supervision over folks that had access to the PII,

10 especially those overseas.  Perhaps the omission is underscored

11 by the general conveyance of security, you know, that sort of

12 thing.

13     Why isn't that specific enough for Rule 12?

14        **MR. WYATT:**  Your Honor, Matthew Wyatt on behalf of

15 Ledger.

16     I would like to address one thing.  So I think we agree

17 that this is not a pure omissions theory.  As was stated, these

18 are omissions that depend on the representations made in the

19 2018 security policy.  And in that case the issue is really

20 reliance.  And it's not that you have to see an omission,

21 obviously that doesn't make sense, but you have to have been

22 aware of whatever that statement would have been if it had been

23 made.

24     And that brings us back to the same exact problem that

25 Your Honor mentioned, which is that plaintiff Seirafi hasn't

1   alleged that he saw the 2018 privacy policy, and it's as simple

2   as that.

3          **THE COURT:** Well, I guess that's why I asked the

4   question, what role does the privacy policy play in the cause

5   of action. Because it is possible to have a strict omission --

6   there are really three kinds of misrepresentations. One is a

7   straight on false affirmative misrepresentation. The other is

8   just omission. You know, this drink contains mercury, but you

9   didn't say anything at all. You didn't represent anything. It

10   had terrible stuff in it. The third is, well, you say

11   something but you didn't get the whole story, it was

12   misleading. It's sort of the misleading thing.

13      And that's why I asked. And they're saying this -- maybe

14   this falls in that middle category.

15          **MR. WYATT:** Certainly.

16      This falls in the category where it depends on

17   representations that were made in the privacy statement. And,

18   in fact, that's what's alleged in paragraph 242 and 259, where

19   plaintiff Seirafi states that the representations in the

20   privacy policy give rise to those, to that omission theory.

21          **THE COURT:** So that's the causal relationship. It

22   says, and these representations being the representations about

23   security, et cetera, et cetera, that are contained in the

24   privacy policy, quote, also give rise to the claim based on

25   Ledger's omission.

1      **MR. WYATT:**  That's correct, Your Honor.

2      **THE COURT:**  Your argument is that, well, if it does,

3  it is a necessary predicate.

4      **MR. WYATT:**  That's right Your Honor.

5      **THE COURT:**  And that predicate has to be one that has

6  to have been read in order for it to be actionable.

7      **MR. WYATT:**  That's correct, Your Honor.

8      It's -- the claim is based entirely on the privacy

9  policy.  And if he hasn't seen it, which he does not allege he

10  has in any particularity, then there cannot be any -- no

11  deception.

12      **THE COURT:**  Does that apply to the unfair prong of

13  the UCL.

14      **MR. WYATT:**  So the unfair project is a separate

15  argument I understand they're making, which is not based on the

16  privacy policy but based on the adequacy of Ledger's security

17  measures.  And there, the belief that the plaintiff is very

18  clear about -- well, it's actually not clear about what Ledger

19  could have done that would have prevented the TaskUs incident,

20  and particularly what reasonable actions Ledger could have done

21  that would have prevented the TaskUs.

22      **THE COURT:**  Well, what about compliance with the GDPR

23  kind of organization and steps to protect the PII?

24      **MR. WYATT:**  I'm sorry, Your Honor.  Can you repeat

25  that?

1          THE COURT:  What about taking the steps that would be

2     compliant with whether it's Massachusetts law, New Jersey law,

3     the GDPR, whatever?

4          MR. WYATT:  Well, this is a California plaintiff,

5     Your Honor.

6          THE COURT:  Yeah.

7          MR. WYATT:  This is not a California or New York

8     plaintiff.

9          THE COURT:  But, I mean, I guess there's an argument

10    that you could look to such things as a -- you know, especially

11    if you're going overseas and you're contracting overseas, you

12    should take certain precautions, and maybe you'll look to some

13    of the international standards as one rule of thumb.

14         MR. WYATT:  Well, the first thing I would say is this

15    has not been alleged in the complaint.  What was said here

16    about what Ledger should have done, first of all, I don't think

17    that has any bearing on the TaskUs incident at all, but it's

18    also not alleged at all in the complaint.  I understand that

19    the theory the plaintiffs bring is based on a failure to

20    supervise, but I'd like to point out that there is no direct

21    relationship.  There's no contractual relationship between

22    Ledger and TaskUs.

23        As was previously stated, TaskUs --

24         THE COURT:  It could contractually obligate the

25    middle, Shopify, to make sure that it then exercises control

1  over subcontractors.

2       **MR. WYATT:**  Well, there is no direct relationship.

3      But I do want to point out that, as they've alleged,

4  Shopify is an e-Commerce giant.  That is Shopify's role to

5  provide the payment services, to which they do to millions of

6  clients, I believe they've alleged.

7      And again, there is no direct relationship between Ledger

8  and TaskUs.  So the idea of Ledger imposing a restriction on

9  TaskUs doesn't make any sense.

10     **THE COURT:**  All right.  Well, I'll give you a chance

11  to respond, Mr. Kim, on the claim that under the unfair prong

12  there's really nothing alleged here that's specific enough

13  about what it did that was unfair.  I'll let you respond to

14  that.  I'm hearing there's nothing, there's no specificity

15  here.

16     **MR. KIM:**  Thank you, Your Honor.

17      With respect to the allegation of unfair, you know,

18  conduct, if you look at the actual charging counts, right, it

19  is fairly summary.  It says they fail to have adequate security

20  standards.  Right?  But I think if you go back to the actual

21  allegations of the complaint, in one way going back to the

22  Court's previous motion to dismiss order, I thought that the

23  Court, you know, did -- had a very thorough discussion of why

24  there's a negligence claim against TaskUs.  I think those same

25  considerations would apply here to Ledger.

1    Now, I know that Ledger has said and will say, no, that's

2    completely different, because you were talking about TaskUs and

3    we have no ability to control TaskUs.  And I would say that

4    that, on its face, to disclaim responsibility when you're

5    selling security, and as I said, you know, the system is only

6    secure as the weakest link, and to say that, we're absolved

7    because, you know, we take no responsibility for what happens

8    once we outsource certain functions to a contractor, I think it

9    is -- that in itself is unfair; that that is something that is

10   unconscionable that violates what reasonable consumers in

11   California would expect.  Right?

12   So, and again, just to make the very technical, you know,

13   procedural or pleading point, to the extent the Court finds the

14   unfair or unlawful aspects to be inadequately pled, one is I

15   think those gaps can be filled in by looking at the allegations

16   as a whole, and specifically how the Court interpreted the

17   allegations with respect to the negligence claims against

18   Shopify and TaskUs, but also this was raised for the first time

19   with respect to this third amended complaint.  So we've not had

20   an opportunity to replead to specifically address the argument.

21   **THE COURT:**  All right.  Let me -- it's getting late,

22   but I did want to ask one more question.  That is the

23   California class.

24   You seem to include indirect purchasers, as I understand

25   it, within the definition.  And I don't know if you intend to

1  or not, but to the extent that you give your information, maybe
2  you can tell me how it works.  I understand if you're a direct
3  purchaser, PII is transferred.  What is -- are there indirect
4  purchasers?  If they don't purchase it directly from Ledger,
5  how does that work, and how is it that their information gets
6  compromised?

7          **MR. KIM:**  Sure, Your Honor.  Let me address that.

8      It's my understanding that, you know, there's a Ledger
9  website.  If you order directly through there, that is run
10  through Shopify.  But I've seen advertisements for third-party
11  sellers of Ledger wallets.  Right?  You can -- I don't know
12  exactly what kind of store it is, but I think it's almost all
13  Internet.  Right?  But I do believe there are other places you
14  can acquire a Ledger wallet.  But I think that from our point
15  of view, whether there was a direct purchase or indirect
16  purchase is not relevant, because with respect to the claims
17  against Ledger, it is purely a price premium type of an
18  allegation.  And I'm sure the Court is very familiar with that.

19      So when it -- you know, you have a price premium kind of a
20  case, right, it doesn't matter whether you brought the product
21  from, exactly what channel of commerce, because you have
22  overpaid for the product.  That's your economic injury.  And I
23  think the Court already recognized in validating the price
24  premium theory, you know, the injury is not because is your
25  data was --

1            **THE COURT:**  You overpaid at the moment you purchased

2    it --

3            **MR. KIM:**  You expected a level of security that you

4    did not receive.

5        So basically the product is intrinsically less valuable

6    once the -- once there's an exposure of a very big, you know,

7    loophole here, and there's privacy practices, because that's

8    the only reason you're spending the money is for security, it

9    is now known to be less secure.

10           **THE COURT:**  All right.

11           **MR. KIM:**  So everyone who purchased the product paid

12   too much for it.  That is the theory.

13       (Simultaneous crosstalk.)

14           **THE COURT:**  -- that therefore it applies to anyone

15   who purchased it, because they overpaid.  And that's your

16   theory.

17           **MR. KIM:**  That is the theory.

18           **THE COURT:**  All right.  So now I understand.

19       So if that's their theory -- and I understand there may be

20   some -- depending if this case proceeds, there may be some

21   *Daubert* action or something about that, but if that's the

22   theory of the overpayment, the price premium overpaid at the

23   moment, I guess that would apply whether you'd purchased it

24   through an authorized seller or unauthorized seller.

25           **MR. WYATT:**  If I understand correctly, it's an

1  argument that if someone else were to try to buy it from one of

2  those people who brought it from an indirect seller it wouldn't

3  be as valuable, but they would be providing their information

4  to Ledger either.  If you haven't provided your information to

5  Ledger, how are you affected at all?

6          **THE COURT:**  Well, I guess the question is whether the

7  what you're buying intrinsically has this problem.

8      So it's not like buying -- there's cases I've had, a GM

9  car with a defective engine.  Here the breach is in the PII

10 that's afforded from the purchase.  Right?  It's not -- once

11 you have the device, it's not -- it's not leaking information

12 in that sense.  It's the information that you have to afford?

13 Is that where the leakage occurs?

14         **MR. KIM:**  I would say it's more general.  It's the

15 proposition going back to what people expect, right, is, you

16 know, you're expecting this level of safety.  Having the --

17         **THE COURT:**  Of your information on the device itself.

18         **MR. KIM:**  Sure.

19     And having that data available to people overseas that are

20 unsupervised and for whom Ledger takes no responsibility, that

21 undermines the whole safety story and renders the product less

22 valuable, and that's -- you know, and I think by looking at it

23 very narrowly, well, the thing that makes it less valuable is

24 because on this one occasion the personal data acquired if you

25 purchased it directly was leaked, or some of it was leaked, I

think that's a narrow way to look at it.  I would look at it
more like you're expecting a certain level of safety.

This incident, whether it's two incidents -- Ledger's, you
know, what we allege to be a very poor response to the
incident -- that this whole -- this whole sequence of events
would cause a reasonable purchaser, if they're aware, to
consider the Ledger product to be less valuable than it was
before this series of events disclosed these deficiencies,
regardless of whether they had provided that product.

And you know, as my colleague said, one way to think about
it is, you know, is the retail price of a Ledger wallet less,
you know, after these things became public.  I think that would
be an interesting empirical issue.  You know, I think typically
what we do -- I've done a lot of these cases.  You know, we
have someone like Colin Weir, they do a conjoint survey, test
various qualities of the product, you know, how much is this --
is this --

**THE COURT:**  If I understand, usually that's something
wrong with the product itself, as in many cases I've had, like
a defective GM engine.

**MR. KIM:**  Sure.

**THE COURT:**  This is not -- this is saying when you
buy the car your credit card information gets siphoned off, and
therefore you wouldn't have paid that much for the car if you'd
known.  But if I bought it from somebody else, if I just paid

1   cash, that car is still worth the same thing.  There's nothing

2   wrong with the car.

3            **MR. KIM:**  Uh-huh.

4            **THE COURT:**  I mean ...

5            **MR. KIM:**  I understand.  But I guess I would

6   analogize it to a different aspect of that type of case.

7   Right?  So if -- in a defect case it's not the case that the

8   defect has to have manifested.  I mean, the chance that the

9   defect manifested --

10           **THE COURT:**  No, I understand that, that there's a

11  chance.  I adjudicated that very issue.

12           **MR. KIM:**  Sure.

13           **THE COURT:**  So there's a chance that the car was

14  going to blow up.  It doesn't have to blow up before -- you

15  would pay less for the car.  But that's something intrinsic

16  about the car.

17       If you're buying the car, but the bank you're -- that

18  they've chosen to take your money has got somebody embezzling

19  and you're going to lose your money, there is a risk there if

20  you buy it through that channel, but that doesn't make the car

21  worth anything less.

22           **MR. KIM:**  Sure.

23           **THE COURT:**  Your argument is that, well, if that's

24  the main way you sell it, then it taints the entire thing, and

25  therefore the car or the wallet would not be worth as much, and

1   so therefore the entire market is affected because of the

2   finance aspect is tainted.

3       And I'm not saying, I don't know if that's plausible or

4   not, but that's a different theory than the actual object being

5   tainted.

6           **MR. KIM:**  Yeah.  What I would say is that what this

7   case has exposed is there is an inherent defect in the Ledger

8   product considered as the combination of the hardware, the

9   software and the ecosystem, including the organization, that

10  defect that would be a concern to anyone regardless of what

11  data they gave and when, is that, you know, operations are

12  being conducted by subcontractors of subcontractors using

13  people off the street in Third World countries, and that's not

14  being disclosed to the people, and that is an inherent defect

15  in the product, if you think about the product as more than a

16  physical thing, but as Ledger itself advertises.

17          **THE COURT:**  The way it is bought.

18          **MR. KIM:**  Yeah.

19          **THE COURT:**  That's different.

20      All right.  I understand the arguments.

21      All right.  I'm going to take the matters under

22  submission.  I know there's some other issues, but I think this

23  is what's been helpful.

24          **MR. KIM:**  Thank you, Your Honor.

25          **MS. AVANESS:**  Respectfully, Your Honor, I want to be

1 respectful of the Court's time, but I request to be heard on

2 the waiver issue in a very brief manner just because I do

3 believe that binding precedent instructs that TaskUs has

4 waived.

5        **THE COURT:** Is this something that's not in the

6 brief?

7        **MS. AVANESS:** It -- it's in addition to the brief and

8 adding more color, as opposed to --

9        **THE COURT:** Is there some authority that you want to

10 tender that's not in the brief?

11        **MS. AVANESS:** Responding to authority presented by

12 TaskUs in their reply.

13        **THE COURT:** All right. If there's something in the

14 reply that's new and you have a case or something you want to

15 draw the Court's attention to, that's fair, but I don't want

16 to -- I'm not here to hear reargument over something you've

17 already argued.

18     So if there is a new cite in response to their reply brief

19 that you didn't have a chance to file a surreply, that's fair.

20        **MS. AVANESS:** The points are largely in response to

21 the cases raised, but hinging on authority previously submitted

22 and largely binding Ninth Circuit precedent.

23        **THE COURT:** All right. Then I will take it under

24 submission.

25     Thank you.

1      (Proceedings concluded at 3:10 p.m.)

2                  ---o0o---

3              **CERTIFICATE OF REPORTER**

4         I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6  DATE: Friday, January 24, 2025

7

8

9       _____

10    Stephen W. Franklin, RMR, CRR, CPE
      Official Reporter, U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25