**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
Bahar Sodaify (SBN 289730)
Yana Hart (SBN 306499)
Bryan P. Thompson (SBN 354683)
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Email: rclarkson@clarksonlawfirm.com
Email: bsodaify@clarksonlawfirm.com
Email: yhart@clarksonlawfirm.com
Email: bthompson@clarksonlawfirm.com

**SCHNEIDER WALLACE
COTTRELL KONECKY LLP**
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Email: tschneider@schneiderwallace.com
Email: jkim@schneiderwallace.com
Email: mweiler@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Classes*

**FREEDMAN NORMAND
FRIEDLAND LLP**
Richard Cipolla (*pro hac vice*)
155 E. 44th, Suite 915
New York, NY 10017
Tel: (646) 970-7509
Email: rcipolla@fnf.law

**FREEDMAN NORMAND
FRIEDLAND LLP**
Velvel Freedman (*pro hac vice*)
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Tel: (305) 971-5943
Email: vel@fnf.law

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAEEM SEIRAFI, EDWARD BATON, ANTHONY COMILLA, BRETT DEENEY, and ABRAHAM VILINGER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEDGER SAS.<br><br>Defendant. | Case No. 3:21-cv-02470-EMC<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq*. |

Individually and on behalf of all others similarly situated, Plaintiffs[1] Naeem Seirafi ("Seirafi"), Edward Baton ("Baton"), Anthony Comilla ("Comilla"), Brett Deeney ("Deeney"), and Abraham Vilinger ("Vilinger"), (collectively, "Plaintiffs"), bring this Action against Defendant Ledger SAS ("Ledger" or "Defendant"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. This Fourth Amended Complaint is intended to conform with the Court's Order granting in part and denying in part Defendants' motion to dismiss the Third Amended Complaint. The omission of certain parties, claims, and allegations is not intended as an abandonment or waiver thereof and Plaintiffs reserve their appellate rights.

## I.    <u>INTRODUCTION</u>

*"We know security means never standing still."*[2]

-Ledger.

1.    Plaintiffs seek redress for the substantial, class-wide damages that Ledger's misconduct caused in connection with a massive 2020 data breach that those companies negligently allowed, recklessly ignored, and then intentionally sought to cover up. The breach has publicly leaked approximately 272,000 pieces of detailed personally identifiable information ("PII"), including consumers' full names, email addresses, postal addresses, and telephone numbers.

2.    Ledger purports to provide "the highest level of security for crypto assets." Its primary products are hardware wallets ("Ledger wallets") that store the "private keys" of an individual's crypto-assets. These private keys are akin to a bank-account password in that access to

---

[1] The claims of Plaintiffs Edward Baton, Anthony Comilla, Brett Deeney and Abraham Vilinger were previously dismissed in the February 8, 2025, Order on Defendants' Motion to Dismiss. But the judgment has not been entered, and these Plaintiffs have thus not been formally terminated from the lawsuit. Together with Mr. Seirafi they will be filing a Motion or Partial Judgment under FRCP 54(b) as to all dismissed claims contemporaneously with the filing of this Fourth Amended Complaint.

[2] *Ledger*, CYPHERHUNTER, https://www.cypherhunter.com/en/p/ledger/ (last accessed Nov. 9, 2023)

---

the private keys allows an individual to transfer one's crypto-assets. But unlike a bank-account transaction, crypto-asset transactions are non-reversible: whoever gains access to the private keys associated with a crypto-asset can then transfer or spend that asset with impunity. Ledger purports to provide owners of crypto-assets with the best security to protect private keys from hackers and other bad actors.

3.    Ledger's sale platform is built on security and trust. As Ledger describes, "we are a unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software."[3]

4.    Ledger thus knows that anonymity is necessary to protect against hacking attempts. Crypto-asset transactions are publicly visible on the underlying blockchain, but using solely public information, nefarious actors cannot identify the owner of particular crypto-assets. Without personally identifying information, hackers face an immense obstacle to targeting an individual's crypto-assets. Conversely, when a hacker knows the identity of a crypto-asset owner, the hacker can construct a workable attack catered to a target.

5.    Consequently, to the world of hackers, Ledger's customer list is a gold mine. It is a list of people who have converted substantial wealth into anonymized crypto-assets that are transferrable without a trace. Using that list, hackers can manipulate or compel those owners to make untraceable and irreversible transfers of the crypto-assets into the hackers' accounts. The stakes of security for crypto-assets are thus enormous. With anonymity, owning a Ledger wallet is a cutting-edge method of securing crypto-assets. But without anonymity, owning a Ledger device simply creates a target for hackers.

6.    Ledger understands these realities and purports to account for them. As Ledger claims in its advertising: "If you don't want to get hacked, get a Ledger wallet."[4] Ledger advertises that it has the "highest security standards," that it "continuously look[s] for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security," and

---

[3] *We Are Ledger: A Brand Vision*, LEDGER (Nov. 22, 2019) https://www.ledger.com/we-are-ledger (last accessed Nov. 9, 2023).
[4] *Enjoy Security, Ownership and Ease of Use for Your Crypto with Ledger*, LEDGER, https://www.ledger.com/ (last accessed Nov. 9, 2023).

that its products provide "the highest level of security for crypto assets." Ledger has built a reputation of the highest possible trust, protection, and security for consumers. Based on Ledger's advertising claims, consumers expect that their personal data, along with their cryptocurrency assets, will remain anonymous, secure, and private. With that expectation, consumers specifically seek out the products and services provided by Ledger. True and correct screenshots of Ledger's advertising claims on its website are depicted below:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Key takeaways**

– Ledger hardware wallet, combined with the Ledger Live application, is the best solution to secure and control your crypto assets
– Ledger hardware wallets are designed with the highest security standard to keep your crypto secure at all time
– Ledger Live app is the one-stop-shop for your crypto: buy, sell, exchange, stake and lend your assets with our partners, easily & securely
– With Ledger you can secure and manage a wide range of crypto assets – 1500+ crypto assets supported
– The most popular hardware wallets: more than 2 millions units sold all over the world

**⠿ Ledger**          Products ⌄          Downloads          Learn ⌄          Crypto Assets          For Busin

People have always protected what they hold precious. When things were tangible, trust was visible.

But that world has changed.

Today, we're at the confluence of two global trends: a global trust crisis and global dataisation. In 15 years, there will be a trillion devices connected online. As more and more of our lives become digital, the threats we face won't be stopped by walls or physical armies.

Critical digital assets are the new oil and securing them is the most important challenge for the coming years.

**That's where we come in. We are Ledger.**

We are a unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software. And in today's world, we know that trust deserves proof. This is why we provide transparency into how our technology works.

We relentlessly stress-test our own technology solutions. Our Ledger Donjon team is made up of world-class experts with extensive backgrounds in the security and smartcard industries. They continuously look for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security. We know security means never standing still.

What first started as an idea of building a secure element chip to safeguard digital assets for crypto enthusiasts has quickly evolved into the creation of a cutting edge security technology company serving individuals, institutional investors and enterprises. This goes beyond just crypto and bitcoin. From connected pacemakers to water supply systems to electric grids, there will be countless critical digital assets in the future that need security. If they're not safe, they can be stolen or compromised, eventually hurting your wallet or even your life.

And through resilience, we give our clients and customers the ability to recover from setbacks, quickly adapt to change and keep going in the face of adversity. Resilience empowers our clients to explore and embrace pioneering opportunities like never before.

Ledger enables resilience through verifiable trust. Knowing trust is the greatest way to make our world truly move forward and progress.

**We are Ledger. Resilience by design.**

FOURTH AMENDED CLASS ACTION COMPLAINT

How do we secure personal data?

In order to ensure the integrity and confidentiality of your personal data, we implement appropriate physical, electronic and organizational procedures to safeguard and secure personal data throughout our Services.

In particular, Ledger implements necessary technical and organizational measures, in order to ensure the security and confidentiality of your personal data collected and processed, and particularly, to prevent your personal data from being distorted, damaged or communicated to unauthorized third parties, by ensuring an appropriate level of security with regards to the risks associated with the processing and the nature of the personal data to be protected.

We notably implement the following security measures, among others:

- Payment Data security: If you provide us with credit card information, such information is encrypted using a secure Internet Trade Protocol (TLS) and sent directly to our Payment Service Provider (PSP). This information is never stored on our server.
- Awareness program and employee trainings
- Data encryption in transit and at rest
- Data centers routinely audited
- Data redundancy for resilience in case of disasters
- Role-based authentication
- Two-factor authentication of our authorized employees
- Continuous system monitoring
- Industry-standard security evaluations
- Independent third-party security reviews and penetration tests

While we endeavor to provide best-in-class protection for your personal data when you use our Services, please keep in mind that the transmission of information on the Internet is not fully secure.

7.      To enhance its brand and increase sales, Ledger engages in high impact digital advertising worldwide, targeting consumers globally. Regardless of where a person resides, that person saw Ledger's similarly stated promises regarding Ledger's robust security, including secure mechanisms and measures to protect consumers' cryptocurrency as well as personal data.

8.      Despite its repeated promises and world-wide advertising campaign touting state of the art security for its customers, Ledger repeatedly and profoundly failed to protect its customers' identities, causing targeted attacks on thousands of its customers' crypto-assets and causing Class members to receive far less security than they thought they purchased with a Ledger wallet. Without the needed security, Ledger wallets are valueless or, at the very least, of much lower value. Plaintiff Seirafi and other similarly situated California consumers would not have purchased Ledger wallets had they known that Ledger has failed to utilize the promised security measures, employed multiple vendors, and failed to oversee such vendors' (including Shopify and TaskUs) handling of the data.

9.      Between approximately September 2019 and August 2020, Ledger employed non-party Shopify Inc. and Shopify (USA) Inc. (collectively "Shopify") to handle payments for Ledger

FOURTH AMENDED CLASS ACTION COMPLAINT

wallets and allowed access to a vast amount of customer data, even after the wallets were sold. Shopify, in turn, employed non-party TaskUs, Inc. ("TaskUs")—a U.S. based outsourcing company registered to conduct business in California, that provides a number of internet-based content services and outsources support from the Philippines. Shopify hired TaskUs to provide customer support and data security consulting services for Ledger's sales website and the Ledger Live services, in which Ledger customers could obtain live support for their investments and effectuate transfers of their assets on Ledger's website.

10.     Specifically, TaskUs was entrusted with the information collected by the Ledger Live service and the Ledger website via Shopify's collection of the data through their e-commerce services to Ledger. TaskUs therefore had access to, and was entrusted with, the sensitive user PII that would ultimately allow cybercriminals to target Plaintiffs and Class members with sophisticated phishing attacks.

11.     Between April and June of 2020, certain "rogue" TaskUs employees took advantage of the Ledger customer information provided to the company through Shopify's e-commerce services and acquired and exported Plaintiffs' and Class members' customer transactional records. The TaskUs employees also obtained data relating to other merchants.

12.     On September 22, 2020, Shopify announced that "two rogue members of our support team were engaged in a scheme to obtain customer transactional records of certain merchants," involving "the data of less than 200 merchants" and that their support teams had "been in close communication with affected merchants to help them navigate this issue and address any of their concerns." This announcement made it clear that Shopify was aware of the Data Breach before the day of the announcement and even had time to "conduct an investigation" and notify affected merchants.

13.     On February 19, 2021, a federal grand jury indicted a California man for wire fraud related to the Data Breach because he paid an employee of a Shopify vendor (TaskUs) to provide him with Shopify's merchant data.[5]

---

[5] *See* Criminal Indictment, *United States v. Heinrich*, 8:21-cr-22-JLS (C.D. Cal. 2021), Docket No. 16 at 2.

14.     The two customer support agents working for the Shopify vendor, TaskUs, obtained merchant and customer data of Shopify's customers, including Ledger. Using this access, the California man obtained a list of Ledger's customers, as well as email addresses and other contact information. TaskUs negligently hired their agents and failed to oversee them, resulting in this security breach.

15.     Ledger knew or should have known of TaskUs's involvement. Ledger and Shopify failed to oversee the handling of the data, including the handling of the data by TaskUs' agents in the Philippines, resulting in the instant security breach. By May/June 2020, Ledger's customer list and their sensitive data had made its way onto the internet's black market, making Ledger wallet owners vulnerable.

16.     The circumstances grew much worse over the next six (6) months. From June 2020 through December 2020, at least one of the hackers who had acquired the data published it online, providing over 270,000 names, physical addresses, phone numbers, and order information, as well as email addresses that were used to purchase the Ledger Wallets, to every hacker in the world. Defendant has made an effort to cover up the full extent of the affected data it failed to protect. As a direct result, the attacks on Ledger's customers grew exponentially, with customers losing money, facing threats of physical violence, and even feeling vulnerable in their own homes. Ledger wallet owner continue to be targeting by scammers, receiving counterfeit hardware wallets at their home addresses feigning to be an updated, "safe" device from Ledger itself, but is actually designed for malware delivery.[6] Indeed, using the customer shipping addresses and other sensitive PII that Ledger, Shopify, and TaskUs had failed to protect, hackers threatened to enter the homes of and attack Ledger customers unless those customers made untraceable ransom payments with the crypto-assets Ledger was supposed to secure.

17.     In the face of these obviously emergent circumstances, rather than acting to protect its customers, Ledger, along with TaskUs and Shopify, collectively stood still. In fact, Shopify's

---

[6] *Inside The Scam: Victims Of Ledger Hack Are Receiving Fake Hardware Wallets,* NASDAQ (June 17, 2021), https://www.nasdaq.com/articles/inside-the-scam:-victims-of-ledger-hack-are-receiving-fake-hardware-wallets-2021-06-17 (last accessed Nov 9, 2023).

head of privacy and data protection officer paid no attention to the publicized articles and reports about the data breach and made no effort to timely investigate the scope of the alleged data breach, prevent and stop the data breach from happening, or notify the affected customers. Ledger used a different approach: it utterly denied that any breach had occurred and continued to claim its products provided the best possible protection for crypto-assets. Defendant did not even inform the affected Ledger's customers of the breach. According to Ledger, it learned of the Data Breach on July 14, 2020, but failed to promptly issue a statement or notify any affected Ledger customers of the Data Breach. On July 29, 2020, Ledger partially admitted that it was involved in the Data Breach, yet Defendant continued to withhold any attempts to notify affected Ledger customers of the Data Breach. When Ledger finally announced that its marketing and e-commerce database had been exposed in June of 2020, it vastly underestimated the breadth of affected customers (estimating 9,500 affected).[7] As the customer list began to spread on the dark web, only in December of 2020 did Ledger finally admit the existence of the breach but nevertheless disputed its publicly-reported scope, and instead significantly minimized the extent of the data breach.

18.    By December 21, 2020, however, Ledger could no longer cover up the data breach that it had known or should have known for at least six (6) months. On that day, the hacked customer list was posted publicly and became widely available. In a message posted on its website from its CEO, Ledger finally admitted to the scope of the attack, stating that the company "very deeply regret[s] this situation."[8] Ledger's CEO further acknowledged that, as a result of the hack, "many [Ledger customers] have been targeted by e-mail and SMS phishing campaigns and that it's clearly a nuisance."[9]

19.    Ledger's misconduct, failure to prevent the data breach, and failure to take action for six (6) months (if not longer), has made targets of Ledger customers, with their identities known or

---

[7] *See Ledger Breach Vastly Underestimated*, 270,000 Clients Data Leaked, CRYPTOBRIEFING (Dec. 21, 2020), https://cryptonews.net/en/news/security/439897/.
[8] *Message by Ledger's CEO-Update on the July Data Breach*, LEDGER (Dec. 21, 2020), https://www.ledger.com/message-ledgers-ceo-data-leak#:~:text=We%20are%20aware%20that%20many,security%20for%20your%20digital%20assets (last accessed Nov 9, 2023).
[9] *Id.*

available to every hacker in the world. Ledger's persistently deficient response compounded the harm. In failing to individually notify every affected customer or admit to the full scope of the breach, Ledger left customers unaware of the data breaches and concomitant hacking risks. The natural and foreseeable result was that many customers fell victim to hackers' phishing emails disguised as emails from Ledger. Further, with their PII now in hackers' hands as a result of the Data Breach, Plaintiffs and Class members are no longer in possession of a secure cryptocurrency portfolio.

20.    Ledger's deficient response to the data breach included a failure to provide any support for customers who had been targeted by the breach or who feared they would be targeted in the future. Users are informed that "Ledger does not provide phone support." Instead, customers are directed to contact Ledger by submitting a written complaint in an online form or by email, to which Ledger would respond after weeks (if it responded at all). Following the December breach, customers reported emailing Ledger dozens of times with no response. Users reported through Twitter that they submitted customer service requests that went unanswered for several weeks, several months, and hundreds of days. Ledger acknowledged its deficient response times, claiming after the breach "[w]e are facing an increase in requests which may result in a longer reply time from Ledger Support. We apologize for the delay while we work to provide you the best service."

21.    But Ledger never provided "the best service." It did not even provide a minimum level of service. Instead, Ledger had become the primary source of vulnerability to owners of crypto-assets and then left those customers without the help they needed. For those seeking to secure crypto-assets, it had become safer to have never purchased a product or service from Ledger. And all the while, Ledger stood still. Thus, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and complete lack of timely customer support, Ledger customers would not have purchased Ledger wallets or would not have paid as much as they did for Ledger wallets.

22.    On behalf of the individuals affected by the data breach described herein, Plaintiffs seek, under consumer-protection statutes, to redress Defendant's misconduct occurring from April 1, 2020, to the present.

## II.   **PARTIES**

### *Plaintiffs*

23.     **Plaintiff Seirafi** is an individual residing in Los Angeles, California. Seirafi purchased the Ledger Nano X for use as a digital wallet to control his cryptocurrency assets. On or around March 2019, Seirafi saw advertisements online for Ledger's services and hardware. Relying on Ledger's representations, Seirafi purchased the Ledger Nano X hardware wallet from Ledger's official website for approximately $120. In doing so, Seirafi was required to provide Ledger with his first and last name, email address, telephone number, and postal address. In making his purchase decision, Seirafi reasonably relied upon the data security services advertised by Ledger, believing Ledger's corresponding services to be safer, better protected, and more secure as a result. Seirafi would not have purchased the Ledger Nano X if he knew that the sensitive information collected by Ledger would be at risk. Seirafi has suffered damages and remains at a significant risk now that his PII has been leaked online.

24.     **Plaintiff Baton** is a resident of Georgia. In July 2017, he purchased a Ledger Nano S from the Ledger online store for use as a digital wallet to control his cryptocurrency assets. He subsequently purchased a second Ledger Nano S from the Ledger online store. In making those purchases, he reasonably relied on Ledger's misrepresentations about the security of its products. He would not have purchased the products if he had known that his sensitive information collected by Ledger would be at risk or that his purchase would become public knowledge. On December 21, 2020, Ledger informed him that his data had been part of a breach. Baton has suffered damages from the breach as set forth below.

25.     **Plaintiff Comilla** is a resident of Albany, New York. Comilla purchased the Ledger Nano X from the Ledger online store for use as a digital wallet to control his cryptocurrency assets on or about June 2, 2020. In doing so, Comilla was required to provide Ledger with his first and last name, phone number, postal address, and email address. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products, believing that that Ledger Nano X was his safest and best option for storing his cryptocurrency. Comilla would not have

purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Comilla has suffered damages from the breach as set forth below.

26.     **Plaintiff Deeney** is a resident of London in the United Kingdom. Deeney purchased a Ledger "Back-Up Pack," consisting of a Ledger Nano X and a Ledger Nano S, on or about February 21, 2020 through Ledger's official website for € 114.16 (excluding tax) for use as a digital wallet to control his cryptocurrency assets. In doing so, Deeney was required to provide Ledger with his first and last name, the email address he used exclusively for crypto-asset transactions, his telephone number, and his postal address including unit number. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products. Deeney would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Deeney has suffered damages from the breach as set forth below.

27.     **Plaintiff Vilinger** is a resident of Tel Aviv, Israel. Vilinger purchased the Ledger Nano S from the Ledger online store for use as a digital wallet to control his cryptocurrency assets on or about January 15, 2018. In doing so, Vilinger was required to provide Ledger with his first and last name, phone number, postal address, and email address. In making his purchase, he reasonably relied on Ledger's misrepresentations about the security of its products, believing their ads and website that indicated the Ledger Nano S was a "cold" offline, secure, and not hackable wallet. Vilinger would not have purchased the Ledger product if he knew that the sensitive information collected by Ledger would be at risk. Vilinger has suffered damages from the breach as set forth below.

### ***Defendant***

28.     Defendant Ledger SAS is a French simplified joint-stock company headquartered in Paris, France. Ledger SAS maintains its principal place of business at 1 Rue du Mail, 75002 Paris, France. It also has offices located at 121 2nd St., #4, San Francisco, CA 94105.  Defendant Ledger SAS offers the hardware wallet Products to secure and control cryptocurrency assets on an online international marketplace, including the State of California. Ledger SAS, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Ledger SAS is the owner and distributor of the products at issue, was

entrusted with the PII of Plaintiff and the Class, and is the company that created and/or authorized the false, misleading, and deceptive advertisements and promises (jointly and severally with Ledger Technologies, Inc.).

### III.  JURISDICTION AND VENUE

29.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, there are more than 100 class members, and the matter is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

30.    This Court has personal jurisdiction over all parties because Defendant conducts business in the State of California, and the substantial events leading up to the breach at issue have occurred in California.

31.    This Court also has personal jurisdiction over Ledger SAS because Ledger SAS solicits customers, including Plaintiffs and Class members, in the United States and California/ Ledger SAS directly ships a substantial amount of its hardware wallets into the United States and California. But for those sales and soliciting those purchases, it would not have collected the PII that was compromised in this case. In fact, 33% of the compromised two hundred and seventy-three thousand (273,000) accounts with address information belonged to Class members with U.S. addresses.

32.    This Court also has personal jurisdiction over Ledger SAS because Shopify (USA) acted as that entity's agent for the conduct giving rise to Plaintiffs' claims. With respect to the breached data of Ledger SAS's customers, the responses to the breaches, and the conduct giving rise to Plaintiffs' causes of action, Ledger SAS had the right to control the conduct of Shopify and TaskUs, which acted as Ledger's agent and was authorized to act on Ledger SAS's behalf with respect to Ledger's customers.

33.    The Ninth Circuit has concluded that this Court has jurisdiction over Ledger with respect to Plaintiffs' California consumer law claims. Plaintiffs' claims arise out of their purchase of Ledger wallets, which requires their agreement to the Sales Terms and Conditions, Privacy Policy, and Ledger Live Terms of Use. Each agreement includes a broad forum-selection clause

which is enforceable, except with respect to Plaintiffs who are "California resident plaintiffs bringing class action claims under California consumer law." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009).[10]

## IV.    FACTUAL ALLEGATIONS

### A. Data Breaches and the Market for PII

34.    Data breaches in the United States have become commonplace – from nearly 125 million breaches in just the fourth quarter of 2020, to approximately 15 million breaches in the third quarter of 2022 (increasing 167% compared to the previous quarter) – with the goal of criminals being to monetize the stolen data.[11]

35.    When a victim's data is compromised in a breach, the victim is exposed to serious ramifications regardless of the sensitivity of the data—including but not limited to identity theft, fraud, decline in credit, inability to access healthcare, as well as legal consequences.[12]

36.    The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that resolution of those problems could take more than a year.[13]

37.    The U.S. Government Accountability Office has concluded that it is common for data thieves to hold onto stolen data for extended periods of time before utilizing it for identity

---

[10] *See* Memorandum Opinion, Dkt. 53-1, *Baton et al. v. Ledger SAS et al*, D.C. No. 3:21-cv-02470-EMC, Case No. 21-17036 (9th Cir. 2022).

[11] Ani Petrosyan, *Number of Data Records Exposed Worldwide From 1st Quarter 2020 to 3rd Quarter 2022*, STATISTA, https://www.statista.com/statistics/1307426/number-of-data-breaches-worldwide/ (last accessed Nov. 9, 2023).

[12] *2017 Annual Data Breach Year-End Review*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/wp-content/uploads/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf (last accessed Nov. 9, 2023).

[13] Erika Harrell, *Victims of Identity Theft, 2014,* U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last accessed Nov. 9, 2023).

theft.[14] In the same report, the Government Accountability Office noted that while credit monitoring services can assist with detecting fraud, those services do not stop it.[15]

38.     When companies entrusted with people's data fail to implement industry best practices, cyberattacks and other data exploitations can go undetected for a long period of time. This worsens the ramifications and can even render the damage irreparable.

39.     PII is a valuable commodity for which a black market exists on the dark web, among other places. Personal data can be worth from $1,000 - $1,200 on the dark web[16, 17] and the legitimate data brokerage industry is valued at more than $250 billion dollars. The value is even higher for the PII that cannot be changed.

40.     In this black market, criminals seek to sell the spoils of their cyberattacks to identity thieves who desire the data to extort and harass victims, take over victims' identities to open financial accounts, and otherwise engage in illegal financial transactions under the victims' names.

41.     PII has a distinct, high value—which is why legitimate companies and criminals seek to obtain and sell it. As alleged in more detail below, there is a growing market for individuals' data.[18]

42.     The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that resolution of those problems could take more than a year.

---

[14] U.S. Government Accountability Office Report to Congressional Requesters, *Data Breaches – Range of Consumer Risks Highlights Limitations of Identity Theft Services* (March 2019), https://www.gao.gov/assets/700/697985.pdf (last accessed Nov. 9, 2023).
[15] *Id*.
[16] Ryan Smith, *Revealed-how much is personal data worth on the dark web*?, INSURANCE BUSINESS MAGAZINE (May 1, 2023), https://www.insurancebusinessmag.com/ca/news/cyber/revealed--how-much-is-personal-data-worth-on-the-dark-web-444455.aspx (last accessed Oct. 26, 2023).
[17] Maria LaMagna, *The sad truth about how much your Google data is worth on the dark web*, MARKETWATCH (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-facebook-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20 (last accessed Nov. 9, 2023).
[18] Emily Wilson, *The Worrying Trend of Children's Data Being Sold on the Dark Web*, TNW (Feb. 23, 2019), https://thenextweb.com/contributors/2019/02/23/children-data-sold-the-dark-web/ (last accessed Nov. 9, 2023).

43.     As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and financial fraud. [19] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the "dark web."

44.     Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

**B.  Defendant's Duty to Safeguard User's Private Information**

45.     Defendant was prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

46.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.

47.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. [20] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

48.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious

---

[19] *What To Know About Identity Theft*, FEDERAL TRADE COMMISSION, https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 9, 2023).
[20] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Nov. 9, 2023).

activity on the network; and verify that third-party service providers have implemented reasonable security measures.

49.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA 15 U.S.C. § 45.

50.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

51.    The FTC recommends that businesses have a comprehensive communication plan that reaches all affected audiences—employees, customers, investors, business partners, and other stakeholders—in the case of a data breach. This plan should be designed to quickly notify people that their personal information has been compromised so that they can take steps to reduce the chance that their information will be misused.

52.    The FTC also instructs businesses to provide detailed notices to affected parties that "clearly describe what you know about the compromise." This information, at a minimum, should include: "how it happened; what information was taken; how the thieves have used the information (if you know); what actions you have taken to remedy the situation; what actions you are taking to protect individuals, such as offering free credit monitoring services; and how to reach the relevant contacts in your organization."[21]

**C.  Bitcoin and Crypto-Assets**

53.    A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

---

[21] *Data Breach Response: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last accessed Nov. 9, 2023).

54.    Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most popular crypto-asset, with a market capitalization exceeding $700 billion as of the filing of this complaint.[22] (The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

55.    At its core, Bitcoin is a ledger of addresses and transfer amounts that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain. The blockchain is completely public.

56.    Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve a similar goal of decentralization.

57.    In April 2013, there were only seven crypto-assets listed on coinmarketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, the site monitors more than 8,825 crypto-assets.[23]

      i.    <u>Transacting with Bitcoin and Blockchain Addresses</u>

58.    Because all blockchain addresses and transfers are public, the way to verify ownership of an address is through public and private keys.

59.    Each address has one public key and one private key associated with it. With the private key, one can control the address and can move bitcoin in or out of the account. The public key is more like a digital signature that is used to verify ownership and transfers of funds. The blockchain address, public key, and private key are often mathematically related to one another.

60.    The private key is, however, the only mechanism that allows for the transfer of crypto-asset. With the private key—and nothing more—a person can implement an untraceable transfer of the crypto-asset from one digital address to another. Without the private key, the crypto-

---

[22] *Cryptocurrency Prices Today By Market Cap,* FORBES, https://www.forbes.com/digital-assets/crypto-prices/?sh=385f823b2478 (last accessed Nov. 9, 2023).

[23] *Today's Cryptocurrency Prices by Market Cap*, COIN MARKET CAP, https://coinmarketcap.com/?page=89 (last accessed Nov. 21, 2023)

asset can never be transferred. In other words, anyone with the private key has total control over the funds. Thus, to safeguard crypto-assets, one must keep the private key private.

ii.    Security and Crypto-Assets

61.    It is the cryptographic principles behind the use of public and private keys that give crypto-assets their name. Cryptography is at the heart of blockchain transactions, and security is one of the chief advantages and selling points of the technology.

62.    Nonetheless, since the inception of crypto-assets, there have been high-profile hacks to steal them. One of the first large Bitcoin exchanges (handling over 70% of all Bitcoin transactions at the time) lost a staggering 850,000 bitcoins to theft, with a value exceeding $31 billion USD today.

63.    It has been estimated that over $4 billion crypto-assets were lost to theft and related crimes in 2019.[24] That risk of theft continues today.

64.    Because it is nearly impossible to guess a user's private key, hackers employ various methods to gain access to private keys. Once a hacker obtains the private key for an address, the hacker controls its funds. Unlike traditional accounts housed at banks, there are no approvals or fraud monitoring warnings for moving crypto-assets out of an account. Moreover, any transfer is effectively untraceable and irreversible, leaving the recipient immune from identification or claw-back.

65.    Given this constant threat of theft, security over an individual's private keys is paramount.

**D.    Ledger and Hardware Wallets**

66.    Ledger is a $1.41 billion[25] corporation that is used world-wide for its unique hardware cryptocurrency wallets that allow consumers to secure and manage their cryptocurrency

---

[24] Jeb Su, *Hackers Stole Over $4 Billion From Crypto Crimes In 2019 So Far, Up From $1.7 Billion In All Of 2018*, FORBES (Aug. 15, 2019), https://www.forbes.com/sites/jeanbaptiste/2019/08/15/hackers-stole-over-4-billion-from-crypto-crimes-in-2019-so-far-up-from-1-7-billion-in-all-of-2018/?sh=42ef46855f58 (last accessed Nov. 9, 2023).

[25] *Crypto wallet company Ledger raises another $108 million,* TECHCRUNCH (Mar. 30, 2023),

assets. Ledger's line of hardware security devices quickly gained popularity and positioned Ledger as a global leader in the market with 1,000,000 units sold in more than 165 countries. Ledger designs and sells the Ledger Nano X and the Ledger Nano S, both hardware wallets, along with a corresponding application and other services for consumers to control and track their assets. Ledger advertises that its technologies constitute a "unique digital security ecosystem that provides protection and is built on verifiable trust across our people, hardware and software."

67.    As set forth above, Ledger offers solutions to consumers to keep their crypto-assets safe. Ledger's main product offerings are "hardware wallets." These are physical consumer items that appear similar to a USB storage device. This is an example of a Ledger hardware wallet:



68.    Despite being named a "wallet," such wallets do not "hold" cryptocurrency in the way a traditional wallet stores cash. Rather, consumers store their private keys on these physical devices, which are never connected to the internet (at least in the case of Ledger's products).

69.    The wallet itself can be accessed only by entering a PIN. Simply misplacing the wallet thus poses no risk of theft.

70.    Ledger also produces "Ledger Live," a software product designed to interact with devices. This screenshot shows its core functionality, in that a user can use the software to buy, sell, send, and receive various crypto-assets:

---

https://techcrunch.com/2023/03/30/crypto-wallet-company-ledger-raises-another-108-million/ (last accessed Nov. 9, 2023).



71.     Ledger has been highly successful selling these devices and services. Having raised $88 million in funding, it is one of the market leaders for crypto-asset security.

72.     Ledger collects and processes the personal data of all consumers who purchase Ledger products, including, but not limited to, first and last names, e-mail addresses, post addresses, and telephone numbers.

73.     This PII was collected by Ledger when Plaintiff and the Class purchased the Products. Ledger's privacy policy, which was updated on July 28, 2020, outlines the security measures used to protect consumer's PII and what this information is used for.[26] Under the privacy policy, Ledger claims to implement:

> "[N]ecessary technical and organizational measures, in order to ensure the security and confidentiality of your personal data collected and processed, and particularly, to prevent your personal data from being distorted, damaged or communicated to unauthorized third parties, by ensuring an appropriate level of security with regards to the risks associated with the processing and the nature of the personal data to be protected."

---

[26] *Privacy Policy*, LEDGER (April 2022), https://shop.ledger.com/pages/privacy-policy (last accessed Nov. 9, 2023).

FOURTH AMENDED CLASS ACTION COMPLAINT

i.   <u>Hacking Hardware Wallets</u>

74.     Users of hardware wallets generally face discrete risks of theft by hacking because private keys exist only where the owners store them. If an owner stores the private keys only on a hardware wallet with no internet connectivity—and not on a personal computer—then traditional hacking cannot reveal those private keys. Instead, the main sources of risk are: (1) "phishing" attacks to trick a user into revealing the private PIN to their hardware wallet; or (2) physical intimidation that forces users into paying money or revealing that information to a hacker.

75.     Phishing is the practice of purporting to be a legitimate institution and contacting targets with the goal of soliciting passwords, banking information, or other sensitive information. Common examples of this practice include mass spam emails sent to mimic the look and feel of a banking website. The email recipient receives the email, believes she needs to link to the account to update information, clicks a link in the email that goes to a sham website made to look like the real bank website, and enters real login information into the sham website. The owners of the sham website then possess that victim's real banking login and password.

76.     Internet users are becoming more and more savvy to phishing, however, requiring hackers to craft attacks that are increasingly realistic and personalized and less reliant on large-scale mass efforts.

77.     Phishing attacks are also generally harder to accomplish against Ledger users, who are typically more skeptical and security conscious and, in turn, savvier to phishing practices. For example, Ledger users will commonly create special email addresses used just for interacting with accounts that manage their crypto assets. And Ledger users will often have a separate dedicated phone number to use for dual-factor authentication when interacting with their crypto assets.[27] These dedicated email addresses and phone numbers add another layer of protection to avoid phishing attacks. Users know that crypto-asset-related emails, texts, or calls to any "main" email address or phone number are illegitimate.

---

[27] Dual authentication is a method in which a user is granted access to some system or device only after successfully presenting two or more pieces of evidence of rightful access, such as unique knowledge (*e.g.*, a password) or unique possession (*e.g.*, a key).

78.     Similarly, using a separate phone number can protect users from other attacks, such as SIM swap attacks.[28] A SIM swap attack occurs when an attacker gains control of an individual's phone number by convincing the individual's mobile carrier to switch it to a new SIM card—one that the attacker possesses. Once attackers gain control of that phone number, they can then bypass dual-factor authentication requirements.

79.     Plaintiff Baton—who has a professional background, including in technology—was as savvy as anyone buying crypto assets and hardware wallets as far back as 2017. Accordingly, in addition to buying multiple Ledger products for storing his crypto assets, Plaintiff Baton took other precautions. For example, he acquired a separate mobile phone and always interacted with crypto assets using a virtual private network to encrypt communications and shield his IP address.

80.     Similarly, Plaintiff Deeney is an experienced, sophisticated, and security-savvy crypto asset investor. He used a dedicated email address for his crypto asset transactions.

81.     As to physical intimidation, even the savviest internet user cannot insulate himself from such threats. A hacker can contact an owner of crypto-assets and threaten the owner with physical violence unless an effective ransom is paid (usually in the form of an untraceable transfer of crypto-assets transfer to the hacker). These threats are rare. Without knowing an owner's home address, physical location, or even phone number, a hacker would have difficulty making a credible threat prompting payment from the victim. And hackers cannot identify viable targets by simply looking up publicly listed names, phone numbers, and addresses. Crypto-assets have not yet been widely adopted; therefore, attackers have no way of knowing whether would-be targets own crypto-assets or hardware wallets. In addition, for owners of crypto-assets, there is no analog for the physical bank ATM—where would-be attackers could potentially wait, identify victims with funds, and intimidate those victims.

82.     For these reasons, the single greatest point of vulnerability for owners of Ledger wallets is public disclosure of the information that a particular person owns the wallet. If hackers

---

[28] SIM stands for "subscriber identification module," and a SIM card is a physical circuit that is used to securely store the unique identifier of any user on a cellular network.

know the names and/or email addresses of people who own Ledger wallets, then hackers can target those people with sophisticated phishing schemes and tailored threats.

83.    Accordingly, by operating in the crypto-asset security space, Ledger places itself between user's funds and would-be hackers. The anonymity of its customer list is a key and obvious element of the security that Ledger offers. By analogy, a manufacturer of state-of-the-art lock safes would not publish its customer list, which is valuable to would-be thieves seeking to identify targets possessing high-value items. Similarly, public disclosure of Ledger's customers puts those individuals in the crosshairs of the very hackers the company seeks to impede.

84.    Furthermore, PII, such as names and email addresses, may be combined with other sources of information to de-anonymize Ledger account holders. Not only may this information be used, as it was here, to create sophisticated "phishing" attacks, but it may also be used to de-anonymize user wallets and (through analysis of blockchain data) individual transactions.

85.    A great deal of information about Plaintiffs and Class Members is already available on the dark web. The availability of Plaintiffs' and Class Members' content and information on the dark web imposes further uncompensated costs on those individuals. The dark web permits criminals further access to users' content and information that make the thefts that occurred here more easily accomplished.

86.    As reported by CBS News, "The little drips of personal data leaked from every major data breach—your name, email, phone number, Social Security number, and mailing address—pool in a murky corner of the internet known as the dark web. Some of these leaks might seem relatively insignificant, but criminals exploit your personal data for profit and to help other criminal operations prosper. The dark web is where these transactions happen."

87.    The content and information exposed in the Ledger data breach certainly amplified the value of information already available on the dark web. On the dark web, "personal information was mixed in with wholesale data dumps of information about thousands of people," allowing the information to be aggregated into "packages" that have street value.[29]

---

[29] Dan Patterson, *We found our personal data on the dark web. Is yours there, too?,* CBS NEWS

ii.    Ledger Advertises State-of-the-Art Security for Crypto-Assets

88.    Ledger's consistent message to consumers is that Ledger wallets offer the best possible protection for crypto-assets. Their tagline embodies this value proposition: "If you don't want to get hacked, get a Ledger wallet." Ledger represented to consumers, prior to the data breach at issue, the following:

> Critical digital assets are the new oil and securing them is the most important challenge for the coming years.
>
> That's where we come in. We are Ledger.
>
> We are a unique digital security ecosystem that provides protection and is *built on verifiable trust across our people, hardware and software.* And in today's world, we know that trust deserves proof. This is why we provide transparency into how our technology works.
>
> *We relentlessly stress-test our own technology solutions.* Our Ledger Donjon team is made up of world-class experts with extensive backgrounds in the security and smartcard industries. *They continuously look for vulnerabilities on Ledger products as well as our providers' products in an effort to analyze and improve the security. We know security means never standing still.*

(emphasis added).

89.    Ledger further and publicly asserted, prior to the data breach at issue:

- "At Ledger we are developing hardware wallet technology that provides the highest level of security for crypto assets;"

- "Ledger hardware wallet, combined with the Ledger Live application, is the best solution to secure and control your crypto assets;"

- "Ledger hardware wallets are designed with the highest security standard to keep your crypto secure at all time;"

- "Ledger enables resilience through verifiable trust. Knowing trust is the greatest way to make our world truly move forward and progress."

90.    Ledger also republished, prior to the data breach at issue, acknowledgments from reputable third-party commentators:

- "French Crypto Wallet Ledger Is Solving Bitcoin's Biggest Flaw" (as featured in Forbes);

---

(March 25, 2019) https://www.cbsnews.com/news/we-found-our-personal-data-on-the-dark-web-is-yours-there-too/ (Last accessed Nov. 21, 2023)

FOURTH AMENDED CLASS ACTION COMPLAINT

- "Ledger makes sure private keys never become accessible to thieves, online or anywhere else" (as featured in Bloomberg);

- "Ledger removes the risk of being hacked" (as featured on CNBC).

91.    Ledger maintained consistent advertising that their products, such as the Ledger Nano X, can protect personal data *anywhere*. In one advertisement, Ledger represented: "Some say that technology is getting too complex, that personal data can't be protected. Some say that the only safe place is home; that crypto currencies aren't safe. We at Ledger believe that your data should be safe everywhere you go, that security can co-exist with simplicity. We believe that your assets should be in good hands. Yours."[30]



92.    Through those statements, Ledger conveyed to consumers that Ledger wallets, coupled with Ledger's services, provide the highest standard of security for owners of crypto-assets. Ledger further conveyed that it was tirelessly assessing its wallets and supporting services for vulnerabilities, while adapting to protect against those threats. By buying a Ledger wallet, consumers purportedly were buying into a comprehensive security support system that maximized protections against threats to crypto-assets.

---

[30] Ledger, *Ledger Nano X – Keep You Crypto Secure, Everywhere*, YOUTUBE (Jan. 7, 2019) https://youtu.be/5xkqIwFWMoM?si=nqPWSzikBbHnLka5 (last accessed Aug. 21, 2024).

93.    Making the forgoing, unequivocal representations, Ledger sold Class members the Ledger Nano X wallet for $119 and the Ledger Nano S wallet for $59. Class members would not have purchased these products at all, or would have paid significantly less for them, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and failure to provide timely customer support.

**E.  Ledger Uses Shopify as an E-commerce Vendor**

94.    Ledger sells its Nano products through a number of distributors, including retailers like Amazon and Walmart. It also sells directly to consumers through https://shop.ledger.com/ (the "Shopping Website").

95.    Shopify powers Ledger's Shopping Website. Shopify is an e-commerce giant. Over one million businesses use its platform, and over $61 billion of sales occurred on its platform through these businesses in 2019. By market capitalization it is one of the top 10 publicly-traded company in Canada and was at one time Canada's largest company by market capitalization.

96.    Shopify's success is based on providing services to allow companies to easily operate online stores. Shopify provides e-commerce solutions for businesses to allow them to easily create digital storefronts. For example, Shopify allows you to create a well-designed web layout, provides a payment provider to accept credit card payments, and makes various profit and inventory applications available. These solutions are essentially a software product to which companies subscribe to host digital stores.

97.    When users purchase directly from Ledger on its Shopping Website, they must provide certain personal information before placing an order, such as their physical address, phone number, and email address. Because Ledger uses Shopify's services, Shopify acts as an intermediary between Ledger and purchasers of Ledger's products. Therefore, Shopify also has access to the personal information that purchasers provide.

**F.  Shopify, in Turn, Uses TaskUs, Which Suffers a Data Breach**

98.    TaskUs, Inc., is a third-party company that provided customer support services to Shopify. TaskUs employees based in the Philippines had access to Shopify's customer data, and

specifically Ledger's data because of its contract with Shopify Inc. subsidiary, Shopify International Limited.

99.    In around 2019, the California man began conspiring with employees of TaskUs to obtain information regarding the customers of merchants, like Ledger, that used Shopify. At some point in the 2020s, the California man obtained access to the personal information of Ledger's customers and acquired and exported Ledger's customer transactional records (the "Data Breach"). The California man also obtained data relating to other merchants from the TaskUs employees.

100.    TaskUs failed to make any efforts to notify anyone of the Data Breach.

101.    On September 22, 2020, Shopify announced that: (1) "two rogue members of our support team were engaged in a scheme to obtain customer transactional records of certain merchants;" (2) the "incident involv[ed] the data of less than 200 merchants;" and (3) "Our teams have been in close communication with affected merchants to help them navigate this issue and address any of their concerns."[31] This announcement made it clear that Shopify was aware of the data breach before the day of the announcement and even had time to "conduct an investigation" and notify affected merchants.

102.    On February 19, 2021, a federal grand jury indicted the California man for wire fraud for his role in causing the data breach. The indictment alleges that starting in May 2019, he paid an employee of a Shopify vendor (TaskUs) to provide him with Shopify's merchant data. The unnamed vendor acted as Shopify's agent, providing customer support services to Shopify customers on its behalf. Upon information and belief, the vendor was TaskUs.

103.    Ledger and TaskUs are global entities, that conduct business nationwide and globally, servicing consumers in the United States and in many foreign countries. They also provide services in virtually every state and advertise their platforms and products online targeting word-wide consumers.

104.    Plaintiffs and the Class, while purchasing the Ledger's products from cloud-based software and relying on the uniform representations made by Ledger, were injured as a result of

---

[31] *Incident Update*, SHOPIFY (Sept. 22, 2020), https://community.shopify.com/c/shopify-discussions/incident-update/td-p/888971 (last accessed Nov. 9, 2023).

actions stemming from San Francisco, California, and thus, they suffered an injury from wrongful conduct that occurred in California.

105.    Specifically, Shopify, Ledger, and TaskUs caused and then covered up a massive 2020 data breach that led to substantial damages for consumers.

106.    TaskUs's rogue members of their support team obtained customer transactional records, including Ledger's customers. Shopify's agents then illegally exported customer transactional records in April and June 2020. Nevertheless, neither Shopify nor Ledger acknowledged the massive data breach, and they continued to cover up the rumors and incidents for the ensuing months.

107.    Ledger's misconduct, deceit, and concealment of material facts regarding the data breach at issue deprived Plaintiffs and the Class of legal rights, causing injury.

108.    Here, the Data Breach involved the data of approximately 272,000 people,[32] approximately a third of whom live in the United States.[33] Hackers copied information such as names, order details, email addresses, physical addresses, and phone numbers.[34] And for many more users, hackers obtained the email address users used when buying their Ledger.[35]

109.    By the time Shopify announced the breach in September, Shopify notified every affected merchant that rogue employees had stolen their data, but neither Shopify nor Ledger warned the hundreds of thousands of vulnerable Ledger customers harmed by the Data Breach. Instead, as the timeline below explains, Ledger attempted to cover up and downplay the scale of the Data Breach, while Shopify did nothing to protect the owners of the data Shopify had failed to secure.

---

[32] *E-commerce and Marketing data breach – FAQ*, LEDGER, https://support.ledger.com/hc/en-us/articles/360015559320-E-commerce-and-Marketing-data-breach-FAQ (last accessed Nov. 9, 2023).

[33]  Larry Cermak, *A detailed look at the Ledger data leak and other recent incidents*, THE BLOCK (Dec. 21, 2020), https://www.theblockcrypto.com/genesis/88706/a-detailed-look-at-the-ledger-data-leak-and-other-recent-incidents (last accessed Nov. 9, 2023).

[34] *Id.*

[35] *Id.*

**G. <u>Ledger's Deficient Response to Early Warning Signs About the Breach</u>**

    i.   <u>April – June 2020: Ledger Initially Denies the Data Breach</u>

110.    In May 2020, public rumors arose concerning the Data Breach. The rumors were that Ledger's consumer information from Shopify had been hacked.[36]

111.    This publicly-stated concern was an opportunity for Ledger to get ahead of the problem. Ledger should have, at a minimum: (1) disclosed the breach; (2) notified all impacted and potentially impacted users; (3) offered services to help impacted users transition to new accounts; (4) monitored for suspicious transactions; (5) hired third-party auditors to conduct security testing; (6) trained employees to identify and contain similar breaches; and (7) trained and educated their users about the threats they faced. Ledger was then on notice of the Data Breach and should have started to investigate these rumors, and yet, Ledger ignored the information about the data breach.

112.    In choosing to ignore its duty to investigate the Data Breach, instead, Ledger's immediate reaction was to deny that there was a breach impacting Ledger's customers. Ledger falsely stated that "**Rumors pretend** our Shopify database has been hacked through a Shopify exploit. Our e-commerce team is currently checking these allegations by analyzing the **so-called** hacked [database], and so far **it doesn't match** our real [database]. We continue investigations and are taking the matter seriously."[37] Ledger did not attempt to verify the accuracy of these statements prior to making them nor did it conduct any investigation to confirm whether it suffered the data breach.

113.    As Ledger admits in its July 29, 2020, announcement of the data breach, the hacker accessed the e-commerce and marketing database through an API Key. An API (application programming interface) Key allows software programs to interact, share data, and integrate

---

[36] Jamie Redman, *Hacker Attempts to Sell Data Allegedly Tied to Ledger, Trezor, Bnktothefuture Customers*, BITCOIN (May 24, 2020), https://news.bitcoin.com/hacker-attempts-to-sell-data-allegedly-tied-to-ledger-trezor-bnktothefuture-customers/ (last accessed Nov. 9, 2023. @UnderTheBreach, TWITTER (May 24, 2020) https://twitter.com/underthebreach/status/1264460979322138628?ref_src=twsrc%5Etfw%7Ctwca mp%5Etweetembed%7Ctwterm%5E1264460979322138628%7Ctwgr%5E%7Ctwcon%5Es1_&re f_url=https%3A%2F%2Fnews.bitcoin.com%2Fhacker-attempts-to-sell-data-allegedly-tied-to-ledger-trezor-bnktothefuture-customers%2F

[37] @Ledger, TWITTER (May 24, 2020), https://twitter.com/Ledger/status/1264506360735174657.

functionalities.[38] APIs facilitate conversations between otherwise disconnected software—here Ledger on one end and separately, the other software it interacted with on the other end. Both have access to the API Key, and Ledger is an API Key owner that can use it to "monitor API activity, including the types of requests and volume of requests."[39] Ledger would be able to see the API Key activity in its systems. Thus, had Ledger actually conducted a basic investigation in May 2020, it would have seen the unauthorized access to the API Key. So, Ledger either did not conduct an investigation, but falsely represented that it had done so, or saw the unauthorized API access and intentionally chose not to disclose it promptly.

114.    During this time, the risks and damages to Ledger's customers were only increasing; a prompt and proper response from Ledger, including full disclosure to all customers, would have mitigated those risks and damages.

115.    Despite the explicit references to Shopify, Ledger's disclosures and the related press raised in May 2020—and the implications for the security of Shopify's own systems—never made it to Shopify's Data Protection Officer's desk. That is, either Ledger improperly failed to notify Ledger, the controls the Data Protection Officer was responsible for failed to give the notification the attention it deserved, or both.

ii.    <u>July 2020: Ledger Admits the Data Breach Occurred, but Downplays Its Scale</u>

116.    On July 29, 2020, Ledger made partial admissions that exacerbated, rather than mitigated, the harm caused by the Data Breach.

117.    After researchers informed Ledger of a potential data breach on its website, Ledger announced that its marketing and e-commerce database had been exposed in June 2020:

> **What happened**
> On the 14th of July 2020, a researcher participating in our bounty program made us aware of a potential data breach on the Ledger website. We immediately fixed this breach after receiving the researcher's report and underwent an internal investigation. A week after patching the breach, we discovered it had been further exploited on the 25th of June 2020, by an unauthorized third party who accessed our e-commerce and marketing database – used to send order

---

[38] Jamie Juliver, *What is an API Key? (And Are They Secure)*, https://blog.hubspot.com/website/api-keys (last accessed Aug. 17, 2024).
[39] *Id.*

FOURTH AMENDED CLASS ACTION COMPLAINT

confirmations and promotional emails – consisting mostly of email addresses, but with a subset including also contact and order details such as first and last name, postal address, email address and phone number. **Your payment information and crypto funds are safe.**

To be as transparent as possible, we want to explain what happened. An unauthorized third party had access to a portion of our e-commerce and marketing database through an API Key. The API key has been deactivated and is no longer accessible.

**What personal information was involved?**
Contact and order details were involved. This is mostly the email address of our customers, approximately 1M addresses. Further to investigating the situation we have also been able to establish that, for a subset of 9500 customers were also exposed, such as first and last name, postal address, phone number or ordered products. Due to the scope of this breach and our commitment to our customers, we have decided to inform all of our customers about this situation.

Those 9500 customers whose detailed personal information are exposed will receive a dedicated email today to share more details.

**Regarding your ecommerce data, no payment information, no credentials (passwords), were concerned by this data breach. It solely affected our customers' contact details**.

**This data breach has no link and no impact whatsoever with our hardware wallets nor Ledger Live security and your crypto assets, which are safe and have never been in peril. You are the only one in control and able to access this information**.

(emphasis in original).

118.    Ledger's disclosure and responsive measures were flawed and misleading.

119.    *First*, as Ledger admitted, it failed to immediately warn its customers and instead waited on the results of its "internal investigation with third party experts before warning [its] community."[40] This delay in issuing even a warning was reckless, or at least negligent.

120.    *Second*, Ledger did not disclose that this breach had anything to do with the Shopify breaches, which involved insiders stealing information for personal profit. Ledger never even mentioned Shopify. This incomplete disclosure was reckless, or at least negligent.

---

[40] *Addressing the July 2020 e-commerce and marketing data breach — A Message From Ledger's Leadership*, LEDGER (July 29, 2020), https://www.ledger.com/addressing-the-july-2020-e-commerce-and-marketing-data-breach (last accessed Nov. 9, 2023)

121.    *Third*, Ledger was not clear as to the status and dissemination of the stolen data. Ledger explained that "[w]e are actively monitoring for evidence of the database being sold on the internet, and have found none thus far." Ledger also explained that they "immediately fixed this breach" and were undertaking an "internal investigation," choosing to eschew third party auditors. Ledger also took pains to repeatedly reiterate to consumers that the breach had "no impact whatsoever with our hardware wallets nor Ledger Live security and your crypto assets." In other words, Ledger's message was that, after an exhaustive internal investigation, they had identified a limited hack and had rectified the situation. This patently inaccurate disclosure was reckless, or at least negligent.

122.    *Fourth*, Ledger sent follow-up notifications only to the 9,500 customers who they determined had additional personal information exposed. In doing so, Ledger failed to notify its one million other customers whose email information had been exposed. This patently incomplete follow-up was reckless, or at least negligent.

123.    Despite the obvious references to Ledger's marketing database (Shopify), Ledger's disclosures and the press about these issues in July 2020—and the implications for the security of Shopify's own systems—never made it to Shopify's Data Protection Officer's desk. That is, either: (1) Ledger improperly failed to notify Shopify, (2) the controls the Data Protection Officer was responsible for failed to give the notification the attention it deserved, or (3) both.

**H.  <u>Attacks on Ledger Users Intensify</u>**

i.    <u>August – December 2020: Hacking Attacks Increase on Ledger Users</u>

124.    By the fall of 2020, even after Shopify had notified merchants about the breach, Ledger was still failing to respond appropriately to the severe threats that customers faced or to the damages they had incurred. Ledger still had not disclosed that its customers had any connection to the Shopify breaches. It had not contacted every customer whose email address had been exposed to hackers. It had not provided sufficient disclosures or resources to assist customers in protecting against rising phishing schemes. Ledger should have announced the Data Breach when it first learned about it – in May 2020, and yet, it instead chose to ignore credible information about the data breach.

ii.    Ledger Users are Bombarded with Digital Phishing Scams

125.    Phishing scammers use emails and text messages to trick people into disclosing personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $57 million to such scams in 2019 alone.[41]

126.    Plaintiffs and other Ledger consumers began receiving a high-volume of phishing scams/emails that were designed to look like emails sent from Ledger. Such emails are intended to trick consumers into giving account information, passwords, and other valuable personal information to scammers. This activity significantly increases the risk of further substantial damages to Plaintiffs and the putative class, including both monetary and identity theft.

127.    In October 2020, for example, a Ledger user reported a phishing attempt by hackers posing as Ledger Support team members and asking Ledger customers to download fake versions of the Ledger Live software. The fake email looked very convincing:

---

[41] *See* Federal Trade Commission. Consumer Information. "How to Recognize and Avoid Phishing Scams". May 2019. https://www.consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams. *See also* Federal Bureau of Investigation. "2019 Internet Crime Report Released". February 11, 2020.  https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120

FOURTH AMENDED CLASS ACTION COMPLAINT



128. Other Ledger users responded to the report by confirming that they had received and been tricked by the fake email. One user reported: "Wow this looked really legit, so much so I used Contact Us form to ask Ledger if it was real. I am normally pretty good at sniffing things like this out – this was by far the most convincing attempt I have ever seen."[42]

129. Plaintiff Seirafi also received similar phishing emails, which appeared to be from Ledger:

---

[42] Benjamin Powers, *"Convincing" Phishing Attack Targets Ledger Hardware Wallet Users,* COINDESK (Oct. 27, 2020), https://www.coindesk.com/phishing-attack-ledger-cryptocurrency-wallet (last accessed Nov. 9, 2023).

FOURTH AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9



10    130.    More phishing emails to Plaintiff Seirafi followed:

27    131.    The hackers behind this fake email were of course armed with Ledger's customer

28   lists and email addresses and, therefore, knew they were targeting Ledger owners. Accordingly, the

FOURTH AMENDED CLASS ACTION COMPLAINT

hackers invested the time and resources to create convincing—and, unfortunately, successful—fakes. Worse yet, because of Ledger's false and misleading statements and omissions regarding the Data Breach, Ledger's customers did not know that their email addresses had been compromised. Ledger thus deprived them of the opportunity to increase their wariness and/or take other precautions to avoid such hacking.

132.    The phishing attempts were not limited to emails. Ledger users began to report the receipt of SMS/text phishing messages, again claiming to be from Ledger, such as the below:



133.    Other hackers used a different phishing attempt, attempting to pose not as Ledger, but as other entities such as the Stellar Development Foundation ("Stellar"), an entity affiliated with the creator of the Stellar Lumen token purchased by Plaintiff Baton. Under this scheme, hackers sent an extremely sophisticated email posing as Stellar and soliciting users such as Baton to "stake" Stellar Lumen tokens—a well-known form of deposit that pays interest.

134.    These emails and websites were effective in part because they looked like Stellar's actual website, using real assets, articles, features, and other content from Stellar's email and

website. In order to stake Lumens, a user would have to transfer the Lumens to a staking address. But the staking "address" provided to deposit the funds was not actually associated with Stellar, and once the funds were transferred, the hackers absconded with it. Critically, this phishing strategy did not require the disclosure of any private keys and increased a victim's trust in the malicious site.

135.    Creating such convincing versions of Stellar's website and emails required a significant amount of effort, which paid off because the hackers knew they could target the emails of likely cryptocurrency holders such as Plaintiff Baton.

iii.    Sim-Swap Attacks on Ledger Users

136.    The data leak can also lead to SIM-swap attacks against the Class.[43]  A SIM-swap attack occurs when the scammer tricks a telephone carrier to porting the victim's phone number to the scammer's SIM card. By doing so, the attacker is able to bypass two-factor authentication accounts, as are used to access cryptocurrency wallets and other important accounts. The type of personal information that has been leaked poses a profound tangible risk of SIM-swap attacks for the Class.

137.    But for Defendant's unlawful conduct, scammers would not have accessed Plaintiffs' and the putative class members' contact information. Defendant's unlawful conduct—including active attempts to conceal the breach and minimize the extent of the breach or damages—has directly and proximately resulted in widespread digital attacks against Plaintiffs and the putative class.

138.    In response to these reports, Ledger should have devoted substantial resources and taken responsibility for being the source of the leak that allowed this precision targeting from hackers. Instead, Ledger continued to tout its security credentials and prevaricated about whether the increased phishing and hacking attempts arose from a data breach.

139.    On November 2, 2020, Ledger refused to acknowledge the Data Breach was the source of the rising attacks on its customers:

As soon as we discovered the data breach on Ledger's website in July

---

[43] Benjamin Powers, *From SIM-Swaps to Home-Invasion Threats, Ledger Leak Has Cascading Consequences,* YAHOO FINANCE (Dec. 23, 2020), https://finance.yahoo.com/news/sim-swaps-home-invasion-threats-213016265.html (last accessed Nov. 9, 2023)

2020, we immediately patched it. Since then, we led two penetration tests with a third-party consultancy to verify and improve the security of our clients' data. For two weeks, some of Ledger's customers have been experiencing continuous phishing scams through various channels, including email and SMS. We've issued several scam alerts through our Twitter, email, and other channels to notify our users during the past two weeks.

The internal task force is investigating these attacks, and as of now, **we can't state that scammers are using Ledger's marketing database**, and therefore, these attacks resulted from July's data breach.[44]

140.  Ledger's efforts to cover up and downplay the actual and potential scale of the Data Breach in the months leading up to its widespread public disclosure caused disastrous harm to its customers. During that time, many crypto-asset investors lost massive sums of money. Had Ledger acted responsibly during this period, much of that loss could have been avoided.

iv.  <u>Ledger Users Received Ransom Threats Demanding Money or Risk Physical Attack</u>

141.  Plaintiff Seirafi and members of the Class have also received ransom demands for monetary payment to prevent physical attacks in their homes.[45] A true and correct representation of a threat Plaintiff Seirafi received by text message is set forth below.

---

[44] *Supra*, n. 42.

[45] *See* COIN TELEGRAPH. "*Ledger data leak: A 'simple mistake' exposed 270K crypto wallet buyers*". (December 24, 2020). https://cointelegraph.com/news/ledger-data-leak-a-simple-mistake-exposed-270k-crypto-wallet-buyers; *see also,* SOMAG NEWS. "*The threat of 'raid home' to a Ledger user.*" (December 22, 2020). https://www.somagnews.com/the-threat-of-raid-home-to-a-ledger-user/

142.    In fact, in a Twitter statement, Ledger corroborated ransom threats like the above, stating that "there has been a new wave of phishing attacks taking place since yesterday, threatening our users physically."[46]

---

[46] TWITTER, https://twitter.com/Ledger/status/1341303521371680769?s=20 (last accessed Nov. 9, 2023).

FOURTH AMENDED CLASS ACTION COMPLAINT

143.    On platforms such as Reddit.com, some class members have also reported emailed threats of home invasion if the class member fails to provide a monetary payment.[47] True and correct representations of some Reddit users' posts regarding ransom threats they have received are set forth below.



---

[47] REDDIT.COM, https://www.reddit.com/r/ledgerwallet/comments/kh8q82/fantastic/; https://www.reddit.com/r/ledgerwallet/comments/kipk68/i_received_a_home_invasion_threat_email/ (last accessed Nov. 9, 2023).

FOURTH AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17    144.    Plaintiffs and many Class members' home addresses are now public online. The

18 Class is a group of people that are especially ripe for ransom demands because the attackers are

19 aware that every member has cryptocurrency assets. This dire situation is analogous to a safe

20 company posting online the name, phone number, email address, and physical address of its

21 customers with safes most likely to contain cash, jewels, and gold bullion. With crypto-assets, the

22 customer is even more vulnerable, because the attackers can force immediate untraceable payments

23 of those assets.

24    145.    But for Defendant's unlawful conduct, such criminals would not have access to the

25 home or other postal addresses of Plaintiffs and the Class. This access has resulted in, at minimum,

26 an invasion of Plaintiffs' and the Class' privacy and can lead to even greater damages, including

27 theft or violent physical attacks.

28

FOURTH AMENDED CLASS ACTION COMPLAINT

v.    Raid of Plaintiff Seirafi's Home as Confirmed by Local Law Enforcement

146.    In addition to the threat of home invasion sent by e-mail to Plaintiff Seirafi and other Class members, on February 13, 2021, the Glendale Police Department received a 911 call by an unknown male stating he had shot his friend. Police were dispatched to Plaintiff's home, setting up a containment zone around the area Plaintiff Seirafi's house is located. While the police determined the call to be a false alarm, Plaintiff Seirafi and Plaintiff Seirafi's parents were frightened by this occurrence. One of the officers to whom Plaintiff Seirafi's counsel spoke confirmed that the caller had a European accent and that the address was traced to a European IP address. Attached as **Exhibit 1** is a true and correct copy of the Glendale Police Department report, No. 21-2025.

147.    Similarly, other Ledger consumers have expressed physical safety concerns. For instance, the founder of DeFi, a company located in London, reportedly moved homes after receiving physical threats, stating that "Ledger's customer base is all over the world. In certain countries the likelihood of an armed robbery could be higher. Ledger does not have the expertise to tell people they are safe."[48]

148.    Plaintiff Seirafi's fear, unfortunately, came to fruition with the raid to his home that took place after his PII information was leaked during the breach.

149.    Plaintiff Deeney and his girlfriend were forced to move in or about January 2021 because of their fear of a home invasion targeting access to Deeney's crypto assets. Prior to the move, it was apparent that individuals were routinely intercepting mail sent to his home to mine further private information about him.

150.    Plaintiffs and the Class remain on edge and alert as they are bombarded with phishing emails and other scams.

151.    For instance, another Reddit user posted that they are worried about their home address being leaked and their family being harmed. A true and correct representation of this user's post is set forth below.

---

[48] Liam Roche, "*Ledger customers exposed as personal data is leaked*." CITY A.M., https://www.cityam.com/ledger-customers-exposed-as-personal-data-is-leaked/ (last visited on March 26, 2021).



152.    Another Reddit user posted a text message threat they received about getting "killed" if they do not pay in cryptocurrency. A true and correct representation of this post is set forth below:



153.    Another Reddit user shared his experience of receiving threats, fearing for his life for the first time if he did not transfer money. This user also stated that after going to the police in

FOURTH AMENDED CLASS ACTION COMPLAINT

his local precinct, he learned that he was the second person who came in that day. A true and correct representation of this post is set forth below:



154.    So long as Plaintiffs and the Class members' PII is accessible on the internet, Plaintiffs and the Class will remain at substantial risk. Ledger has not offered any solutions to remedy the damages to Plaintiffs and the Class. Plaintiffs and the Class members will remain at permanent risk unless they take on the significant time and expense to change all of their personal information that was exposed.

155.    Because of Defendant's unlawful conduct, Plaintiffs and the Class are in constant fear and anxiety resulting from the leak of their PII and consistent barrage of scams and threats.

      vi.    <u>December 2020: In the Face of Widespread Public Disclosure, Ledger Admits to the Scale of the Data Breach</u>

156.    By early December 2020, reports continued to escalate about phishing attempts on Ledger's users. By that time, Ledger's inaction had provided an opportunity for the hackers to increase the sophistication and effectiveness of phishing attempts. For example, some of the phishing attempts referenced breaches and then instructed users, as a security measure, to install fake versions of Ledger Live that asked for their private key information:

44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**:::** Ledger

### December 4th — Important Security Update

Dear client,

We regret to inform you that we have been alerted of a data breach affecting
confidential data belonging to approximately 115,000 of our customers, which
includes personal information, PIN-encrypted private and public keys, as well as the
amount of each cryptocurrency stored inside the wallet.

You're receiving this message because the e-mail address (-) associated with your
wallet has been found to be within the affected compromised data.

**What happened?**

On Wednesday, December 9th 2020, our security researchers detected an
unauthorized third party gaining access to one of the Ledger Live's internal servers.
We immediately fixed the breach and undertook an internal and external
investigation of the situation.

**What we know**

As of today, it's not technically possible to conclusively assess the scope of the
security breach. While there was no clear evidence of user wallets being affected,
due to the nature of the breach, **we have to assume that your cryptocurrency
assets could be compromised.**

**What you should do**

If you're receiving this email, you're affected by the breach. We have no evidence of
user wallets being affected, but it's smart to place security over convenience. In
order to make sure your assets are safe, install the latest version of Ledger Live
and follow the instructions to secure your wallet with a new PIN.

Yours sincerely,
Pascal Gauthier, Ledger CEO

Download latest version

26      157.    Users reported losing significant sums of crypto-assets as a result of such phishing.
27  Plaintiff Baton lost about 150,000 Stellar Lumens, worth approximately $72,000 at today's market
28  prices. Plaintiff Comilla lost all his crypto assets due to a successful phishing attack, 2.6 bitcoin and

8 ether, worth about $115,000 at today's market prices. Plaintiff Vilinger also lost all his crypto assets after the breach, 6.4 bitcoin worth about $225,000 at today's market prices, even though he only connected this Ledger product to the Internet every few months. On information and belief, he was the victim of de-anonymization of his Ledger wallet as set forth above. Plaintiff Deeney lost $145,000 when account manipulation caused by the data breach caused one of his trading accounts to be temporarily frozen, preventing him from closing out a short position on XRP.

158.   The phishing attempts were sufficiently successful—and notorious—so that, through December 20, 2020, the going rate among hackers for the compromised list of Ledger customer data was approximately $100,000.[49]

159.   On December 20, 2020, a hacker published the Ledger customer data online. This publication included the personal information of more than 270,000 Ledger customers. In fact, the contents of the Ledger database were distributed on Raidforums. Raidforums is a database sharing and marketing forum that distributes leaked information online. This leak of 272,000 pieces of detailed PII of consumers is significantly greater than he amount of data estimated by Ledger – of 9,500, an estimate reported by Ledger in July 2020.

160.   Consumers and reporters justly criticized Ledger, stating that the company, in its prior statements, had "vastly underestimated" the Data Breach.[50]

161.   With the data made publicly available for free, many Ledger customers started receiving frightening threats. Ledger customers immediately started receiving spam phone calls, emails, and even death threats. Many of these customers shared their experiences online:

---

[49] @UnderTheBreach, TWITTER (Dec. 20, 2020,),
https://twitter.com/UnderTheBreach/status/1340735356375851009.
[50] Vishal Chawla, Liam Kelly, *Ledger Breach Vastly Underestimated, 270,000 Clients Data Leaked*, CRYPTO BRIEFING (Dec. 21, 2020), https://cryptobriefing.com/ledger-breach-clients-data-leaked/ (last accessed Nov. 9, 2023).

162.    Scammers continue to harass Ledger wallet users, sending counterfeit hardware wallets to Ledger users home addresses. Security researcher Mike Grover investigated the device, which appears to be "a simple flash driver strapped on to the Ledger with the purpose [. . .] of malware delivery."[51] The shipments of counterfeit wallets are accompanied with a letter purportedly signed by Ledger's CEO, claiming to have sent an updated devices for security purposes following the cyberattack.

---

[51] *Inside The Scam: Victims Of Ledger Hack Are Receiving Fake Hardware Wallets,* NASDAQ (June 17, 2021), https://www.nasdaq.com/articles/inside-the-scam:-victims-of-ledger-hack-are-receiving-fake-hardware-wallets-2021-06-17 (last accessed Nov 9, 2023).



163.    Plaintiffs Seirafi, Batton, Comilla, Deeney, and Vilinger like many members of the Class, also received spam emails, phone calls, and texts which, *inter alia,* attempted to phish for additional personal information and sell prurient content. Plaintiffs' PII is now available for other parties to sell and trade, and they continue to risk receiving more harm for the indefinite future. In fact, the U.S. Government Accountability Office found that, "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[52]

---

[52] *Report to Congressional Requester*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 9, 2023).

164.    The breach has also exposed the location of the purchased Products, by allowing access to Plaintiff and the Class's home addresses, which inherently impacts the security of the Products and, in turn, creates actual harm and a threat of future harm.

165.    Ledger's CEO, Pascal Gauthier, has refused to provide compensation to users whose PII information was leaked in the breach arguing that "It's just an online scam to scare you with these tactics."[53]

166.    Ledger knew of and advertised the importance of protecting its customers' personal information, but before and after the Data Breach, it failed to take reasonable steps to protect its customers. Before the breach, Ledger should have regularly deleted or archived customer data or should have otherwise protected that information from online accessibility. After the breach, for over *five* months, Ledger repeatedly failed to provide critical information to its customers, compounding the harm to Plaintiffs and the Class.

vii.    <u>TaskUs Should Have Increased Data Security, and Defendant Should Have Known Its Customers' Data Would Be a Target for Cyberattacks.</u>

167.    In the years immediately preceding the Data Breach, Defendant knew or should have known that its computer systems were a target for cybersecurity attacks.

168.    For example, in April 2020, ZDNET reported that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[54]

169.    Thousands of similar articles, warnings, White Papers, studies, and reports on data security for businesses have publicized the increasing threat of data breaches to companies of all sizes.

---

[53] *Ledger Won't Reimburse Users After Major Data Hack*, DECRYPT (Dec. 21, 2020), https://decrypt.co/52215/ledger-wont-reimburse-users-after-major-data-hack (last accessed Nov. 9, 2023).
[54] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year* (Apr. 30, 2020), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed May 19, 2023).

170.    The FBI, FTC, GAO, U.S. Secret Service, United States Cybersecurity and Infrastructure Security Agency, State Attorney General Offices and many other government and law enforcement agencies, and hundreds of private cybersecurity and threat intelligence firms, have issued warnings that put Defendant on notice, long before the Data Breach, that (1) cybercriminals were targeting large, public companies such as Ledger; (2) cybercriminals were ferociously aggressive in their pursuit of large collections of PII like that in possession of Defendant; (3) cybercriminals were selling large volumes of PII and corporate information on Dark Web portals; and (4) the threats were increasing.

171.    Had Defendant been diligent and responsible, it would have known about and acted upon warnings published in 2017 that 93% of data security breaches were avoidable and the key *avoidable* causes for data security incidents are:

- Lack of a complete risk assessment, including internal, third-party, and cloud-based systems and services;
- Not promptly patching known/public vulnerabilities, and not having a way to process vulnerability reports;
- Misconfigured devices/servers;
- Unencrypted data and/or poor encryption key management and safeguarding;
- Use of end-of-life (and thereby unsupported) devices, operating systems, and applications;
- Employee errors and accidental disclosures — lost data, files, drives, devices, computers, improper disposal;
- Failure to block malicious email; and
- Users succumbing to business email compromise (BEC) and social exploits.[55]

172.    Defendant knew, or should have known, that the PII of individuals is highly valuable to criminals, selling at $40 to $200 for names, addresses, credit histories, and phone numbers.[56] Experian publishes selling prices for individual items of PII and reported that stolen credit card or

---

[55] Gretel Egan, *OTA Report Indicates 93% of Security Breaches Are Preventable*, PROOFPOINT (Feb. 7, 2018), available at https://www.proofpoint.com/us/security-awareness/post/ota-report-indicates-93-security-breaches-are-preventable (last accessed May 19, 2023).

[56] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed May 19, 2023).

debit card numbers can sell for $5 to $10 apiece on the Dark Web.[57] TECHREPUBLIC reported in 2021 that the average price for PII in the U.S. was $8, but there could be a wide range of values for data packages with multiple pieces of data for each individual, such as that stolen from Defendant.[58]

173.   In light of the information and warnings readily available to Defendant before the Data Breach, Defendant had reason to be on guard and to increase data security to avoid an attack.

174.   Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated and published as the result of a cyberattack.

175.   Prior to the Data Breach, Defendant knew or should have known that it should encrypt the sensitive data elements within the PII it collected so that it would be protected against publication and misuse in the event of a data breach.

176.   Data security experts advise that "the vast majority of data breaches are preventable" if companies follow widely-available advice on data security practices, including "continually audit[ing] and reevaluat[ing]" their data security practices; being aware of and working proactively to counter cybercriminals' evolving techniques and approaches; and training and re-training their employees.[59] Upon information and belief, Defendant did not follow this advice.

---

[57] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN CYBERSECURITY (Dec. 6, 2017), available at https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed May 19, 2023).

[58] Jonathan Greig, *How much is your info worth on the Dark Web? For Americans, it's just $8*, TECHREPUBLIC (Feb. 8, 2021), available at https://www.techrepublic.com/article/how-much-is-your-info-worth-on-the-dark-web-for-americans-its-just-8/#:~:text=Personal%20information%20from%20US%20citizens,from%20tech%20research%20firm%20Comparitech. (last accessed May 19, 2023).

[59] Nate Nead, *How To Prevent A Data Breach In Your Company*, FORBES BUSINESS COUNSEL, FORBES (Jul. 30, 2021) available at https://www.forbes.com/sites/forbesbusinesscouncil/2021/07/30/how-to-prevent-a-data-breach-in-your-company/?sh=3828f7b918da (last accessed May 19, 2023).

### I. **Plaintiffs Suffered Damages**

177.   Plaintiffs Seirafi, Baton, Comilla, Deeney, and Vilinger and the Class have suffered damages as a result of the Data Breach. These injuries include, but are not limited to: (i) lost value of PII, a form of property that Ledger obtained from Plaintiffs and Class Members; (ii) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering, and other unauthorized use of their PII; (iii) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) the continued, long term, and certain increased risk that unauthorized persons will access and abuse Plaintiffs' and Class Members' unencrypted PII that is available on the dark web; (v) the continued and certain increased risk that the PII that remains in Ledger's possession is subject to further unauthorized disclosure for so long as Ledger fails to undertake proper measures to protect the PII; (v) invasion of privacy and increased risk to personal safety; (vi) theft of their PII and the resulting loss of privacy rights in that information; and (vii) the price premium associated with the purchase of Ledger wallets.

178.   As a direct and proximate result of the Data Breach and Defendant's failure to protect their PII, Plaintiffs and Class Members have been injured by facing ongoing, imminent, impending threats of identity theft crimes, fraud, scams, social engineering, and other misuses of their PII, as well as an increased risk to their personal safety; ongoing monetary loss and economic harm, including loss of value of their PII; loss of value of privacy and confidentiality of the stolen PII; illegal sales of the compromised PII; mitigation expenses and time spent on credit monitoring; identity theft insurance costs; credit freezes/unfreezes; expense and time spent on initiating fraud alerts and contacting third parties; decreased credit scores; lost work time; and other injuries.

179.   Plaintiff Seirafi has received several spam messages since his email was leaked and his home was raided. Plaintiff Vilinger has received a huge amount of phishing and other scam emails, and his home was targeted in an attempted break-in. Plaintiff Baton had his email, physical address, and phone number compromised. He received regular spam calls, still receives spam emails, and had to change his phone number and where he receives packages—all as a result of this breach. The other Plaintiff suffered similar experiences.

180.    If Ledger had timely disclosed the extent of the Data Breach, some Plaintiffs—sophisticated users with technology backgrounds and wary of scams—would have been on heightened alert and not fallen prey to these scams. Furthermore, others who may not have been as sophisticated in technology could also take steps to protect their privacy rights.

181.    This breach has also exposed the location of the purchased Ledger products, by allowing access to Plaintiffs' and consumers' home addresses, which inherently impacts the security of the products themselves and creates actual harm and a threat of future harm.

182.    Some Plaintiffs remain fearful of intruders due to their physical address being publicly leaked.

183.    These leaks of personal information, in conjunction with the information that they were Ledger customers, have exposed Plaintiffs to additional risks of theft and threat.

184.    In addition, Plaintiff Seirafi and members of the Class would not have purchased Ledger's products at all, or would have paid significantly less for them, had they known of Ledger's lax security practices, unwillingness to promptly and completely disclose data breaches, and failure to provide timely customer service. Furthermore, had they known of Ledger's lax security practices, unhelpful customer service, and failure to report of the extent of the breach and other issues, they would not have provided any valuable PII to Ledger or stored any bitcoins or other forms of digital currency in Ledger wallets.

## V.    **CLASS ALLEGATIONS**

185.    Plaintiff Seirafi brings this Action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following Class:

> All persons residing in California who purchased a Ledger Nano X wallet or a Ledger Nano S wallet directly from Ledger within the limitations period, as may be extended or tolled by any applicable rule of law or equitable doctrine, prior to December 21, 2020.

> Plaintiffs reserve the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

186.    **Numerosity.** The Class is so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

187.    **Ascertainability.** The Class is readily ascertainable and identifiable. They may be identified through contact information that was breached. They may be notified of the pendency of this Action by electronic mail using a form of notice customarily used in class actions.

188.    **Typicality.** Plaintiff Seirafi's claims are typical of the claims of the Class, who are similarly affected by Defendant's respective wrongful conduct in violation of the laws complained of herein.   Plaintiffs do not have any interest that is in conflict with the interests of the Class members.

189.    **Commonality.** Plaintiff Seirafi and the Class sustained damages and/or are entitled to restitution from data exposure caused by Defendant's unlawful conduct and/or for the diminution in value of the products they purchased revealed by Defendant's uniform and unlawful conduct. Common questions of law and fact include the following:

- Whether Defendant's conduct is an unlawful business act or practices within the meaning of Business and Professions Code section 17200, *et seq*.;

- Whether Defendant's conduct is an unfair business act or practice within the meaning of Business and Professions Code section 17200, *et seq.;*

- Whether Defendant represented to Plaintiffs and the Class that they would protect Plaintiffs and the Class members' PII;

- Whether Defendant owed a duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

- Whether Defendant breached a duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

- Whether Class members' PII was accessed, compromised, or stolen in the breach;

- Whether Defendant's conduct caused or resulted in damages to Plaintiffs and the Class;

- Whether Defendant failed to notify the public of the breach in a timely and adequate manner;

- Whether Defendant knew or should have known that its systems were vulnerable to a data breach;

- Whether Defendant adequately addressed the vulnerabilities that allowed for the data breach;

- Whether the precautions that Defendant took and failed to take with respect to the protection of the Class members' data;

- Whether the steps Defendant took and failed to take after learning of the Data Breach and the reasonableness (or rather unreasonableness) of those steps;

- The economic value of Ledger's wallets and services as advertised;

- The actual economic value of Ledger's wallets and services where, contrary to its advertising, Ledger failed to protect customers' personal information from nefarious actors; and

- The restitution to which Class members are entitled as result of the fact that the actual value of the Ledger wallets was far less than the value of the wallets as advertised.

190.    **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. Furthermore, litigating tens of thousands of individual cases will inevitably lead to inconsistent rulings and results, burden the judicial and legal system, and magnify the delay and expense to all the parties and the court system because of multiple trials on the same factual and legal issues.

191.    There will be no difficulty in the management of this Action as a class action.

### FIRST CAUSE OF ACTION

### CALIFORNIA UNFAIR COMPETITION LAW

**Cal. Bus. & Prof. Code § 17200, *et seq.***

**(On Behalf of Plaintiff Seirafi and the Class)**

192.    Plaintiff Seirafi incorporates the preceding paragraphs.

193.    Ledger is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

194.    California's Unfair Competition Law (the "UCL") prohibits "unfair competition," which Ledger violated by engaging in unlawful, unfair, and deceptive business acts and practices.

### a.    "Unfair" Prong

195.    Under California's False Advertising Law, Cal. Bus. & Prof. Code Section 17200, *et seq*., a challenged activity is "unfair" when "any injury it causes outweighs any benefits provide to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

196.    Ledger's conduct as alleged herein does not confer any benefit to consumers.

197.    Ledger's conduct as alleged herein causes injuries to consumers, who do not receive a product consistent with their reasonable expectations.

198.    Ledger's conduct as alleged herein causes injuries to consumers, who paid for a secure system and whose PII was leaked as a result of Ledger's unlawful conduct.

199.    The injuries caused by Ledger's conduct as alleged herein outweigh any benefits.

200.    Ledger's conduct, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes an unfair business practice within the meaning of California Business and Professions Code Section 17200.

201.    Ledger could have furthered its legitimate business interests in ways other than by unfair conduct.

202.    Ledger's conduct threatens consumers by misleadingly advertising their systems as "secure" and exposing consumers' PII to hackers. Ledger's conduct also threatens other companies, large and small, who play by the rules. Ledger's conduct stifles competition and has a negative impact on the marketplace and reduces consumer choice.

203.    All of the conduct alleged herein occurs and continues to occur in Ledger's business. Ledger's wrongful conduct is part of a pattern or generalized course of conduct repeated on approximately thousands of occasions daily.

204.    Ledger failed to implement and maintain reasonable security measures to protect Plaintiff Seirafi and the Class members' personal information from unauthorized disclosure, release,

data breaches, and theft, which was a direct and proximate cause of the Data Breach. Ledger failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff Seirafi and the Class members whose personal information has been compromised.

205.   Ledger's failures to implement and maintain reasonable security measures also were contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures.

206.   Ledger's failures to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Ledger's inadequate security, consumers could not have reasonably avoided the harms that Ledger caused.

207.   Plaintiff Seirafi and the Class members have suffered injury-in-fact and have lost money or property as a result of Defendant's unfair conduct. Among other things, Plaintiff Seirafi and the Class members paid an unwarranted premium for these Products, which they would not have purchased had they known that Ledger has not adhered to the security measures it claimed it would. Specifically, Plaintiff Seirafi and the Class members paid for products and services advertised as secure when Ledger in fact failed to institute adequate security measures and neglected vulnerabilities that led to a data breach. Plaintiff Seirafi and the Class members would not have purchased the Products and services, or would not have given Ledger their PII, had they known that their PII was vulnerable to a data breach. Plaintiff Seirafi and the Class seek and request an order awarding Plaintiff Seirafi and the Class restitution of the money wrongfully acquired by Ledger by means of Ledger's unfair and unlawful practices.

### b.   "Unlawful" Prong

208.   California Business and Professions Code Section 17200, et seq., identifies violations of any state or federal law as "unlawful practices that the unfair competition law makes

1  independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D.
2  Cal. 2008).

3       209.    Ledger's unlawful conduct, as alleged in the preceding paragraphs, violates
4  California Civil Code Section 1750, et seq.

5       210.    Ledger's conduct, as alleged in the preceding paragraphs, is false, deceptive,
6  misleading, and unreasonable and constitutes unlawful conduct.

7       211.    Ledger knew or should have known of its unlawful conduct.

8       212.    In fact, Ledger's failure to implement and maintain reasonable security measures to
9  protect Plaintiff Seirafi and the Class members' personal information from unauthorized disclosure,
10 and identify foreseeable security risks, or even remedy/improve the security risks, were a direct and
11 proximate cause of the Data Breach.

12      213.    Ledger's failures to implement and maintain reasonable security measures also were
13 contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that
14 entities that are trusted with it use appropriate security measures. These policies are reflected in
15 laws, including the FTC Act, 15 U.S.C. § 45, and California's Consumer Records Act, Cal. Civ.
16 Code § 1798.81.5.

17      214.    Ledger has engaged in "unlawful" business practices by violating multiple laws,
18 including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable
19 data security measures) and 1798.82 (requiring timely breach notification); California's Consumers
20 Legal Remedies Act, Cal. Civ. Code § 1780, *et seq.*; the FTC Act, 15 U.S.C. § 45; and California
21 common law.

22 **PRAYER FOR RELIEF**

23     On behalf of himself and the Class, Plaintiff Seirafi request as follows:

24     (a) That the Court determines that this Action may be maintained as a Class Action, that
25         Plaintiff Seirafi be named as Class Representative of the Class, that the undersigned
26         be named as Lead Class Counsel of the Classes, and that notice of this Action be
27         given to Class members;
28

(b) That the Court enter an order declaring that Defendant's actions, as set forth in this Complaint, violate the laws set forth above;

(c) That the Court issue appropriate equitable and any other relief against Defendant to which Plaintiff and the Class is entitled, including but not limited to restitution;

(d) That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

(e) That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

(f) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury for all claims.

Dated: March 7, 2025                      Respectfully submitted,

*/s/ Richard Cipolla*
Richard Cipolla (*pro hac vice*)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th St. Suite 915
New York, NY 10017
Telephone: (646) 970-7509
Email: rcipolla@fnf.law

Velvel Freedman (*pro hac vice*)
**FREEDMAN NORMAND FRIEDLAND LLP**
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Telephone: (305) 971-5943
Email: vel@fnf.law

Ryan J. Clarkson (SBN 257074)
Bahar Sodaify (SBN 289730)
Yana Hart (SBN 306499)
Bryan P. Thompson (SBN 354683)
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050

FOURTH AMENDED CLASS ACTION COMPLAINT

Email: rclarkson@clarksonlawfirm.com
Email: bsodaify@clarksonlawfirm.com
Email: yhart@clarksonlawfirm.com
Email: bthompson@clarksonlawfirm.com

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Email: tschneider@schneiderwallace.com
Email: jkim@schneiderwallace.com
Email: mweiler@schneiderwallace.com

FOURTH AMENDED CLASS ACTION COMPLAINT